**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STAGE STORES, INC., *et al.*,[1] | ) | Case No. 20-32564 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

# DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON MAY 11, 2020, AT 3:00 P.M. (CENTRAL TIME) IN COURTROOM 404, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**RELIEF IS REQUESTED NOT LATER THAN MAY 11, 2020.**

**PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**

**IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER. THE DIAL-IN NUMBER IS +1(832)-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691.**

**PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS WWW.JOIN.ME. PERSONS CONNECTING BY MOBILE DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.**

**ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING". THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGE JONES". THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER. PLEASE COMPLETE THE NAME AND CLICK "NOTIFY". HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING. YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**
**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Stage Stores, Inc. (6900) and Specialty Retailers, Inc. (1900). The Debtors' service address is: 2425 West Loop South, Houston, Texas 77027.

**3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;**
**4) SELECTING "VIEW HOME PAGE" FOR JUDGE DAVID R. JONES;**
**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**
**6) SELECT IN RE STAGE STORES, INC., *ET AL.* FROM THE LIST OF ELECTRONIC APPEARANCE LINKS; AND**
**7) AFTER SELECTING IN RE STAGE STORES, INC., *ET AL.* FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

**SUBMITTING YOUR APPEARANCE ELECTRONICALLY IN ADVANCE OF THE HEARING WILL NEGATE THE NEED TO MAKE AN APPEARANCE ON THE RECORD AT THE HEARING.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):[2]

## Relief Requested

1. The Debtors seek entry of an order, substantially in the form attached hereto, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "Bankruptcy Code"),

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of Elaine D. Crowley, Chief Restructuring Officer of Stage Stores Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

**Background**[3]

5. The Debtors are apparel, accessories, cosmetics, footwear, and home goods retailers that operate department stores under the Bealls, Goody's, Palais Royal, Peebles, and Stage brands and off-price stores under the Gordmans brand. The Debtors have approximately 14,694 employees, who operate 700 stores across forty-two states. The Debtors' department stores predominately serve small towns and rural communities, and the Debtors' off-price stores are mostly located in mid-sized Midwest markets. The Debtors' 2019 revenue was approximately $1.6 billion.

6. On May 10, 2020, (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[3] As more fully described in the First Day Declaration, as a result of the global pandemic caused by COVID-19, the majority of the Debtors' employees remain on furlough as of the date hereof and certain of the Debtors' accounting and reporting systems are not fully up to date. All estimated figures utilized in this Motion are based on the best currently-available information.

**Debtors' Workforce**[4]

7. As of the Petition Date, the Debtors have approximately 14,694 employees, including approximately 4,314 full-time employees (the "Full-Time Employees"),[5] approximately 7,602 part-time employees (the "Part-Time Employees"), and approximately 2,778 seasonal employees (the "Seasonal Employees" and, together with the Full-Time Employees and Part-Time Employees, the "Employees"), most of whom are involved in the day-to-day operations at the Debtors' stores. As a result of the furlough currently in place, only approximately 87 employees are currently working, but furloughed employees are receiving benefits. Debtor Specialty Retailer, Inc. employs all of the Employees. The Employees perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases. In many instances, the Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, who possess unique skills and experience, or who have developed relationships with vendors that are essential to the Debtors' business. These individuals are not easily replaced. Without the continued, uninterrupted services of the Employees, the Debtors' business operations will be halted and the administration of their estates will be substantially impaired.

8. In addition to the Employees, the Debtors retain specialized individuals as independent contractors ("Independent Contractors") from time to time to complete discrete projects or to fulfill certain duties, including, among other things, sales, photography and creative services, web services, as well as temporary workers (the "Temporary Staff") from several staffing

---

4 Capitalized terms used and not otherwise defined in this section shall have the meanings given to them in this Motion or the First Day Declaration, as applicable.

5 Full-Time Employees are generally Hourly Employees (as defined below) scheduled to work 30 hours or more per week or Salaried Employees (as defined below).

agencies ("Staffing Agencies") who supplement the Debtors' workforce in the absence of Employee labor. The Debtors currently retain several Independent Contractors and Temporary Staff. The exact number fluctuates based on the Debtors' specific needs at any given time. The Independent Contractors and Temporary Staff are a critical supplement to the Employees.

9. The vast majority of the Employees, Independent Contractors, and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and to support their families. These workers will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing them with health and other benefits. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Compensation and Benefits**

10. To minimize the personal hardship the Employees could suffer if prepetition Employee-related obligations are not paid when due or as expected and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors seek authority to pay and honor certain prepetition claims, if any, relating to, among other things, wages, salaries, and other compensation, employee discounts, expense reimbursement, payroll obligations and withholding of federal and state taxes, (including garnishments, Employees' share of insurance premiums, taxes, and other amounts withheld), payroll processing, discretionary severance policies, health benefits (including vision and dental coverage), insurance programs, workers' compensation benefits, short and long-term disability coverage, retirement savings plans, time-off policies and certain other benefits that the Debtors have historically provided in the ordinary course

(collectively, the "Compensation and Benefits"); and (b) pay all costs incidental to the Compensation and Benefits.[6]

11. Subject to Court approval, the Debtors intend to continue their applicable prepetition Compensation and Benefits in the ordinary course. The Debtors estimate that their average bi-weekly obligations on account of Compensation and Benefits will range between approximately $3,000,000 and $8,000,000 during the course of these chapter 11 cases. Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, or discontinue any of their Compensation and Benefits, and to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

## I. Compensation, Incentives, and Employee Discounts.

### A. Wage Obligations.

12. In the ordinary course of business, the Debtors incur obligations to their Employees for base salary (the "Wage Obligations"). Prior to the furlough, the Debtors paid approximately 13,524 Employees, (approximately 92% of their workforce) on an hourly basis (the "Hourly Employees"), and paid salaries to the remaining 1,170 Employees (the "Salaried Employees"). The Debtors pay Employees on a bi-weekly basis.

13. The Debtors' average bi-weekly Wage Obligations, including salaries, wages, and related compensation, has historically been approximately $8,000,000. The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employees' bank accounts or other electronic means.

[6] For the avoidance of doubt, the Debtors are not seeking authority to make any payments that would be subject to section 503(c) of the Bankruptcy Code, but reserve all rights to do so at a later date.

14. As of the Petition Date, the Debtors estimate that they owe approximately $150,000 on account of unpaid Employee salaries and wages earned by Employees prior to the Petition Date (the "Unpaid Compensation"), substantially all of which will come due within the first twenty-one days of these chapter 11 cases. As described above, loss of the Unpaid Compensation could cause the Employees to experience substantial financial hardship. In light of the benefits that the Employees will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such hardship.

15. Accordingly, by this Motion the Debtors seek authority to pay their Employees any Unpaid Compensation in the ordinary course of business consistent with past practice, and to continue honoring Wage Obligations in the ordinary course of business.

**B. Independent Contractors and Staffing Agencies.**

16. The Debtors generally retain and pay Independent Contractors directly. The Debtors generally retain and pay Temporary Staff through Staffing Agencies. Historically, the Debtors have paid approximately $20,000 to Independent Contractors on a monthly basis and $300,500 to Staffing Agencies on a monthly basis. As of the Petition Date, the Debtors owe approximately $500,000 to Independent Contractors and/or Staffing Agencies on account of services rendered and reimbursable expenses.

17. The Debtors seek authority, but not direction, to pay such obligations subject to availability in their Budget.

**C. Bonus Incentives.**

18. In addition to the Debtors' Wage Obligations, approximately 405 Employees are entitled to certain bonuses (the "Bonuses") in addition to their base salary or wages.[7] The amount due to any one Employee as a Bonus depends on various performance-based metrics, measured over a one-year performance period, which vary in accordance with such Employee's position and targets such as store or regional performance, sales, shrinkage reduction, and/or company performance as established by the primary executive of such Employee's function.

19. The Bonuses are paid on a quarterly or annual basis, as applicable, and are processed as part of the Debtors' normal payroll. The Bonuses form an important and integral part of many of the Employees' overall compensation packages and motivate the Employees to maintain customer goodwill and efficiently pursue the sale of the Debtors' inventory—both of which inure to the benefit of the Debtors' estates. Additionally, some of the Employees rely on the Bonuses for their daily living expenses such that failure to pay the Bonuses would impose undue hardship.

20. As of the Petition Date, the Debtors estimate that they owe approximately $53,000 on account of accrued but unpaid Bonuses (the "Unpaid Bonuses"). The Debtors seek authority, but not direction, to pay Unpaid Bonuses subject to availability in their Budget.

[7] Bonuses are typically offered to Employees in positions to include store managers, district managers, regional managers, buyers, planners, directors, asset protection associates, asset protection managers, directors, and above.

**D. Retention Incentives.**

21. In the ordinary course of business, the Debtors offer certain Employees a cash incentive if the Employee remains continuously employed by the Debtors through a specified date, subject to specified terms (the "Retention Incentives"). The Retention Incentives are typically not directly tied to company performance. The Retention Incentives are an important tool to incentivize experienced Employees to continue their employment with the Debtors. As of the Petition Date, the Debtors estimate that approximately $400,000 is accrued on account of the Retention Incentives (the "Unpaid Retention Incentives"). The Debtors seek authority, but not direction, to pay Unpaid Bonuses subject to availability in their Budget.

**E. Private Label Credit Card Incentives.**

22. Additionally, in the ordinary course of business, the Debtors offer their Employees an opportunity to earn certain incentives based on achieving targets related to opening new customer accounts for the Debtors' private label credit card (the "PLCC Incentives"). The Debtors typically pay the PLCC Incentives as part of payroll. The PLCC Incentives are comparable to commission, and are available to Employees that interface directly with customers. On average, approximately 5,494 sales associates receive remuneration on account of the PLCC Incentives on a monthly basis. The amount the Debtors award an Employee on account of the PLCC Incentives varies between $0 and $5 per account opened, with such amounts increasing depending on the amount of new accounts attributable to the Employee in a given month. The PLCC Incentives form an integral part of certain Employees' compensation packages and incentivize such Employees to strive for superior performance in relation to the acquisition of new accounts for the Debtors' private label credit card.

23. The Debtors seek authority, but not direction, to pay any unpaid PLCC Incentives subject to availability in their Budget.

**F. Employee Discounts.**

24. In the ordinary course of business, the Debtors offer their Employees and such Employees' Eligible Dependents (as defined below) a discount (the "Employee Discount") on items purchased from the Debtors either in person or online. Employees hired on or after November 24, 2019 are eligible for a 20% discount applied toward their total purchase. Employees hired before November 24, 2019 are eligible for a discount based on the number of years they have been employed by the Debtors.[8] Further, certain former Employees are eligible to maintain their Employee Discount for a lifetime as of their termination date (the "Lifetime Discount") upon meeting certain criteria. The Employee Discount and Lifetime Discount not only improve Employee morale, but they also ensure that the Debtors secure their employees as customers, providing a significant source of revenue given that the Debtors employ approximately 14,694 individuals.

25. Accordingly, the Debtors seek authority, but not direction, to continue offering and honoring the Employee Discount and Lifetime Discount in the ordinary course of business.

**G. Employee Recognition Platform.**

26. In the ordinary course of business, the Debtors maintain a web based recognition platform called "Bravo!" through MotivAction (the "Recognition Platform"). The Recognition Platform is a point based system pursuant to which Employees may earn points for various reasons to include attaining recognition for exceptional performance or achieving a milestone service anniversary. Employees may redeem their points at MotivAction's online store for items such as

---

8 For employees hired before November 24, 2019: Employees with up to two years of employment are eligible for a 20% discount, Employees with two to five years of employment are eligible for a 25% discount, and employees with five or more years of employment are eligible for a 30% discount.

merchandise, e-gift cards that can be used at Stage or Gordmans stores, and travel. Points under the Recognition Platform are treated as wages upon redemption, and single redemptions greater than 300 points are taxable. The Recognition Platform provides the Debtors with another important tool to promote core values and desired behaviors across their workforce, motivate Employees, and build a positive workplace.

27. At this time, the Debtors are not seeking authorization to continue the Employee Recognition Program on a postpetition basis.

## II. Expense Reimbursement and Job Related Expenses.

### A. Reimbursable Expenses.

28. The Debtors have policies whereby the Debtors reimburse Employees, in the ordinary course of business for reasonable approved expenses incurred in connection with the performance of their assigned duties (the "Reimbursable Expenses"). The Reimbursable Expenses include travel-related expenses such as meal allowances, air and ground transportation, lodging, car mileage allowances, and other business-related expenses in accordance with the Debtors' policies. Employees apply for reimbursement of the Reimbursable Expenses by submitting an expense report to the Debtors either directly or through a third-party expense reporting application called Abacus. Once the Debtors have determined that the charges are for allowable reimbursable business expenses, they reimburse the Employees for these expenses.

29. The Debtors' inability to reimburse Employees on account of the Reimbursable Expenses could impose hardship on those Employees who otherwise incurred obligations for the Debtors' benefit. As of the Petition Date, the Debtors estimate that they do not owe any amounts on account of Reimbursable Expenses.

30. Employees incur the Reimbursable Expenses as business expenses on the Debtors' behalf with the understanding that such expenses will be reimbursed. Accordingly, to avoid

harming such Employees and to protect against the risk that these Employees may become personally liable for such expenses, the Debtors request authority, but not direction, to pay any prepetition amounts on account of the Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course of business.

**B. Company Purchase Cards.**

31. The Debtors also provide certain Employees having a reoccurring need to make business-related purchases with corporate credit cards (the "Purchase Cards"). The Purchase Cards have historically been provided through Bank of America or American Express. The Purchase Cards are directly billed to the Employees, and the Debtors reimburse the Employees for these bills as a Reimbursable Expense. Currently, approximately 40 to 65 Purchase Cards are used by Employees. In the twelve months prior to the Petition Date the Debtors paid approximately $250,000 on account of the Purchase Cards on a monthly basis. As of the Petition Date, approximately $10,000 is outstanding on the Purchasing Card accounts.

32. Given the importance of certain Employees' ability to use the Purchase Cards, the Debtors request authority, but not direction, to continue utilizing and making payments on account of the Purchase Cards in the ordinary course of business.

**C. Business Vehicle Program.**

33. In the ordinary course of business, the Debtors lease certain vehicles (the "Business Vehicles") for use in support of their operations (the "Business Vehicle Program"). The Debtors maintain a relationship with Enterprise Rent-A-Car ("Enterprise") under which the Debtors lease Business Vehicles in the ordinary course of business for use by approved Employees based on the requirements of their job function. The Debtors estimate that as of the Petition Date there are approximately 62 vehicles under lease assigned for use to the Debtors' Employees. In the twelve months prior to the Petition Date, the Debtors paid approximately $135,000 on account

of the Business Vehicles on a monthly basis. As of the Petition Date, the Debtors estimate that they owe approximately $330,000 on account of the Business Vehicles. Given that many of the Debtors Employees oversee large geographic areas and are required to travel in the performance of their job functions, the Debtors request the authority, but not direction, to continue the Business Vehicle Program in the ordinary course of business.

**D. Vehicle Allowances.**

34. The Debtors provide certain Employees in the positions of senior vice president ("SVP") and executive vice president ("EVP") an annual vehicle allowance (the "Vehicle Allowances") of $6,000 for SVPs and $12,000 for EVPs. SVPs and EVPs frequently use their personal vehicles in the performance of their job functions. As such, the Vehicle Allowances present an efficient method of compensating these Employees for vehicle maintenance, wear and tear, insurance, and other costs borne by these Employees as a function of the use of their personal vehicles for the Debtors' benefit. The Debtors estimate that they provide a Vehicle Allowance to approximately 12 Employees. As of the Petition Date, the Debtors estimate that they owe approximately $62,300 on account of the Vehicle Allowances. Accordingly, the Debtors request authority, but not direction, to continue the Vehicle Allowances in the ordinary course of business.

**E. Cell Phone Program.**

35. The Debtors have historically paid for cellular service for certain Employees based on the requirements of their job functions (the "Cell Phone Program"). Employees eligible for the Cell Phone Program are generally responsible for purchasing their own device, unless an EVP or above deems otherwise. As part of the Cellphone Program, the Debtors open and pay for the account associated with the phone through Verizon or AT&T. Additionally, upon separation, the Employee has the option to assume financial responsibility for the phone number associated with

the device using a personal account which the Employee maintains. As of the Petition Date, the Debtors estimate that they provide cell phones to 285 Employees. Further, the Debtors estimate that the total amount of accrued but unpaid obligations on account of the Cellphone Program is $30,000. Given that some Employees rely on the Cell Phone Program, and that the sudden loss of a phone with little notice would harm such Employees and impair their ability to perform their job functions, the Debtors request authority, but not direction, to continue paying expenses associated with the Cell Phone Program.

## III. Payroll Withholding and Processing.

### A. Withholding Obligations and Payroll Taxes.

36. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions. The Debtors also deduct other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans discussed below, such as an Employee's share of healthcare benefits and insurance premiums, contributions under voluntary benefit programs, 401(k) retirement contributions, college savings plans, legally ordered deductions, and other miscellaneous deductions (collectively, the "Deductions"), which are forwarded to the appropriate third-party recipients.

37. In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes,

the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time as the Employees' payroll checks are disbursed.

38. As of the Petition Date, the Debtors estimate that they owe $40,000 on account of the Deductions and the Payroll Taxes (collectively, the "Withholding Obligations"). By this Motion, the Debtors seek authority, but not direction, to pay any unpaid Withholding Obligations and Payroll Taxes and to continue to honor the Withholding Obligations and Payroll Taxes in the ordinary course of business.

**B. Payroll Processing.**

39. The Debtors use ADP, a third-party provider to support payroll processing, payroll tax calculations and filings, and other payroll-related services (the "Payroll Processing Services"). The Debtors calculate the earnings attributable as a function of payroll. The Debtors then provide this information to ADP for processing. ADP is integral to the Debtors' payroll process and facilitates accurate and fair compensation based on time worked, performance, and incentives earned.

40. The substantial majority of the Debtors' compensation obligations are satisfied by direct deposit through an electronic transfer of funds directly to each applicable bank account, with the balance of obligations satisfied by check. ADP is responsible for serving as the Debtors' payroll and federal Form W-2 tax processing vendor, as well as completing the majority of the Debtors' payroll tax filings, including federal, state, and local tax filings.

41. The Debtors pay ADP approximately $25,000 per month for Payroll Processing Services. As of the Petition Date, the Debtors estimate that they owe approximately $20,000 in the aggregate to ADP for Payroll Processing Services (the "Unpaid Payroll Processing Fees"), substantially all of which will come due within the first twenty-one days of these chapter 11 cases.

By this Motion, the Debtors seek authority, but not direction, to pay the Unpaid Payroll Processing Fees and to continue payroll processing in the ordinary course of business.

**IV. Discretionary Employee Severance.**

42. The Debtors maintain a, non-binding approval policy whereby the Debtors, at their discretion, may, from time to time, offer certain Employees a certain number of weeks of severance benefits, or a lump sum, depending on the terms of such agreements (the "Discretionary Severance Agreements"). Payments made under the Discretionary Severance Agreements are typically provided in exchange for entry into release and confidentiality agreements, pursuant to which the Employees typically release any claims against the Debtors and agree to, among other things, not disclose confidential information, solicit employees, or disparage the Debtors for a certain period of time. Payments under the Discretionary Severance Agreements are not offered to Employees terminated for cause. As a matter of policy, the Debtors do not enter into Discretionary Severance Agreements without prior written approval of the board of directors to pay an Employee an amount, which is equal to or greater than: (a) the annual base salary or wages received by the employee as of the last day the employee was employed by any of the Debtors; or (b) the base salary or wages paid to the employee in the trailing twelve months immediately preceding the last day the employee was employed by the Debtors. The Debtors are unaware of any existing Discretionary Severance Agreements that would have required such approval by the board of directors. Additionally, payments under the Discretionary Severance Agreements are generally subject to certain limits or "caps" based on the Employees' seniority and length of employment, with hourly-Employees subject to a cap equal to four weeks of pay and senior executives subject to a cap equal to twenty weeks of base pay. The Debtors do not seek authority in this Motion to pay any obligations under the Discretionary Severance Agreements to any "insider" (as the term

is defined in section 101(31) of the Bankruptcy Code) outside the confines imposed by section 503(c)(2) of the Bankruptcy Code.

43. As of the Petition Date, 168 former non-insider Employees are receiving payments under a Discretionary Severance Agreement for services rendered before the Petition Date. Approximately $370,000 remains outstanding in respect to the Discretionary Severance Agreements ("Unpaid Severance"). The Debtors seek authority, but not direction, to pay and honor the Unpaid Severance owed to each eligible Employee and to continue honoring any obligations under Discretionary Severance Agreements as of the Petition Date on a postpetition basis in the ordinary course of business. The Debtors seek authority, but not direction, to pay any Unpaid Severance subject to availability in their Budget.[9]

## V. Employee Benefits Programs.

44. The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, health and prescription drug, dental, vision, flexible benefits plans, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, retirement plans, tuition assistance, college savings plans, and other employee benefit programs as described below (collectively, the "Employee Benefits Programs"). The Employee Benefits Programs are, in each case, available to Employees depending on factors such as their status as Full-Time Employees or Part-Time Employees, their seniority with the Debtors, and the length of their employment (the "Eligible Employees"). Certain benefits are also available to specified dependents ("Eligible Dependents") of

[9] Under the current circumstances, the Debtors do not anticipate making any payments under the Discretionary Severance Agreements. However, the Debtors reserve the right to, and seek authority to, make such payments as long as such payments are provided for in the Budget and otherwise consistent with section 503(c) of the Bankruptcy Code.

Eligible Employees to include spouses or civil union partners, dependent children under the age of twenty-six, and handicapped or disabled dependents (as determined by insurance providers).

45. The Employee Benefits Programs confer substantial benefits to Eligible Employees and Eligible Dependents, who rely on many such programs for their physical and financial wellbeing. Failure to continue the Employee Benefits Programs could cause Employees to experience severe hardship. In light of the substantial benefit the Employees have provided and will continue to provide to the Debtors' estates, the Debtors wish to avoid imposing such a hardship. Accordingly, by this Motion, the Debtors seek authority, but not direction, to: (a) pay any unpaid amounts due with respect to the Employee Benefits Programs and (b) continue to provide the Employee Benefits Programs in the ordinary course of business. As of the Petition Date, the Debtors estimate that they owe approximately $168,806 on account of the Employee Benefits Programs, substantially all of which will come due within the first twenty-one days of these chapter 11 cases.

46. The Debtors believe they are authorized to continue the Employee Benefits Programs in the ordinary course of business; however, out of an abundance of caution the Debtors seek authority to continue the Employee Benefits Programs on a postpetition basis in the ordinary course of business (including any prepetition amounts that may be outstanding) consistent with their prepetition practices.

47. The Employee Benefits Programs are described in greater detail below.

**A. Health Benefit Plans.**

48. The Debtors offer self-insured medical coverage to Full-Time Employees through Blue Cross Blue Shield of Texas ("BCBSTX") as a third-party administrator. Eligible Employees may elect one of three health plan options (the "Value Plan", the "Base Plan" or the "Enhanced Plan" and collectively the "Health Benefit Plans") based on their needs. All Health Benefit Plans

include prescription drug coverage through Prime Therapeutics in affiliation with BCBSTX. Approximately 2,800 Employees are enrolled in the Health Benefit Plans, under which Eligible Employees and their Eligible Dependents receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness coaching. Pursuant to the Health Benefit Plans, Employees generally pay their co-pays and premiums through amounts withheld from their paychecks to the Debtors. The Debtors hold these funds and pay claims less than $1,000,000 out of pocket. Claims in excess of $1,000,000 are covered through stop-loss insurance provided through BCBSTX. Additionally, the Debtors fully reimburse certain Employees in positions of EVP and above for co-pays, premiums, and claims through BeniComp. The Debtors typically pay fees to BCBSTX on a monthly basis and typically pay claims on a weekly basis through automatic clearing house transfer ("ACH"). As of the Petition Date, the Debtors have incurred a monthly average of approximately $2,000,000 on account of the Health Benefit Plans, of which approximately $650,000 is funded by deductions from participating Eligible Employees.

**B. Health Savings Accounts.**

49. Eligible Employees enrolled in the Value Plan are provided the opportunity to contribute a portion of their pre-tax compensation to a health savings account to pay for unexpected health care expenses (the "HSA") with the Debtors also contributing certain amounts. The HSAs are administered by Wage Works.

50. The Debtors generally contribute $500 for individual coverage and $1,000 for other coverage levels. These amounts are pro-rated based on the "effective date" of the Value Plan. Eligible Employees may choose to contribute up to $3,550 for individual coverage and up to $7,100 for other coverage tiers minus the Debtors' contribution on an annual basis. The Debtors forward these contributions, in addition to the administrative fees paid by the Debtors, to Wage Works on behalf of the applicable Employees on an as needed basis. In 2019, the Debtors paid

approximately $5,391 on account of the HSAs. As of the Petition Date, the Debtors estimate that they owe approximately $16,806 in administrative fees to Wage Works on account of the HSAs and FSAs (as defined below).

**C. Flexible Spending Accounts.**

51. Eligible Employees enrolled in the Base Plan or Enhanced Plan are provided the opportunity to contribute a portion of their pre-tax compensation to either, or both, of two flexible spending accounts, the healthcare FSA and/or the dependent care FSA (collectively, the "FSAs"), to pay for eligible, out-of-pocket health care, and dependent care costs and expenses.

52. Other than administrative fees, the FSAs are funded primarily by Employee contributions. Eligible Employees may choose to contribute between $130 and $2,750 annually to the healthcare FSA or between $130 and $5,000 for the dependent care FSA coverage tiers minus the Debtors' contribution on an annual basis. The Debtors forward these contributions, in addition to certain administrative fees paid by the Debtors, to Wage Works on behalf of the applicable Employees on an as needed basis. In 2019, the Debtors paid approximately $40,206 on account of the FSAs.

**D. Dental Plan.**

53. The Debtors offer their Employees the option to participate in a self-insured dental plan (the "Dental Plan") administered by Delta Dental ("Delta"). The Debtors typically pay fees to Delta on a monthly basis via check and typically pay claims on a weekly basis through ACH. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of the Dental Plan (including employer contributions and employee contributions).

**E. Vision Plan.**

54. The Debtors also offer Eligible Employees the option to participate in a vision plan (the "Vision Plan") administered by Vision Service Plan ("VSP"). The Vision Plan is funded

entirely through Employee deductions passed through to VSP, with no amounts owed by the Debtors. As of the Petition Date, the Debtors believe they owe approximately $10,000 of employee deductibles on account of the Vision Plan.

**F. Workers' Compensation and Other Insurance Programs.**

**1. Workers' Compensation.**

55. The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which they have Employees (collectively, and as described herein, the "Workers' Compensation Program"). The Debtors maintain commercial insurance policies for workers' compensation and employer's liability (collectively, the "Workers' Compensation Policies"). The Debtors' main Workers Compensation Policies are provided by Arch Insurance Company and Arch Indemnity Insurance Company (the "Arch Policies"). The Debtors also participate in the state workers' compensation funds for the States of Ohio, North Dakota, and Wyoming. CareWorks is the third party administrator for claims arising from these states, while ESIS serves as the third party administrator for claims arising outside of Ohio, North Dakota and Wyoming. The Debtors pay an annual premium of approximately $365,000 to maintain the Workers' Compensation Program.

56. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program, without regard to whether such liabilities were outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are approximately 171 open claims under the Workers' Compensation Policies. As of the Petition Date, the Debtors estimate that there is approximately $2,175,778 in remaining liability on account of the Workers' Compensation Programs. Certain of the Debtors' Workers' Compensation Programs may change postpetition in the ordinary course due to changes in applicable laws and regulations and the

Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authority to continue the Workers' Compensation Programs postpetition, including the authority to modify current policies and practices that become necessary.

**2. Life Insurance, Accidental Death and Dismemberment Insurance, and Disability Benefits.**

57. The Debtors provide Eligible Employees with certain insurance policies through Dearborn National Insurance Company to include company-paid basic life insurance, additional life insurance, dependent life insurance, accidental death and dismemberment insurance, and company-paid short-term and long-term disability benefits (collectively, the "Employee Insurance Coverage"). As of the Petition Date, the Debtors believe they owe approximately $50,000 on account of the Employee Insurance Coverage (including employer contributions, employee contributions, and administrative costs).

- Company-paid Basic Life Insurance: The Debtors provide basic life insurance for all Full-Time Employees in amounts equal to up to one year of such Employee's annual base salary rounded to the nearest thousand dollars. Such coverage is reduced by 35% when the Employee reaches age 65 and by 50% of the original pre-65 amount when the employee reaches age 70.

- Additional Life Insurance: Full-Time Employees may apply for additional life insurance coverage ("Additional Life Insurance"). Full-Time Employees who qualify, may pay a specified premium per-paycheck to provide additional life insurance not to exceed $1.2 million of coverage when combined with their Company-Paid Basic Life Insurance. Such coverage is reduced by 35% when the Employee reaches age 65 and by 50% of the original pre-65 amount when the employee reaches age 70.

- Dependent Insurance: Full-Time Employees enrolled in Additional Life Insurance coverage for themselves, may also elect dependent life insurance for their spouse and/or child(ren) (up to age 26, unless disabled). Such Employees may choose from five plan options and pay a specified premium deducted from each paycheck after taxes.

- Accidental Death & Dismemberment Insurance: Full-time Employees may elect accidental death & dismemberment insurance

for themselves and eligible family members. Such Employees pay a premium, which is deducted from each paycheck after taxes. Such coverage is reduced by 35% when the covered person reaches age 65 and by 50% of the original pre-65 amount when the employee reaches age 70.

- Company-Paid Short-Term Disability: The Debtors provide certain Full-Time Employees with short-term disability benefits ("Short-Term Disability") that continue such Employee's income if the Employee is unable to work because of illness (including maternity) or non-work-related injury. The Debtors pay for the full cost of coverage. The continuation of an Eligible Employee's pay during Short-Term Disability varies based on such Eligible Employee's years of employment with the Debtors and the number of weeks such Eligible Employee is absent on Short-Term Disability.

- Company-Paid Long-Term Disability: All salaried Employees, store managers and grandfathered associates[10] who regularly work a minimum of 30 hours per week become eligible for long-term disability benefits on the first of the month following 30 days of continuous employment. The benefit amount is 50% of such Employee's monthly income excluding bonuses and overtime pay. The Debtors pay the full cost of this coverage.

### 3. Voluntary Coverage Programs.

58. The Debtors offer Eligible Employees certain voluntary insurance coverage through Unum Group, to include accident insurance, whole life insurance, critical illness insurance, hospital indemnity insurance, legal and identity theft services, and pet insurance (collectively, the "Voluntary Coverage Programs"). These amounts are paid by electing Employees through sums deducted from their paycheck with no amounts owed directly by the Debtors. As of the Petition Date, the Debtors believe they owe approximately $12,000 of employee deductibles on account of the Voluntary Coverage Programs.

[10] Grandfathered associates are those Employees who were hourly assistant store managers or salaried senior assistant store managers as of November 26, 2016. Grandfathered associates can lose grandfathered status if they change to part-time status or move into a role that is not eligible for coverage under the plan.

**G. Retirement Savings Plans.**

59. The Debtors maintain a retirement savings plan intended to satisfy the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"); all Employees over the age of twenty-one who have completed at least sixty days of employment with the Debtors may participate in the 401(k) Plan. Additionally, certain highly compensated individuals (as defined by the Internal Revenue Service) may participate in the Debtors' non-qualified deferred compensation plans (the "NQDC Plans" and, together with the 401(k) Plan, the "Retirement Savings Plans"). The Debtors maintain two NQDC Plans, one for Employees at the level of SVP and above and one for Employees at the level of Group Vice President ("GVP") or below. The Debtors estimate that there are approximately 3,023 active Employees who currently participate in the Retirement Savings Plans.

60. The NQDC Plans provide certain participating Employees with the opportunity to defer payment of certain earned compensation amounts, thereby deferring the associated income tax obligations until a future date. The Debtors maintain a rabbi trust for purposes of funding the future payment of such obligations. The assets in the rabbi trust are subject to substantial restrictions, including, without limitation, that in the event of the Debtors' insolvency, the trustee must preserve such assets for the benefit of the Debtors' general creditors. In the absence of these restrictions, eligible Employees would have been required to include the amount of any contributions to the rabbi trust on their behalf (as well as any interest or other earnings accrued on such contributed amounts) in their gross taxable income in the year in which the contributions were made and/or the interest was accrued. See *McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 572-73, 575 (5th Cir. 2000). Many of the participants in the NQDC Plans have substantial plan balances (*i.e.*, the average plan balance is approximately $250,000) that constitute their

primary or only source of retirement savings, and these same participants are vital to the Debtors' ability to conduct an orderly wind-down.

61. All of the Retirement Savings Plans are administered by Fidelity Investments, and Fidelity Investments also serves as the trustee for the rabbi trust supporting the NQDC Plans.

62. The Retirement Savings Plans allow for automatic pre-tax salary deductions up to the limits set forth by the Internal Revenue Code, and each month, the Debtors withhold approximately $525,000 (in the aggregate) from participating Employees' paychecks on account of their Retirement Savings Plan contributions. The Debtors match (i) 50% of the first 6% of an Employee's contributions to the 401(k) Plan, (ii) 50% of the first 6% of an Employee's deferrals (that are in excess of the 401(k) Plan limit) to the NQDC Plan for GVPs and below and (iii) 100% of the first 10% of an Employee's base salary and bonus deferrals to the NQDC Plan for SVPs and above. The Debtors' annual cost to maintain the Retirement Savings Plans is approximately $10,000 (excluding the cost associated with the Debtors' matching contributions). As of the Petition Date, the Debtors believe they owe approximately $5,300 on account of employer matching contributions to the Retirement Savings Plans, and the Debtors hold in trust approximately $97,600,000 for obligations under the Retirement Savings Plans (the "Retirement Savings Plan Amounts").

63. The Debtors seek authority, but not direction, to (a) continue the Retirement Savings Plans in the ordinary course of business on a postpetition basis, (b) remit all Retirement Savings Plan Amounts in the ordinary course of business and (c) access the funds in the rabbi trust for purposes of honoring their obligations under the NQDC Plans in the ordinary course of business.

**H. WARN Obligations.**

64. On May 8, 2020, the Debtors issued conditional notices pursuant to the Worker Adjustment and Retraining Notification Act (the "WARN Act"). These notices were issued to certain employees and governmental entities eligible to receive them in accordance with the WARN Act in relation to a potential closure of the Debtors' headquarters and distribution centers. The notices provided that, in the event the Debtors are not able to procure additional liquidity, employees at those locations faced a termination of their employment on July 8, 2020 or within 14 days thereafter.

65. Unless an exception applies, the WARN Act generally requires 60 days' advance notice in the event of a qualified mass layoff or plant closing, or payment of wages and benefits in lieu of such notice. Although the notices were issued 60 days before the anticipated terminations, certain employees may not receive a full 60 days of pay and benefits before termination, including due to pending furloughs. The notices issued by the Debtors claimed each possible exception under the WARN Act, including due to the unforeseeable impact of COVID-19: "faltering company," "unforeseeable business circumstances," and "natural disaster." The Debtors' position is that these exceptions relieve it from any obligation to provide additional pay or benefits in the event that employees do not receive pay and benefits for a full 60 days after receiving the notice. In the event these exceptions are challenged and are found not to apply, any claim to recover wages and benefits under the WARN Act should be considered prepetition because the Debtors sent notice prior to their bankruptcy filings. *See In re Powermate Holding Corp.*, 394 B.R. 765 (Bankr. D. Del. 2008).

**I. Additional Benefit Programs.**

66. In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of ancillary benefits, including a 529 College Savings Plan, tuition assistance

and other employee programs (the "Additional Benefit Programs"). The aggregate cost to the Debtors of the Additional Benefit Programs is $15,000. The Debtors seek authority, but not direction, to pay any amounts due with respect to these programs and policies and to continue them in the ordinary course of business on a postpetition basis.

### J. Executive Reimbursement.

67. The Debtors reimburse executive Employees in positions of EVP or above for tax preparation and certain other personal financial services not to exceed $5,000 for EVPs or $10,000 for the Debtors' chief executive officer. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 in the aggregate on account of such reimbursements. The Debtors seek authority, but not direction, to reimburse any such unpaid amounts and to continue such reimbursements on a postpetition basis.

## VI. Time-Off.

68. In the ordinary course of business the Debtors maintain certain time off policies (the "Time Off-Policies") which the debtors may alter or modify from time to time. The Time-Off policies provide an important benefit to the Employees and their families and help maintain the wellbeing and motivation of the Debtors' workforce. Further, failure to offer certain of the Time-Off Policies could expose the Debtors to liability under state, federal, or other applicable law. As such, the Debtors seek authority, but not direction, to continue offering the Time-Off Policies in the ordinary course of business on a postpetition basis. Additionally, the Debtors seek authority, but not direction, to honor any cash and non-cash obligations owed on account of any Time-Off Policies in the ordinary course of business.

69. The Time-Off policies are described below:

**A. Paid Time Off**

70. The Debtors offer paid time off ("PTO") to all Full-Time Employees to provide such Employees with the flexibility to plan for vacation, personal and family illness, doctors' appointments, school, and other activities. In general, Full-Time Employees are allocated PTO based on years of service with the Debtors, with Employees having five or fewer years of employment eligible for seventeen days (up to 136 hours) of PTO and Employees having twenty or more years of employment eligible for up to thirty-two days (up to 256 hours) of PTO subject to certain requirements and exceptions.[11]

**B. Holiday Policy.**

71. Upon their date of hire Full-Time Employees become eligible for compensation associated with six company-recognized national holidays New Year's Day, Memorial Day, Independence Day (Fourth of July), Labor Day, Thanksgiving Day, Christmas Day. Employees must work the last scheduled day before the holiday and the first scheduled day after the holiday to receive holiday pay. Hourly-Employees who work on a company-recognized holiday are typically paid 1.5 times their base pay rate and granted an additional day off. Salaried Employees who work on a company-recognized holiday are typically granted an additional day off.

**C. Bereavement.**

72. Full-Time Employees are eligible for up to three-days of paid bereavement leave ("Bereavement") as of their date of hire in the unfortunate event that they experience the death of

[11] For example, new hires and newly converted Full-Time Employees are subject to a 90-day waiting period before any PTO is available. Full-Time Employees hired between August 1 and September 30 will receive a maximum of 5 days (up to 40 hours). Full-Time Employees hired on or after October 1 will not receive any PTO until the new fiscal year or 90 days, whichever is later. If an Employee leaves the Debtors, unused PTO time will not be paid at the time of termination unless required by state law. In addition, PTO may not be used after an Employee gives notice of his/her resignation if the use of PTO would result in the associate working fewer than two weeks.

an immediate family member. Immediate family members include, spouses, children (including step-children), Parents (including step-parents and in-laws), siblings (including step-siblings and half-siblings), grandparents, and grandchildren. If an employee is on PTO at the time such Employee experiences the death of a family member, such Employee can request that the PTO be recoded as Bereavement time and it will be paid as such.

**D. Jury Duty.**

73. The Debtors compensate Employees who are required to serve on a jury ("Jury-Duty") for scheduled hours missed while serving. Employees on Jury Duty must provide appropriate documentation to their supervisor and return to scheduled work upon release from Jury Duty.

**E. Family Medical Leave Act.**

74. The Debtors provide Eligible Employees with unpaid job-protected leaves of absence in accordance with the Family Medical Leave Act (FMLA). Employees are eligible for FMLA if they have worked for the Debtors for at least twelve months and have completed at least 1,250 hours in those previous twelve months. Qualifying events for FMLA include the birth and care of a newborn child of the Employee, placement of a child for adoption or foster care, care for a spouse, child or parent with a serious health condition, and emergencies arising out of the fact that the associate's spouse, son, daughter or parent is on active duty or called to active duty status as a member of the National Guard or Reserves in support of a contingency operation.

**VII. Postpetition Director Compensation.**

75. The Debtors maintain a board of directors comprising five non-Employees directors and two Employee directors (each, a "Director"). Each Director typically receives approximately $172,000 annually in total direct compensation (the "Direct Compensation") in his or her capacity as a Director. Additionally, certain Directors may receive additional compensation for additional

responsibilities such as committee or board chairmanship (the "Leadership Retainer" together with the Direct Compensation the "Director Compensation"). Leadership Retainers typically range between $12,500 and $125,500 depending on the applicable Director's additional duties.

76. The Debtors last paid Director Compensation in March, and the Debtors are not paying Director Compensation during the furlough. Therefore the Debtors do not owe any amounts on account of the Director Compensation as of the Petition Date. The Debtors request the authority, but not direction, to pay the Director Compensation as it comes due in the ordinary course of business.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations.

#### A. Certain of the Compensation and Benefits Are Entitled to Priority Treatment.

77. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* U.S.C. § 1129(a)(9)(B) To the extent that an Employee receives no more than the statutory prescribed limit of $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

**B. Payment of Certain Compensation and Benefits Is Required by Law.**

78. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

79. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

**II. Payment of the Compensation and Benefits and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.**

80. Courts generally acknowledge that it is appropriate to authorize the payment of prepetition obligations in appropriate circumstances. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc.*, (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

81. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

82. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section

363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

83. Section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). Courts apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation).

84. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("The payment by a debtor-in-possession of prepetition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit

the payment of certain prepetition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment.”).

85. Here, the requested relief amply satisfies the foregoing standards. Along with their customers, the Employees are the Debtors’ most important asset. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors’ estates and their creditors by allowing the Debtors’ business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors’ competitors. Such a development would deplete the Debtors’ workforce, thereby hindering the Debtors’ ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors’ ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition Compensation and Benefits.

86. The majority of Employees rely exclusively on the Compensation and Benefits to satisfy their daily living expenses. Many of the Debtors’ Employees expect and require their wages to arrive on a timely basis. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto expeditiously. Failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors’ businesses. Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the Health and Welfare Coverage and Benefits described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain

health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

87. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Compensation and Benefits and to continue the Compensation and Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

## III. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.

88. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

89. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on the financial well-being of Employees and Employee morale and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

90. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Compensation and Benefits obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Emergency Consideration**

91. Pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm," and Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay may hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

92. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

93. Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any

particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

94. The Debtors will provide notice of this Motion to: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the fifty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to Wells Fargo Bank, National Association, as Agent under the Debtors' prepetition credit agreement; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors request that the Court enter an order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
May 10, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
jwertz@jw.com
kpeguero@jw.com
vpolnick@jw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Neil E. Herman (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
neil.herman@kirkland.com

-and-

Joshua M. Altman (*pro hac* vice pending)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: josh.altman@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on May 10, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh