*Solicitation Version*

> THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STAGE STORES, INC., *et al.*,[1] | ) Case No. 20-32564 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DISCLOSURE STATEMENT FOR THE AMENDED JOINT
## CHAPTER 11 PLAN OF STAGE STORES, INC. AND SPECIALTY RETAILERS, INC.

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email:    mcavenaugh@jw.com
          jwertz@jw.com
          kpeguero@jw.com
          vpolnick@jw.com

*Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Neil E. Herman (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:    joshua.sussberg@kirkland.com
          neil.herman@kirkland.com

-and-

Joshua M. Altman (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:    josh.altman@kirkland.com

*Co-Counsel to the Debtors
and Debtors in Possession*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Stage Stores, Inc. (6900) and Specialty Retailers, Inc. (1900).  The Debtors' service address is:  2425 West Loop South, Houston, Texas 77027.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]**

---

**THE DEADLINE TO VOTE ON THE PLAN IS**
[July 31], 2020 at 4:00 p.m. (prevailing Central Time)

**THE DEADLINE TO OBJECT TO THE PLAN IS**
[July 31], 2020 at 4:00 p.m. (prevailing Central Time)

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *AMENDED JOINT CHAPTER 11 PLAN OF STAGE STORES, INC. AND SPECIALTY RETAILERS, INC.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.[3]

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS AND/OR ARRANGEMENTS THAT WILL IMPLEMENT THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL

---

[2]   Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

[3]   The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their business, including, without limitation, Stage Stores, Inc. This Disclosure Statement may omit the registered trademark (®), trademark (™), and other similar symbols for such trademarks named herein.

INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

IF CONFIRMATION OR EFFECTIVENESS OF THE PLAN DOES NOT OCCUR, THE PLAN SHALL ACT AS A MOTION SEEKING A DISMISSAL OF THE CHAPTER 11 CASES IN ACCORDANCE WITH THE BANKRUPTCY CODE.

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN

THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF SUCCESS OR THE DEBTORS' ABILITY TO SATISFY ALL CLAIMS TO BE PAID UNDER THE PLAN. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT NEED TO BE CONSIDERED. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; AND ADVERSE TAX CHANGES.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................................1

II.     PRELIMINARY STATEMENT ..............................................................................................1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ..................................................................................................................................4

        A.      What is chapter 11? ...........................................................................................................4
        B.      Why are the Debtors sending me this Disclosure Statement? ..............................................4
        C.      Am I entitled to vote on the Plan? .....................................................................................4
        D.      What will I receive from the Debtors if the Plan is consummated? .....................................5
        E.      How are Administrative Claims treated under the Plan?......................................................8
        F.      How are Priority Claims treated under the Plan?.................................................................8
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ........8
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?"...............................................................................................................8
        I.      What are the sources of Cash and other consideration required to fund the Plan?..............9
        J.      Is there potential litigation related to Confirmation of the Plan?........................................9
        K.      Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of
                Allowed Unsecured Claims under the Plan? .......................................................................9
        L.      Will there be releases and exculpation granted to parties in interest as part of the Plan? .10
        M.      What is the deadline to vote on the Plan? .........................................................................10
        N.      How do I vote for or against the Plan? .............................................................................10
        O.      What are the consequences of filing a late proof of claim?...............................................11
        P.      Why is the Bankruptcy Court holding a Confirmation Hearing? ......................................11
        Q.      When is the Confirmation Hearing set to occur?...............................................................11
        R.      What is the purpose of the Confirmation Hearing? ...........................................................11
        S.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ......................................................................................................................11
        T.      Do the Debtors recommend voting in favor of the Plan? ..................................................12

IV.     THE DEBTORS' PLAN ..........................................................................................................12

        A.      The Plan ...........................................................................................................................12
        B.      Release of Liens ...............................................................................................................19
        C.      Releases by the Debtors ....................................................................................................19
        D.      Third-Party Release ..........................................................................................................20
        E.      Exculpation ......................................................................................................................21
        F.      Injunction .........................................................................................................................22
        G.      Preservation of Setoff Rights ...........................................................................................22
        H.      Securities and Exchange Commission Considerations ......................................................22
        I.      Independent Investigation .................................................................................................23

V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.23

        A.      Stage Stores' Corporate History .......................................................................................23
        B.      The Debtors' Business Operations.....................................................................................24
        C.      Critical Components of the Debtors' Cost Structure ........................................................26
        D.      The Debtors' Prepetition Capital Structure .......................................................................27

VI.     PREPETITION RESTRUCTURING EFFORTS...................................................................28

        A.      Landlord Engagement .......................................................................................................28

|  | B. | The Need for Liquidity | 28 |

| VII. | | **EVENTS LEADING TO THE CHAPTER 11 FILINGS** | **28** |
| | A. | Challenging Operating Environment | 29 |
| | B. | Underperforming Department Stores | 29 |
| | C. | Supply Chain and Borrowing Base Challenges | 29 |
| | D. | COVID-19 and Lease Challenges | 29 |

| VIII. | | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** | **30** |
| | A. | First Day Relief | 30 |
| | B. | Other Procedural and Administrative Motions | 30 |
| | C. | Approval of the Use of Cash Collateral | 30 |
| | D. | Schedules and Statements | 31 |
| | E. | Appointment of Official Committee | 31 |
| | F. | Litigation Matters | 31 |
| | G. | Rejection and Assumption of Executory Contracts and Unexpired Leases | 31 |
| | H. | The Wind-Down Debtors, and Wind Down | 32 |
| | I. | Recommendation to Support Plan | 33 |

| IX. | | **RISK FACTORS** | **33** |
| | A. | Bankruptcy Law Considerations | 33 |
| | B. | Risks Related to the Debtors' Businesses | 36 |

| X. | | **SOLICITATION AND VOTING PROCEDURES** | **37** |
| | A. | Holders of Claims Entitled to Vote on the Plan | 38 |
| | B. | Voting Record Date | 38 |
| | C. | Voting on the Plan | 38 |
| | D. | Ballots Not Counted | 39 |

| XI. | | **CONFIRMATION OF THE PLAN** | **39** |
| | A. | Requirements for Confirmation of the Plan | 39 |
| | B. | Best Interests of Creditors | 40 |
| | C. | Feasibility | 40 |
| | D. | Acceptance by Impaired Classes | 40 |
| | E. | Confirmation without Acceptance by All Impaired Classes | 41 |

| XII. | | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | **42** |
| | A. | Introduction | 42 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors | 43 |
| | C. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S. Holders of Allowed Claims Entitled to Vote | 43 |
| | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-U.S. Holders of Claims | 46 |
| | E. | Information Reporting and Backup Withholding | 48 |

| XIII. | | **RECOMMENDATION** | **49** |

**EXHIBITS**

EXHIBIT A     Chapter 11 Plan

EXHIBIT B     Wind Down Budget

## I.     INTRODUCTION

Stage Stores, Inc. ("Stage") and Specialty Retailers, Inc., ("Specialty Retailers") as debtors and debtors in possession (collectively, the "Debtors" or "Stage Stores"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests (each as defined in the Plan) in the Debtors in connection with the solicitation of votes for acceptance of the *Amended Joint Chapter 11 Plan of Stage Stores, Inc. and Specialty Retailers, Inc.* [Docket No. 296], dated May 21, 2020 (as amended, supplemented, or modified from time to time, the "Plan").[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the other Debtors.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS UNDER THE CIRCUMSTANCES.   THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.     PRELIMINARY STATEMENT

Stage Stores is a leading retailer of trend-right, moderately priced, name-brand apparel, accessories, cosmetics, footwear, and home goods in small and mid-size markets across the United States. In late 2018 and early 2019, Stage Stores tested and began to implement a new business model in an effort to position the company for future success.  More specifically, Stage Stores began to transition all of its stores from a specialty department store model operating under the Bealls, Palais Royal, Peebles, Stage, and Goody's brands to an off-price business model under the Gordmans brand name.  Based on the encouraging results of 82 store transitions completed before September 2019, Stage Stores believed that the off-price model would buffer the company against the general shift in consumer behavior away from brick-and-mortar retail and help alleviate liquidity challenges.[2]  While the Debtors missed their fourth quarter holiday forecasts, the market nevertheless supported the changes:  Stage Stores stock (NYSE: SSI) rose from lows of under a dollar in January 2019 to a high of $9.50 in early 2020, including a 13% jump after Stage Stores announced its plans.[3]

But Stage Stores' liquidity issues intensified in early 2020. The Company sought third-party refinancing and sale options as it also negotiated with vendors and landlords for incremental relief. And then COVID-19 happened. In this new reality, absent a third-party investor or purchaser, Stage Stores did not have the liquidity to implement its plan and continue operations.  To preserve liquidity, the Debtors closed their stores and furloughed approximately 14,694 employees on March 27, 2020.  The Debtors did not make rent payments on the majority of their 734 leases from March through and including the Petition Date, resulting in approximately $31 million in past due rent.  Many landlords sent the Debtors notices of

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

[2]   The Debtors converted nine department stores to the off-price model in 2018 and, based on the success of those conversions, announced plans to convert approximately 220 department stores to off-price stores by the middle of 2020.  Throughout 2019, the off-price stores continued to exceed expectations.

[3]   *See* Stage Stores stock jumps 13% after announcing off-price store conversion, 40 store closures Sept. 17, 2019. Available Online.   https://www.marketwatch.com/story/stage-stores-stock-jumps-13-after-announcing-off-price-store-conversion-40-store-closures-2019-09-17.

default and began to take other actions, including locking the Debtors out of their stores, commencing (or threatening to commence) eviction proceedings, or resorting to other "self-help" remedies. Combined with zero revenue and uncertainty associated with consumer demand in the coming months, Stage Stores, like so many others, was in the middle of a perfect storm.

Accordingly, the Debtors commenced these chapter 11 cases on May 10, 2020 to stabilize their store base and operations. The Debtors continue to believe that there is value in their brands and operations as a going-concern, and will continue to explore any potential transactions in the coming weeks.

In connection with the Debtors' sale efforts, on the Petition Date, the Debtors filed a *Notice of Sale Process* [Docket No. 19] (the "Sale Notice"), outlining the process by which the Debtors will be conducting the sale of their assets. The Sale Notice provides that any party that wishes to submit a bid to purchase the Debtors' assets as a going concern (either for all stores and brands or a subset of stores and brands) must submit a bid as described on the Sale Notice. The Debtors, in consultation with the Agent and the Committee, will consider any and all bids for any and all assets. To the extent the Debtors receive multiple bids for the same Assets, they may conduct an auction. If the Debtors determine to consummate any bid, the Debtors will seek approval of the transaction on an emergency basis.

Also on the Petition Date, the Debtors filed a motion seeking to wind down the company's operations [Docket No. 27] (the "Wind-Down Motion"). The Court entered an order approving the Wind-Down Motion [Docket No. 144] (the "Wind-Down Order"). Pursuant to the Wind-Down Order, the Court: (a) authorized the Debtors to Wind-Down their operations; (b) authorized the Debtors to utilize the services of Gordon Brothers to conduct the Wind-Down; (c) approved procedures to conduct the store closings, (d) approved modifications to certain customer programs, including the Debtors' return policy and acceptance of gift cards; (e) authorized the sale or disposition of the Store Closing Assets free and clear of all liens, claims, and encumbrances; and (f) approved the abandonment of certain burdensome Merchandise, FF&E, and personal property.

As of May 10, 2020, the Debtors reported approximately $10.3 million of available cash. As set forth in that certain cash management motion [Docket No. 17], Debtor Specialty Retailers holds all of the bank accounts in its name. The Debtors estimate, based on current assumptions (including those set forth in Article III.D hereof), that the Distributable Cash as of the Effective Date will be between $10 million and $20 million.

For more information on the Debtors' financial statements and information, please refer to the monthly operating reports filed by the Debtors from time to time with the Bankruptcy Court.

The Plan contemplates that a Plan Administrator will be appointed on the Effective Date to finalize the wind down the Debtors' estates, monetize any remaining assets, and make distributions to creditors in accordance with the Plan. The Plan Administrator will be identified closer to the Effective Date as part of the Plan Supplement. Upon completion of the Wind Down, the Plan Administrator will take steps to dissolve any remaining Debtor entities.

Under the terms of the Plan, Holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and in exchange for, such Holders' Claims and Interests:

- Holders of Allowed Other Secured Claims will receive: (a) payment in full in Cash of such Holder's Allowed Other Secured Claim, (b) the collateral securing such Holder's Allowed Other Secured Claim, and (c) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

- Each Holder of an Allowed Other Priority Claim shall receive: (a) payment in full in Cash of such Holder's Allowed Other Priority Claim or (b) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

- Except as set forth herein, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, to the extent not already indefeasibly paid in full in cash, each Holder thereof shall receive: (a) its Pro Rata share of the Prepetition Secured Claims Recovery until paid in full, (b) to the extent the Prepetition Secured Claims Recovery is insufficient to pay all Prepetition Secured Claims in full, the residual unliquidated Prepetition Collateral and any available Postpetition Collateral, or (c) such other treatment as may be agreed upon by the Prepetition Agents and the Debtors.

- On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery until paid in full.

- Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will be canceled and released.

- Each Intercompany Interest shall be settled, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests.

- Each Allowed Existing Interest in the Debtors shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Interests in the Debtors shall be entitled to any recovery or distribution under the Plan on account of such Existing Interests.

- Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

In addition, Holders of Administrative Claims, Priority Tax Claims, Other Priority Claims, Prepetition Secured Claims, and General Unsecured Claims that vote to accept or do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan or do not object to the releases contained in the Plan shall be deemed "Released Parties" and will receive a release from the Debtors. The compromises and settlements to be implemented pursuant to the Plan preserve value by enabling the Debtors to swiftly emerge from chapter 11.

The Plan provides the best available alternative for the Debtors' estates and creditor recoveries. If the Debtors' business were liquidated in a chapter 7 process, store closing processes likely would be stopped in their tracks, forcing locations to go dark and terminate employees until a trustee could turn the lights back on. Even then, important employees with institutional knowledge will be gone for good, leaving an extremely large and complex liquidation to be managed by new hires unfamiliar with the Debtors' business.

The needless loss of value to creditors and the Debtors' estates would be enormous. Creditors would receive lower recoveries in chapter 7 because the Debtors' estates necessarily would bear additional costs associated with transitioning to chapter 7, retaining a chapter 7 trustee, counsel, and advisors, and administering a chapter 7 process.

If confirmation or effectiveness of the Plan does not occur, the Plan shall act as a motion seeking a dismissal of the chapter 11 cases in accordance with the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in these chapter 11 cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all Holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Kurtzman Carson Consultants LLC, the Debtors' notice, claims, and balloting agent (the "Notice, Claims, and Balloting Agent") actually receives such Ballots by the Voting Deadline, *i.e.*, [July 31], 2020 at 4:00 p.m. prevailing Central Time. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing. If the Bankruptcy Court does not confirm the Plan or the Plan is not consummated for any reason, the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.

III. **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

A. **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B. **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C. **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of

the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "<u>Class</u>."  Each Class's respective voting status is set forth below:

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Prepetition Secured Claims | Impaired[4] | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Interests in Stage Stores | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.     What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent less favorable treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

---

[4]    Current projections anticipate the payment of such Claims in full.  However, due to the uncertainty associated with store closings and the local, state, and national responses to COVID-19, the Debtors are soliciting such Holders in the event they do not receive payment in full.

| SUMMARY OF EXPECTED RECOVERIES[5] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| 1 | Other Secured Claims | Each Holder of an Allowed Other Secured Claim shall receive:<br><br>(i)  payment in full in Cash of such Holder's Allowed Other Secured Claim;<br><br>(ii) the collateral securing such Holder's Allowed Other Secured Claim; or<br><br>(iii) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | Less than $1 million | Unimpaired |
| 2 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive:<br><br>(i) payment in full in Cash of such Holder's Allowed Other Priority Claim; or<br><br>(ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | Less than $1 million | Unimpaired |
| 3 | Prepetition Secured Claims | Except as set forth herein, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Prepetition Secured Claim, to the extent not already indefeasibly paid in full in cash, each Holder thereof shall receive:<br><br>(i)  its Pro Rata share of the Prepetition Secured Claims Recovery, until paid in full;<br><br>(ii) to the extent the Distributable Cash is insufficient to pay all Prepetition Secured Claims in full, the residual unliquidated Prepetition Collateral and any available Postpetition Collateral; or<br><br>(iii) such other treatment as may be agreed upon by the Prepetition Agents and the Debtors.<br><br>If such Holder votes to accept the Plan, such Holder shall be deemed a Released Party for all | $232.1 million | Impaired |

---

[5]     The Plan contemplates distributions being made pursuant to a waterfall priority scheme in accordance with the Bankruptcy Code. Thus, the recoveries for each class listed in this chart depend entirely on the extent to which classes senior to them are satisfied.

| SUMMARY OF EXPECTED RECOVERIES[5] | | | | |
|---|---|---|---|---|
| Class | Claim / Equity Interest | Treatment of Claim / Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | purposes hereunder. | | |
| 4 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall: <br><br> (i)   receive its Pro Rata share of the General Unsecured Claims Recovery until paid in full. | $342 million | Less than 6% |
| 5 | Intercompany Claims | Each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will be canceled and released. | N/A | N/A |
| 6 | Intercompany Interests | Each Intercompany Interest shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Intercompany Interests will not receive any distribution on account of such Intercompany Interests. | N/A | N/A |
| 7 | Existing Interests | Each Allowed Existing Interest shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Interests shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | N/A |
| 8 | Section 510(b) Claims[6] | Allowed Section 510(b) Claims, if any, shall be canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |

---

[6]   The Debtors do not anticipate that there will be any Allowed Section 510(b) Claims, but have included Class 8 Section 510(b) Claims as part of the Plan out of an abundance of caution.

### E.      How are Administrative Claims treated under the Plan?

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### F.      How are Priority Claims treated under the Plan?

Each Holder of an Allowed Other Priority Claim shall receive:  (a) payment in full in Cash of such Holder's Allowed Other Priority Claim or (b) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

### G.      What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to implement the Restructuring Transactions and the Plan shall serve as a motion to dismiss these chapter 11 cases in accordance with the Bankruptcy Code.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors".

The Debtors believe that liquidation under chapter 7 of the Bankruptcy—a very possible event if the Plan is not confirmed—would result in significantly reduced creditor recoveries as compared to the Plan.  Smaller recoveries would result because of, among other things, significant additional administrative expenses associated with the appointment of a chapter 7 trustee and administration of a chapter 7 liquidation, including additional claims that may be entitled to administrative priority, and potential disputes with the Purchasers in relation to the Debtors' obligations under the Purchase Agreement (if any) or related documents.

### H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.   After Confirmation of the Plan by the Bankruptcy Court, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article XI of this Disclosure Statement entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to

"substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (c) commencement of distributions under the Plan.

I.      **What are the sources of Cash and other consideration required to fund the Plan?**

The Wind-Down Debtors, through the Plan Administrator, will fund distributions under the Plan with Cash available on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including the remaining proceeds of any Sales after giving effect to the Wind Down, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. The Debtors have also offered to grant certain releases to Holders of Claims that vote to accept or do not object to the Plan.

J.      **Is there potential litigation related to Confirmation of the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation. In addition, if it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

K.      **Will the final amount of Allowed Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate General Unsecured Claims that would be Allowed is up to approximately $342 million. Except to the extent there is any Distributable Cash in excess of amounts necessary to satisfy all Allowed Other Priority Claims, if any, and after giving effect to the Administrative and Priority Claims Recovery and Other Priority Claims Recovery, each Allowed General Unsecured Claim against the Debtors shall receive no distribution on account of such Allowed General Unsecured Claim; however, Holders of General Unsecured Claims will receive their pro rata share of any such excess Distributable Cash. In addition, Holders of General Unsecured Claims that vote to accept the Plan shall be deemed a Released Party for all purposes under the Plan. Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

The projected amount of Allowed General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages. Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Allowed General Unsecured Claims. To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date. Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by

the Debtors herein, the value of recoveries to Holders of Allowed General Unsecured Claims could change as well, and such changes could be material.

Finally, the Debtors, the Plan Administrator, the Committee, or other parties in interest may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**L.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Importantly, (a) all Holders of Claims or Interests that vote to accept or are presumed to accept the Plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, and (c) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form or ballot indicating that they opt not to grant the releases provided in the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and settled all Claims and Causes of Action against the Debtors and the Released Parties.  The releases are an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.20 of this Disclosure Statement, entitled "Releases."

**M.      What is the deadline to vote on the Plan?**

The Voting Deadline is [July 31], 2020 at 4:00 p.m. (prevailing Central Time).

**N.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Notice, Claims, and Balloting Agent **on or before the Voting Deadline, *i.e.*, [July 31], 2020 at 4:00 p.m. prevailing Central Time**.  *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**O.     What are the consequences of filing a late proof of claim?**

Pursuant to the terms of the Bar Date Order, if Proofs of Claim are not received by the Claims and Noticing Agent on or before the Claims Bar Date or the Governmental Bar Date, as applicable, and except in the case of exceptions explicitly set forth in the Bar Date Order, the Holders of the underlying Claims shall be barred from asserting such claims against the Debtors and precluded from voting on any plans of reorganization filed in these chapter 11 cases and/or receiving distributions from the Debtors on account of such claims in these chapter 11 cases.  The Debtors or the Wind Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims not received by the Claims and Noticing Agent before the Bar Date or the Governmental Bar Date, as applicable, and not subject to an exception as set forth above; *provided* that the Debtors will provide notice to such Claimant at the address or email address on the Proof of Claim, to the extent such information is provided, informing such Claimant that its Claim will be removed from the Claims register as a result of being untimely filed.

.

**P.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.     When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [August 7], 2020 at [●] [a/p].m (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than [July 31], 2020 at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.     What is the purpose of the Confirmation Hearing?**

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

**S.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice, Claims, and Balloting Agent; Kurtzman Carson Consultants LLC; via one of the following methods:

> *By regular mail, hand delivery, or overnight mail at:*
> Kurtzman Carson Consultants LLC
> Re: Stage Stores, Inc., *et al.*
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, CA 90245

*By electronic mail at:*
 www.kccllc.net/stagestores/inquiry

*By telephone (toll free) at*:
888-647-1732 (toll-free) or 310-751-2622 (international)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice, Claims, and Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Notice, Claims, and Balloting Agent at http://www.kccllc.net/stagestores (free of charge) or the Bankruptcy Court's website at http://ecf.txsb.uscourts.gov (for a fee).

**T.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**IV.      THE DEBTORS' PLAN**

As discussed in Article III herein, the Plan contemplates, among other things, distributions to Holders of Allowed Claims in accordance with its terms, followed by the Wind Down of the Debtors' operations.

Under the Plan, the remaining assets of the Debtors will be distributed to creditors in accordance with the waterfall priority payment scheme outlined therein and in accordance with the Bankruptcy Code. Furthermore, the Plan Administrator will take over as of the Effective Date and oversee the distributions under the Plan. Notably, the Plan contains certain releases for the Debtors and certain third-parties, as well as exculpation provisions as further discussed therein.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Plan includes the following key terms, among others described herein and therein:

**A.      The Plan**

**1.   Restructuring Transactions**

On the Effective Date, to the extent not inconsistent with the Sale Transaction (if any), the applicable Debtors or the Wind-Down Debtors shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described in the Plan, including, as applicable, consummation of the Sale Transaction (if any), the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions,

dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:   (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan; *provided*, *however*, that no such restructuring transactions may violate the terms of any Unexpired Lease assumed by the Debtors.

### 2. Sale Transaction; Sources of Consideration for Plan Distributions

The Plan Administrator and/or the Wind-Down Debtors will fund distributions under the Plan with Cash held on the Effective Date by or for the benefit of the Debtors or Wind-Down Debtors, including any proceeds of any Restructuring or Sale Transaction after giving effect to the Wind Down contemplated by the Wind-Down Order, and the proceeds of any non-Cash assets held by the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan or in the Purchase Agreement (if any) on the Effective Date, any Cause of Action not settled, released, enjoined or excupated under Article VIII of the Plan on or prior to the Effective Date shall vest in the Wind-Down Debtors and shall be subject to administration by the Plan Administrator.  The Debtors have also offered to grant certain releases to Holder of Claims that vote to accept or do not object to the Plan.

### 3. Wind-Down Debtors

At least one Debtor shall continue in existence after the Effective Date as the Wind-Down Debtors for purposes of:   (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor(s) after the Effective Date and after consummation of any Sale Transaction, (2) performing their obligations under any Purchase Agreement[7] (if any) or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers (if any), (3) resolving any Disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Effective Date, any Estate non-Cash assets remaining shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates and Consummating the Plan.  Such assets shall be held free and clear of all liens, claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  Any distributions to be made under the Plan from such assets shall be made by the Plan

---

[7] "*Purchase Agreement*" means the agreement(s) between the Debtors and a third-party Purchaser memorializing any Sale Transaction.

Administrator or its designee. The Wind-Down Debtors and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

### 4.  Plan Administrator

The Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions in the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of the Wind-Down Debtors shall be deemed to have resigned, solely in their capacities as such, and a representative of the Plan Administrator shall be appointed as the sole director and sole officer of the Wind-Down Debtors and shall succeed to the powers of the Wind-Down Debtors' directors and officers. From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors. For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtors or the Plan Administrator, as applicable, to continue the employment any former director or officer, including pursuant to the Purchase Agreement (if any) or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers.

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to make distributions thereunder and wind down the businesses and affairs of the Debtors and the Wind-Down Debtors, as applicable, including: (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors remaining after consummation of a Sale Transaction (if any); (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (3) making distributions as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (9) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

### 5.  Appointment of the Plan Administrator

The Plan Administrator shall be appointed by agreement of the Debtors and the Committee (and if the Prepetition Secured Claims are not paid in full by the Effective Date, the Prepetition Agents). The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

14

### 6. Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 7. Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement.

### 8. Funding of Reserves, including the Post Effective Date Reserve

The Plan Administrator shall be authorized to establish and fund each of the Reserves for the purposes of such Reserves as set forth herein. The Post Effective Date Reserve will be funded with an amount of Cash it deems necessary or appropriate to satisfy future costs and expenses necessary for the implementation of the Plan and discharge of its duties hereunder that will at least cover the costs of the Wind-Down Budget. The Post Effective Date Reserve shall be used by the Plan Administrator solely to satisfy the distributions set forth herein, the expenses of the Wind-Down Debtors and the Plan Administrator as set forth in the Plan; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents shall constitute expenses of the Wind-Down Debtors and shall be paid from the Post Effective Date Reserve. The Plan Administrator may create reserve-specific segregated accounts from the Post Effective Date Reserve in accordance with its business judgment, and may move Distributable Cash into the Post Effective Date Reserve at any time to the extent needed, in the Plan Administrator's business judgement, to cover unanticipated costs of the Wind-Down. In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

To the extent any amounts in a Reserve are tied to Claims that become Disallowed, the Plan Administrator may, in its business judgment, remove the amount in such Reserve that was allocated to such Claim from the Reserve and move it to Distributable Cash. Any amounts remaining in any Reserve after payment of all Claims contemplated by such Reserve in full shall promptly be transferred to the Post Effective Date Reserve and shall be distributed according to the priority set forth in Article III without any further action or order of the Court.

### 9. Wind Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve the Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of any Purchase Agreement and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind Down from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such

15

withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

### 10. Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors. The Plan Administrator may obtain, at the expense of the Wind-Down Debtors, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

On and after the Effective Date, the Wind-Down Debtors and/or the Plan Administrator shall be authorized to purchase D&O Liability Insurance Policies for the benefit of their respective directors, members, trustees, officers, managers, and any Scheduled Party (as defined in the D&O Liability Insurance Policies) in the ordinary course of business.

### 11. Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

### 12. Dissolution of the Debtors and Wind-Down Debtors

On or after the Effective Date, the Plan Administrator may File a certification with the Bankruptcy Court that it has substantially administered the Plan for Debtor Stage Stores, and such Debtor shall be deemed dissolved without further order of the Bankruptcy Court or action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which such dissolved Debtor is formed or any other jurisdiction. With respect to Debtor Specialty Retailers, the Plan Administrator may File a certification with the Bankruptcy Court that all distributions have been made, all its duties under the Plan have been completed, and seeking entry of a final decree closing the last of the Chapter 11 Cases, upon which the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Wind-Down Debtors, including the filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction or further court order. The Plan Administrator is authorized to take all necessary or appropriate actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.

### 13. Cancellation of Securities and Agreements

Upon the Effective Date: (1) the obligations of the Debtors under the Prepetition Financing Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan) shall be canceled solely as to the Debtors and their

affiliates, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

### 14. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) implementation of the Restructuring Transactions and (2) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, manages, or officers of the Debtors or the Wind-Down Debtors.  Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtors.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 15. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, and the Securities issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 16. Section 1146 Exemption

To the extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Wind-Down Debtor or to any other Person) of property under the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Wind-Down Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment

of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 17. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article IX of the Plan, the Wind-Down Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Wind-Down Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX thereof.

The Wind-Down Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article IX of the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Wind-Down Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Wind-Down Debtors reserve and shall retain such Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Wind-Down Debtors, except as otherwise expressly provided in the Plan, including Article IX of the Plan. The applicable Wind-Down Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 18. Closing the Chapter 11 Cases

Upon the occurrence of the Effective Date, all of the Chapter 11 Cases, except for the Chapter 11 Case of Debtor Specialty Retailers, shall be deemed closed, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Specialty Retailers.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Specialty Retailers in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**19. Recoveries to Certain Holders of Claims and Interests**

The recoveries to Holders of Claims and Interests is described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

**20. Releases**

The Plan contains certain releases, as described in Article III.L of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?" The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### B. Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article VIII of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and satisfied, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtors to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

### C. Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed to be hereby conclusively, absolutely, irrevocably, and forever released by each and all of the Debtors, the Wind-Down Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, that the Debtors, the Wind-Down Debtors, or their Estates or affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital**

structure, management, ownership, or operation thereof, the Prepetition Financing Documents or any draws thereunder, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII of the Plan is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or Wind-Down Debtors or their respective Estates asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained in the Plan to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (iii) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

### D.    Third-Party Release

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released each Debtor, Wind-Down Debtor, and Released Party from any and all any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtors, or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Debtors' capital structure, management, ownership, or operation thereof, the Prepetition Financing Documents or

any draws thereunder, the Restructuring Transactions, the sale and marketing process, the Store Closing Sales, the Wind Down, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date or relating to any of the forgoing.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each release described in this Article VIII is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) an absolute and complete bar to any of the Debtors or Wind-Down Debtors or their respective Estates conveying direct or derivative standing to any person or entity to pursue any claim, Causes of Action or liability against any Released Party, or asserting any claim, Causes of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) any claims related to any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or actual fraud, (iii) the rights of the Debtors with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtors under any employment agreement with a current or former employee of the Debtors, or (iv) the rights of Holders of Allowed Claims or Interests to receive distributions under the Plan.

E.     Exculpation

Notwithstanding anything in the Plan to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, consummation of the Sale Transaction, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined by a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in

compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, satisfied, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

G.    Preservation of Setoff Rights

Notwithstanding anything to the contrary related to any of the foregoing, nothing shall modify the rights, if any, of any holder of Claims or any current or former party to an Executory Contract or Unexpired Lease, to assert any right of setoff or recoupment that such party may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, (i) the ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, or any successors to the Debtors, under the Plan; (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation; or (iii) assertion of setoff or recoupment as a defense, if any, to any claim or action by the Debtors, the Wind-Down Debtors, or any successors of the Debtors.

H.    Securities and Exchange Commission Considerations

Notwithstanding any provision contained herein to the contrary, no provision of the Plan, or any order confirming the Plan, shall (i) release any non-debtor person or entity (including any Released Party) from any Claim or Causes of Action of the SEC; or, (ii) enjoin, limit, impair, or delay the SEC from

commencing or continuing any Claims, Causes of Action, proceedings, or investigations against any non-debtor person or entity (including any Released Party) in any forum.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### I.    Independent Investigation

In June 2020, the Debtors' legal advisors commenced a review of potential Claims and Causes of Action that the Debtors may possess against third parties, including members of the Debtors' board of directors.  The review included an assessment of the transaction through which the Debtors acquired certain assets of Gordmans Stores, Inc. through a bankruptcy auction in 2017, as well as the circumstances leading to the Debtors' chapter 11 filing. The investigation was commenced in order to advise the Debtors' board of directors regarding the appropriateness of releases provided by the Plan.  In the course of the investigation, the Debtors have considered multiple potential Claims and Causes of Action, which the Debtors are continuing to evaluate.  The Debtors are cooperating with the Committee regarding sharing information related to the Debtors' investigation to assist the Committee in its analysis related to the appropriateness of the proposed releases included in the Plan.

### V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Stage Stores' Corporate History

Stage Stores, then known as Specialty Retailers, was founded in 1988 as a private company with the concurrent acquisition of Palais Royal and Bealls.  At the time of the acquisition, Palais Royal operated primarily larger stores in the Houston metropolitan area and Bealls operated primarily smaller stores principally located in rural Texas towns.  In the early 1990s, Specialty Retailers was focused on integrating the two businesses, identifying their respective strengths, and developing and refining its growth strategy. During this period, Specialty Retailers developed a growth strategy that was focused on expanding its presence in small markets across the country through new store openings and strategic acquisitions and consolidations of complementary apparel retailers.  As part of this strategy, in 1993, Apparel Retailers, Inc. ("Apparel Retailers") was formed and concurrently became the parent company of Specialty Retailers.  In 1996, Apparel Retailer, Inc. changed its named to Stage Stores, Inc. and went public in conjunction with a stepped-up expansion strategy, with a particular focus on small market growth.  In 1999, Stage Stores filed for chapter 11 bankruptcy in the Southern District of Texas following a period of rapid expansion.

Following the IPO and throughout the 2000s, Stage Stores continued to implement its growth strategy in small and mid-size markets across the United States, acquiring Peebles Inc. and the Goody's name.  In 2017, with the goal of benefitting from the recent growth in the off-price segment of the retail industry, Stage Stores entered the off-price segment with its strategic acquisition of the Gordmans brand. Since the Gordmans acquisition, Stage Stores has announced its decision to convert all of its stores to the Gordmans off-price model by mid-2020.



As of the date hereof, the Debtors' senior management includes Michael L. Glazer, President & CEO; Elaine D. Crowley, Chief Restructuring Officer; and Executive Vice President; Steven R. Williams, Chief Information Officer and Executive Vice President; Russel A. Lundy, Chief Stores Office & Executive Vice President; Thorston Weber, Chief Merchandising Officer and Executive Vice President; Gina R. Lampman, Vice President and Chief Accounting Officer; and Amy B. Gray, Chief Human Resources Officer and Executive Vice President.  The members of the board of directors for the Debtors include Michael L. Glazer, Alan J. Barocas, Elaine D. Crowley, Diane M. Ellis, Earl J. Hesterberg, Lisa R. Kranc, William J. Montgoris.

### B.    The Debtors' Business Operations

Stage Stores—through its wholly owned subsidiary, Specialty Retailers—operates a network of specialty department stores and off-price retail stores across the United States that offer nationally recognized, moderately priced, brand-name and private-label apparel, accessories, fragrances, cosmetics, footwear, and home goods for the entire family.  Stage Stores' merchandise is sourced from primarily domestic vendors and is distributed through Stage Stores' distribution centers located in Jacksonville, Texas and Omaha, Nebraska, or through one of five smaller overflow locations.

### (i)    Department Stores and Off-Price Stores

As of the Petition Date, Stage Stores operated in 42 states through 437 department stores under the Bealls, Goody's, Palais Royal, Peebles, and Stage nameplates and 289 off-price stores under the Gordmans brand.  Stage Stores also historically operated an e-commerce business for its department stores, which was closed prior to Petition Date.  Stage Stores' department stores are predominately located in small towns and rural communities in south and south central states and its off-price stores are located in mid-sized, non-rural Midwestern states.

### (ii)    Merchandising

Stage Stores' business is highly dependent on identifying on-trend merchandise that reflect current styles and trends.  Stage Stores offers a well-edited selection of moderately priced, branded merchandise within merchandise categories of women's, men's, and children's apparel, accessories, cosmetics, footwear, and home goods in its department stores, and off-price stores.  Stage Stores' department stores merchandise offers more apparel categories, while its off-price stores carry a larger selection of home goods



Stage Stores' department stores and off-price stores each offer different assortments of merchandise and employ different merchandising techniques and selling strategies. For instance, Stage Stores' department stores offer a deeper, more curated selection of assortments with sales driven by high-low pricing promotions, value coupons, and in-person advice from knowledgeable employees. Approximately 83% of Stage Stores' department store sales are related to nationally recognized brand names, such as Adidas, Calvin Klein, Carters, Chaps, Clinique, Dockers, Estée Lauder, G by Guess, Izod, Jessica Simpson, Levi's, Nike, Nine West, and Skechers, and the remaining 17% of sales are related to Stage Stores' private label and exclusive brand merchandise. On the other hand, Stage Stores' off-price stores offer a varied assortment of top trends, brand-name apparel, and stylish home décor at everyday value pricing in a treasure-hunt environment with sales driven by calendar events such as holidays, back-to-school, graduations, birthdays, and anniversaries. Moreover, Stage Stores' stores vary in merchandise to accommodate the different demographic, regional, and climate characteristics where stores are located.

### (iii)    Off-Price Conversions

As discussed above, starting in 2017, Stage Stores took significant steps towards entering the off-price segment of the retail industry by acquiring select assets of Gordmans Stores, Inc. After strong performance results from the Gordmans off-price stores, in 2018, Stage Stores converted nine of its department stores to the Gordmans off-price model. By November 2018, the Gordmans off-price stores' comparable sales increased approximately 10% and the converted department stores were also showing strong results. Stage Stores department stores' comparable sales, however, decreased by 5.5% and total company comparable sales decreased by 2.8%.

During the last quarter of 2018, the off-price stores continued to succeed while the department stores did not materially improve. As a result, in January 2019, Stage Stores introduced its new multi-year plan to accelerate off-price growth by converting approximately 220 department stores to the off-price model by the middle of 2020, which included another 37 off-price conversions in the first quarter of 2019 alone. By mid-March of that year, the converted stores completed in both 2018 and 2019 exceeded performance expectations, which became the catalyst for Stage Stores' announcement of an acceleration and slight expansion of its off-price store conversion strategy, this time with the goal of converting 85 department stores to the Gordmans off-price model by 2019 and another 300 conversions by the middle of 2020. Then in July of 2019, Stage Stores announced its plan to convert substantially all of its stores to the

Gordmans off-price model with expectations to end 2020 with more than 400 conversions. As of the Petition Date, Stage Stores has converted 233 of its department stores to the Gordmans off-price model.

### C.     Critical Components of the Debtors' Cost Structure

#### (i)     Supply Chain

The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of inventory and other goods to off-price and department store locations. Generally, the Debtors contract with various domestic and foreign vendors and manufacturers to supply merchandise in connection with the Debtors' business operations. The Debtors obtain a substantial majority of their merchandise from domestic vendors. This merchandise is consolidated separately on the East and West coasts by contracted consolidators. The remainder of the merchandise, including the Debtors' private label goods, is shipped from China and consolidated in California. Domestic shippers then ship the merchandise to the Debtors' distribution centers located in Jacksonville, Texas and Omaha, Nebraska, or to one of five additional overflow locations. The flow of merchandise from the vendors to the Debtors' brick-and-mortar stores primarily depends on services provided by third-party delivery service companies. In some instances, however, the Debtors also act as a carrier and shipper.

#### (ii)     Employee Compensation and Benefits

The Debtors employ approximately 14,659 employees, including approximately 4,324 full-time employees, approximately 7,650 part-time employees, and approximately 2,772 seasonal employees (collectively, the "Employees"). The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including medical insurance programs, workers' compensation benefits, short and long-term disability coverage, retirement savings plans, time-off policies, and certain other benefits that the Debtors have historically provided in the ordinary course.

#### (iii)     Real Estate Obligations

The Debtors lease substantially all of their store locations. The majority of the Debtors' leased premises consist of department stores throughout the United States. The Debtors also lease their corporate headquarters in Houston, Texas, a distribution center in Omaha, Nebraska, and five smaller overflow locations. The Debtors own their primary distribution center in Jacksonville, Texas.

Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors undertook an extensive analysis of the Debtors' existing store footprint to determine if (and how many) stores the Debtors should close in connection with their broader financial and operational restructuring initiatives. Although the Debtors believe that there are multiple potential, profitable footprints, the COVID-19 epidemic has severely curtailed the Debtors' ability to right-size their footprint under the circumstances without third-party investment. As such, while the Debtors continue to market and pursue all alternatives, at the time being, the Debtors intend to initiate store closures at all of their retail locations.

Delay in consummating the store closings would diminish the recovery tied to monetization of the store closure. First, the store closure process drives revenue to the Debtors' estates, offsetting fixed costs and rent obligations. Second and relatedly, the swift and orderly commencement of sales will allow the Debtors to timely reject the applicable store leases, and therefore avoid the accrual of unnecessary administrative expenses on account of rent payments. The delay of the store closings may cause the Debtors to incur additional postpetition rent at many of these stores, at a possible cost to the estate of up to $12.6 million per month.

### D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors were liable for approximately $232 million in principal amount of aggregate debt obligations.  The Debtors' prepetition capital structure is summarized as follows:

| Funded Debt | Lenders | Maturity | Interest Rates | Principal Amount |
|---|---|---|---|---|
| **Revolving Credit Facility**<br><br>**178.6 million** | Wells Fargo Bank, National, N.A.<br>JPMorgan Chase Bank, N.A.<br>Regions Bank<br>Bank of America, N.A<br>Truist Bank | December 16, 2021 | LIBOR + 1.40% with one step-down to LIBOR + 1.25% if average daily excess availability is equal to or greater than 40% of the revolving loan cap (0.00% LIBOR floor) | $250 million |
| **Term Loan**<br><br>**47.4 million** | Wells Fargo Bank, National, N.A.<br>Pathlight Capital Fund I LP<br>Pathlight Capital Offshore Fund I LLC<br>Pathlight Capital LLC | December 16, 2021 | LIBOR + 6.125% (1.00% LIBOR floor) | $50 million |
|  |  |  |  | $300 million |

In addition to funded debt obligations, the Debtors have outstanding unsecured trade debts (*e.g.*, amounts owed to trade vendors, suppliers, landlords) that total approximately $173 million as of the Petition Date

### 1.    The Revolving Credit Facility and Term Loan Facility

The Debtors are party to that certain Second Amended and Restated Credit Agreement, dated as of October 6, 2014 (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Credit Agreement"), by and among Specialty Retailers , as borrower, and the remaining Debtor as guarantor party thereto, the Lenders, and Wells Fargo, National Association, as administrative agent, collateral agent, and term loan agent (in such capacities, together with its successors and assigns, the "Prepetition Agent").  The Prepetition Credit Agreement provides for a $250 million asset-based loan with a maturity date of December 16, 2021 (the "ABL").  In addition, the Prepetition Credit Agreement provides for a $50 million last-out term loan, also with a maturity date of December 16, 2021 (the "Term Loan," and together with the ABL, the "Prepetition Credit Facility").

The Interest rates under the ABL and the Term Loan are determined with reference to either the LIBO Rate or the Prime Rate (each as defined in the Prepetition Credit Agreement).  The LIBO Loans under the ABL bear interest at the LIBO Rate plus 1.50%, with one step-down to the LIBO Rate plus 1.25% if the Average Daily Excess Availability (as defined in the Prepetition Credit Agreement) is equal to or greater than 40% of the Revolving Loan Cap (as defined in the Prepetition Credit Agreement).  The Prime Rate Loans bear interest at the Prime Rate plus 0.50% with a step-down to the Prime Rate plus 0.25% if the Average Daily Excess Availability is equal to or greater than 40% of the Revolving Loan Cap.

The LIBO Loans under the Term Loan bear interest at the LIBO Rate plus 6.125%, and the Prime Rate Loans bear interest at the Prime Rate plus 5.125%.  Interest on the Term Loan is due on the first calendar day of each month.  As of the Petition Date, approximately $47.4 million in aggregate principal amount remained outstanding under the Term Loan.  Upon an Event of Default and an acceleration of the obligations in connection with an exercise of remedies under the Prepetition Credit Agreement, the Term

27

Loan payments are subordinate to payment to the lenders under the ABL until the ABL obligations are paid in full, other than obligations in respect of Bank Products (as defined in the Credit Agreement) in excess of a $2 million cap.

Obligations under the Prepetition Credit Facility are secured by a lien on substantially all of the Debtors' assets, including, without limitation, a first priority lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash and cash equivalents, and intellectual property. There are also mortgages in favor of the Prepetition Agent with respect to four parcels of real property. Additionally, the Debtors have entered into deposit account control agreements in favor of the Prepetition Agent with respect to their bank accounts. Thus, substantially all of the Debtors' cash is subject to a perfected security interest in favor of the Prepetition Agent.

## VI.     PREPETITION RESTRUCTURING EFFORTS

The Debtors diligently worked with their financial advisors since 2019 to develop and explore strategic alternatives to maximize value for the Debtors and their assets. In June 2019, the Debtors engaged BRG to act as their financial advisor and in September 2019, engaged PJ Solomon Securities, LLC ("PJ Solomon") as investment banker. The Debtors, with the assistance of their advisors, engaged in a significant marketing process to solicit bids for an equity investment or the purchase of the Debtors' assets in order to obtain the greatest proceeds to maximize the value for the Debtors' stakeholders. As of the Petition Date, PJ Solomon had reached out to 42 parties regarding sale and junior financing opportunities of the Debtors' assets. Additionally, PJ Solomon had contacted 16 strategic parties. Despite significant interest, this process was derailed by the COVID-19 pandemic. The Debtors intend to build off this process to pursue a sale in connection with the chapter 11 cases.

### A.     Landlord Engagement

The Debtors undertook efforts to obtain lease concessions and rent abatements from their landlords throughout early 2020 in conjunction with their sale efforts. The Debtors retained A&G Realty Partners ("A&G") to assist in this process. A&G reached out to 595 landlords and as of the Petition Date had negotiated 315 lease modifications consisting of abatement savings, go-forward reductions, and/or termination agreements.

### B.     The Need for Liquidity

In response to the liquidity shortfall described above, the Debtors, with the assistance of their advisors, evaluated funding alternatives (including equity investors and third-party purchasers) necessary to obtain liquidity and implementing Stage Stores' go-forward business plan. These efforts were ultimately derailed by the COVID-19 pandemic and no incremental liquidity became available. Since late March 2020—when the Debtors had no revenue as a result of store closures—the Debtors worked closely with their lenders to ensure they had adequate liquidity to meet a minimum level of obligations, including for employee benefits paid during the furlough period.

## VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases. These include macroeconomic factors—including most significantly, the general downturn in the retail industry, which has led to a decrease in sales, competitive sales promotions resulting in reduced profit margins, and the marked shift away from brick-and-mortar retail to online channels. Over time, these factors have tightened the Debtors' liquidity and complicated their vendor relationships. As described above and in further detail below, these factors culminated in liquidity challenges beginning in winter 2019 and continued into 2020.

### A. Challenging Operating Environment

The Debtors, along with many other apparel and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores. Given the Debtors' brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sales targets and depressed profitability performance. COVID-19 was the proverbial "nail in the coffin" for the Debtors, coming just as the Debtors were working to resolve liquidity concerns and greatly exacerbating the Debtors' challenges.

### B. Underperforming Department Stores

Despite relatively strong performance results from Stage Stores' off-price stores, comparable sales for Stage Stores' department stores remained depressed in early 2020 and counterbalanced the strong performance of the off-price stores. Additionally, the Debtors' sales for the holiday season did not meet expectation, primarily impacted by lower pre-conversion department store sales. These losses from Stage Stores' department stores, compounded with the foregoing factors, have rendered Stage Stores unable to meet its sale targets.

### C. Supply Chain and Borrowing Base Challenges

The Debtors' retail stores underperformed in the fourth quarter 2019 holiday season and in early 2020. As a result, the Debtors' lenders added incremental borrowing base reserves to their Revolving Credit Facility related to anticipated performance. These reserves tightened an already limited liquidity situation.

Additionally, during the first months of 2020, merchandise shipments and inventory receipts began to slow due to liquidity tightness and a lack of vendor and factor support. Prior to the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded. The lack of fresh and sufficient inventory further tightened the Debtors' liquidity (including by reducing the borrowing base under the ABL), creating a negative feedback loop. Without the flow of fresh inventory, the Debtors' retail business effectively starved.

### D. COVID-19 and Lease Challenges

As a result of COVID-19, the Debtors closed their stores in March and furloughed substantially all of their employees. They also did not pay most of their rent due for March, April, and May. The Debtors received some default notices in March and early April, but the rate of such notices picked up materially in late April and early May. In addition, landlords began to lock the Debtors out of certain stores and threatened to evict the Debtors and dispose of the in-store inventory. Because the Debtors operate retail stores, these threats represented an existential threat to their operations, as well as potential safety threats to the communities which they have both depended upon and supported. Responding to and managing these default notices and related litigation outside of chapter 11 would have been a monumentally difficult task.

## VIII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Elaine D. Crowley, Chief Restructuring Officer of Stage Stores, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 26], filed on May 10, 2020.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://www.kccllc.net/stagestores.

### B.   Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Ordinary Course Professionals Motion.  On May 20, 2020, the Debtors filed the *Debtors' Motion Authorizing the Retention and Compensation of Professionals Utilized in the Ordinary Course of Business* [Docket No. 279] (the "OCP Motion").  The OCP Motion sought to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  On June 10, 2020, the Bankruptcy Court entered an order granting the OCP Motion [Docket No. 434].

- Retention Applications.  On May 28, 2020, the Debtors filed a number of applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland & Ellis, LLP, and PJ Solomon as investment banker, BRG as restructuring advisor.  On June 4, 2020, the Debtors filed an application seeking to retain Jackson Walker LLP as co-counsel and conflicts counsel.  On June 15, 2020, the Debtors filed an application seeking to retain A&G Realty Partners, LLC as real estate consultant and advisor to the Debtors.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### C.   Approval of the Use of Cash Collateral

On June 10, 2020, the Bankruptcy Court entered the Cash Collateral Order approving the Debtors' use of cash collateral on a final basis [Docket No. 441].  The Cash Collateral Order authorized the Debtors, among other things, to use Cash Collateral and granted adequate protection to the Prepetition Agent, the Prepetition Lenders and their interests in the prepetition collateral pursuant to sections 105, 361, 362, 363, and 507 of the Bankruptcy Code.

### D.     Schedules and Statements

On June 19, 2020, the Debtors filed their Schedules of Assets and Liabilities and Statement of Financial Affairs [Docket Nos. 485, 486, 487, and 492].

### E.     Appointment of Official Committee

On May 20, 2020, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 274], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  (a) Seven Apparel Group, Inc., (b) Nike USA, Inc., (c) Specialty Store Services, Inc., (d) Adobe Systems, Inc., (e) Enchante Accessories, Inc., (f) Skechers USA Inc., and (g) Regency Commercial Associates LLC.  The Committee has retained Cooley LLP and Cole Schotz P.C. as legal counsel and Province, Inc. as its financial advisor.

### F.     Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### G.     Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered hundreds of Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.  The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases, but may also elect to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.  Indeed, on May 15, 2020, the Bankruptcy Court entered an order approving procedures for the assumption or rejection of Executory Contracts and Unexpired Leases [Docket No. 204].  Pursuant to the approved procedures, the Debtors have rejected approximately 169 Executory Contracts and Unexpired Leases as of the date hereof.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans (other than the Stage Stores Inc. Retirement Plan), severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, or otherwise is specifically described in the Plan to not be rejected; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Confirmation Date (unless the counterparty to such Unexpired Lease or Executory Contract and the Debtors agree otherwise); (3) is to be assumed by

the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the any sale transaction; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is an Insurance Contract. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

The Stage Stores Inc. Retirement Plan will be terminated in accordance with Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), unless it is assumed by a third party.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

### H.    The Wind-Down Debtors, and Wind Down

At least one Debtor  (to be determined with the consent of the Prepetition Secured Parties, to the extent the Prepetition Secured Claims are not paid in full) shall continue in existence after the Effective Date as the Wind-Down Debtor(s) for purposes of (1) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtors after the Effective Date and after consummation of a Sale Transaction (if any), (2) performing their obligations under the Purchase Agreement (if any) or any transition services agreement entered into on or after the Effective Date by and between the Wind-Down Debtors and the Purchasers, (3) resolving any Disputed Claims, (4) making distributions on account of Allowed Claims in accordance with the Plan, (5) filing appropriate tax returns, and (6) administering the Plan in an efficacious manner.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to the Wind Down.

As soon as practicable after the Effective Date, the Plan Administrator shall cause the Debtors to comply with, and abide by, the terms of the Purchase Agreement (if any) and take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Except to the extent necessary to complete the wind down of any remaining assets or operations from and after the Effective Date the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

I.      **Recommendation to Support Plan**

As described above, the Plan paves the way for an efficient, cost-effective confirmation process and consummation of the Plan and Wind Down.  The Debtors urge all Holders of Claims entitled to vote to accept or reject the Plan to vote to accept the Plan.

IX.     **RISK FACTORS**

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

A.      **Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.      **The Debtors May Fail to Satisfy Vote Requirements**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

4.      **The Debtors May Not Be Able to Secure Confirmation of the Plan**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes;

(b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to fulfill their obligations related to a Sale Transaction (if any) and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.  Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors have retained the exclusive right to propose the Plan as of the date hereof.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

7.    **The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations, and (d) potential disputes with the Purchasers (if any) regarding the Debtors' obligations in respect of any Sale Transaction.

8.    **The Chapter 11 Cases Could Result in a "Structured Dismissal"**

If the Confirmation or Consummation of the Plan does not occur, (1) the Plan shall be null and void in all respects other than as set forth herein, (2) the Plan shall be deemed a motion seeking dismissal of these Chapter 11 Cases in accordance with the applicable provisions and priority scheme of the Bankruptcy Code, and (3) nothing contained in the Plan or this Disclosure Statement shall:  (a) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect.

9.    **The Debtors May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

10.   **Risk of Nonoccurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

11.   **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed

amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 12. The Plan's Release, Injunction, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtors, or Released Parties, as applicable.  The Debtors believe that releases, injunctions, and exculpations set forth in the Plan comply with the requirements for approval of such provisions under applicable law.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 13. The Total Amount of Allowed Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to Holders of Allowed Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 14. The Total Amount of Allowed Administrative and Priority Claims May Exceed the Amount of Distributable Cash and/or Be Higher Than Anticipated

The amount of Cash the Debtors ultimately receive on account of a Sale Transaction (if any) and from other sources prior to and following the Effective Date may be lower than anticipated.  Additionally Allowed Administrative Claims or Priority Claims may exceed the total amount of Distributable Cash and/or be higher than anticipated.  Accordingly, there is a risk that the Debtors will not be able to pay in full in cash all Administrative Claims and Priority Claims on the Effective Date as is required to confirm a chapter 11 plan.

### 15. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Wind-Down Debtors and certain Holders of Claims.

### B.     Risks Related to the Debtors' Businesses

### 1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a wind-down business plan will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) results of the Debtors' Wind Down sales may be materially lower than projections, (b) uncertainty surrounding lockouts and lease matters may materially impact sales, and (c) although stores may reopen, states may re-enter shelter-in-place orders, closing stores prior to completing going out of business sales.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn

could adversely affect the Debtors' operations and financial condition and ability to liquidate inventory and consummate any Sale Transactions. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 2. Results of the Wind Down Sales May Not Meet Projections

The Wind Down sales may fail to meet projections due to the economic uncertainty surrounding the continued spread of COVID-19, which has had a significant impact on the Debtors' business in the context of consumer demand. On a macro level, this pandemic has dampened global growth and could ultimately lead to an economic recession. If this occurs, demand for retail and consumer goods will continue to decline. Significantly, such a continued decline during the Wind Down and over the next several months could greatly impact the Debtors' sales. Such a scenario would negatively impact the ability of the Debtors to sell inventory and complete the Wind Down.

### 3. Sales May Be Materially Impacted by Uncertainty Surrounding Lockouts and Commercial Lease Matters

As of the Petition Date, the Debtors were party to 734 commercial real estate leases. As described above, in the months leading up to the Petition Date the Debtors stopped making rent payments on the vast majority of their store leases, resulting in $31 million in past due rent as of the Petition Date. The success of each individual store depends on a valid lease during the course of the Wind Down. Leases may be affected by natural expiration, prepetition termination, and prepetition lock-outs. The Debtors hope to maintain relationships with their landlords and continue to remain in their stores during the course of the Wind Down. However, if the Debtors are not able to successfully coordinate lease terms with the Wind Down process, the Debtors' going out of business sales may be materially impacted.

### 4. Renewed Shelter-in-Place Orders May Interrupt Going Out of Business Sales

Renewed government lockdowns and employee infections could both inhibit the Debtors' ability to wind down their businesses as a going concern. The inability to remain open to the public during the Wind Down would materially impact the ability of the Debtors to facilitate any Sale Transactions and liquidate inventory at store locations. The inherent risk that state governments may again shut down non-essential businesses plays a significant role in the success of the Chapter 11 plan.

## X. SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.      Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 and Class 4 (the "Voting Classes").  The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes on the Plan from Holders of Claims or Interests in Classes 1, 2, 5, 6, 7, and 8, provided that each such Holder in an impaired or potentially impaired class shall receive a form on which to designate its election not to grant the releases under the Plan.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.      Voting Record Date

**The Voting Record Date is [June 30], 2020**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

### C.      Voting on the Plan

**The Voting Deadline is [July 31], 2020 at 4:00 p.m. (prevailing Central Time)**.  To be counted as votes to accept or reject the Plan, all Holders of Allowed Claims entitled to vote on the Plan must complete, execute, and return their Ballots so that they are **actually received** by the Notice, Claims, and Balloting Agent pursuant to the Solicitation and Voting Procedures on or before **[July 31], 2020, at 4:00 p.m.** prevailing Central Time (the "Voting Deadline").

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the reply envelope enclosed with your ballot or to one of the below addresses.

<div style="border:1px solid black; padding:10px; text-align:center;">

**If sent by hand delivery or overnight mail:**

**Stage Stores, Inc., Ballot Processing**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

</div>

**OR**

**SUBMIT AN ELECTRONIC BALLOT TO THE NOTICE, CLAIMS, AND BALLOTING AGENT VIA ELECTRONIC MAIL TO STAGESTORESINFO@KCCLLC.COM**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE, CLAIMS, AND BALLOTING AGENT TOLL FREE AT 888-647-1732 (TOLL-FREE) OR 310-751-2622 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO WWW.KCCLLC.NET/STAGESTORES/INQUIRY.**

    **D.**     **Ballots Not Counted**

    **The following Ballots shall not be counted in determining the acceptance or rejection of the Plan**:  (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (b) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (c) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed; **provided** that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00; (d) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot cast via electronic mail will be deemed to be an original signature); (e) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (f) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

    **ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

**XI.**     **CONFIRMATION OF THE PLAN**

    **A.**     **Requirements for Confirmation of the Plan**

    Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.      Best Interests of Creditors

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Pursuant to the Wind Down, the Debtors will sell substantially all of their assets. As a result, a chapter 7 proceeding will do nothing more than create additional costs associated with converting to a chapter 7 liquidation. These additional costs include a percentage fee based on disbursements, as well as additional professional fees associated with a chapter 7 trustee selecting advisors.

While information regarding the additional costs are speculative, the costs are clearly higher and more burdensome for the Debtors' estates than the current proposed Plan (which do not have such incremental costs).

Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.      Feasibility

The Bankruptcy Code requires that a chapter 11 plan provide for payment in full in cash of all administrative and priority claims unless holders of such claim consent to other treatment. The Plan provides for the payment of priority and administrative obligations from Distributable Cash and/or proceeds of any Sale Transaction(s). It is likely there will not be sufficient Distributable Cash to satisfy all administrative and priority claims in full upon the Effective Date. The Debtors will be required to obtain consent from any such claim holder that is not otherwise paid in full in Cash. The Debtors believe that the Plan is feasible on these alternative bases.

### D.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.  Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe

41

that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Wind-Down Debtors, and certain Holders of Claims (each, for purposes of this Article XII, a "Holder") entitled to vote on the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in, or new interpretations of, Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (1) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (2) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder that is:  (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. Persons have authority to control all substantial decisions of the trust or (B) that has a valid election in

42

effect under applicable Treasury Regulations to be treated as a U.S. Person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Wind-Down Debtors**

The Plan provides for a Sale Transaction (if any), which is a taxable transaction for U.S. federal income tax purposes.  Gain or loss, if any, will be recognized by the Debtors or Wind-Down Debtors, as applicable, based on the difference between the tax basis in the assets that were disposed of in that transaction and the sale price allocable to such assets.  To the extent any taxable income is generated in connection with such sale, the Debtors have certain tax attributes that may be available to offset any such taxable income.  The Debtors currently estimate that, as of the end of their 2020 fiscal tax year,[8] they had approximately $58.7 million of federal NOLs, $27.4 million of disallowed business interest carryforwards under Section 163(j) of the Tax Code, and approximately $5.3 million of general business credit carryforwards.[9]  The Debtors do not currently anticipate that a cash tax liability is likely to arise in connection with a Sale Transaction, but that expectation depends on, among other things, the Debtors' determination that their tax attributes, and ability to claim losses in connection with sales of specific assets for an amount less than their tax basis, is not subject to limitation pursuant to section 382 of the Tax Code.

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to Certain U.S. Holders of Allowed Claims Entitled to Vote**

The following discussion assumes that the Debtors will undertake a Sale Transaction (if any). U.S. Holders are urged to consult their tax advisors regarding the tax consequences of a Sale Transaction.

(i)      **U.S. Federal Income Tax Consequences for Holders of Allowed Class 3 Claims**

Except as set forth in the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed

---

[8]     As is common for many retailers, the Debtors utilize a non-calendar fiscal tax year, which ended January 2020.

[9]     These estimates account for an expectation that the Debtors will file a request to "carry back" a significant portion of their NOLs under recently-enacted legislation.

Class 3 Prepetition Secured Claim, each Holder thereof shall receive: (a) its Pro Rata share of the Prepetition Secured Claims Recovery, until paid in full; (b) to the extent the Prepetition Secured Claims Recovery is insufficient to pay all Prepetition Secured Claims in full, the residual unliquidated Prepetition Collateral and any available Postpetition Collateral; or (c) such treatment as may be agreed upon by the Prepetition Agents and the Debtors.

A U.S. Holder of such a Claim should recognize gain (or loss) equal to the difference between: (a) the amount of gain realized from the exchange, which should be equal to the <u>sum</u> of (i) Distributable Cash received, and (ii) the fair market value of any Unliquidated Collateral received, <u>minus</u> (b) the U.S. Holder's adjusted basis, if any, in the Claim.

With respect to the Unliquidated Collateral received, U.S. Holders should obtain a tax basis in such property equal to the property's fair market value as of the date such property is distributed to the U.S. Holder. The holding period for any such property should begin on the day following the receipt of such property.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("<u>OID</u>"), or market discount (which differs from the treatment described above), see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

### (ii)     U.S. Federal Income Tax Consequences for Holders of Allowed Class 4 Claims

On the Effective Date, or as soon as reasonably practicable, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the General Unsecured Claims Recovery until paid in full.

A U.S. Holder of such a Claim should recognize gain (or loss) equal to the difference between: (a) the amount of gain realized from the exchange, which should be equal to the Cash received, <u>minus</u> (b) the U.S. Holder's adjusted basis, if any, in the Claim.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount (which differs from the treatment described above), see the sections entitled "Accrued Interest (and OID)" and "Market Discount" below.

### (iii)     Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain (or loss) or as ordinary income (or loss) will be determined by a number of factors, including, among others, the tax status of the U.S. Holder, whether the Allowed Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the U.S. Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. Each U.S. Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

U.S. Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital

losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of: (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

### (iv)   Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary; however, the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### (v)   Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than: (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### (vi)   Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### (vii)    Reserves and Delayed Equity Distributions

The Plan provides that certain distributions may be delayed while contingent, unliquidated, or disputed Claims are addressed.  Pending the resolution of such Claims, a portion of the property to be received by Holders of Claims or Interests may be deposited into the various Claim distribution accounts described in the Plan (including, to the extent applicable, the Reserves (other than the Professional Fee Escrow Account) and the Administrative and Priority Claims Recovery).  The property that is subject to delayed distribution will be subject to "disputed ownership fund" treatment under section 1.468B-9 of the United States Treasury Regulations.  Pursuant to such treatment, a separate federal income tax return shall be filed with the IRS with respect to such accounts.  Such accounts will be liable, as an entity, for taxes, including with respect to interest, if any, or appreciation in property between the Effective Date and date of distribution.  Such taxes shall be paid out of the assets of such accounts (and reductions shall be made to amounts disbursed from such accounts to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to such accounts, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

### D.    Certain U.S. Federal Income Tax Consequences of the Plan to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake a Sale Transaction (if any) and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### (i)    Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless:  (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Sale Transaction occurs and certain other conditions are met, or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would

generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### (ii)      Accrued Interest

Subject to the discussion of FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to Claims generally will not be subject to U.S. federal income or withholding tax, *provided* that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)      the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Stage's stock entitled to vote;

(b)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Stage (each, within the meaning of the Tax Code);

(c)      the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

(d)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "*Accrued Interest*," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### (iii)     FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or

periodical income.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed U.S. Treasury regulations, which can be relied on until final regulations become effective.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's exchange of its Claim.

### E.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code. The IRS may make the information returns reporting withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments made to a Holder under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless the Holder of such Allowed Claim: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally by, in the case of a U.S. Holder, such U.S. Holder providing a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder providing a properly executed applicable IRS Form W-8 (or otherwise establishing such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

*[Remainder of page intentionally left blank]*

## XIII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  June 30, 2020

STAGE STORES, INC.
on behalf of itself and Specialty Retailers, Inc.

*/s/ Elaine D. Crowley*

Elaine D. Crowley
Chief Restructuring Officer
Stage Stores, Inc.

COUNSEL:

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email:      mcavenaugh@jw.com
            jwertz@jw.com
            kpeguero@jw.com
            vpolnick@jw.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Neil E. Herman (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Email:      joshua.sussberg@kirkland.com
            neil.herman@kirkland.com

-and-

Joshua M. Altman (admitted *pro hac* vice)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200
Email:      josh.altman@kirkland.com

*Co-Counsel to the Debtors*
*and Debtors in Possession*

**EXHIBIT A**

**Plan**

**<u>EXHIBIT B</u>**

**Wind Down Budget**