**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
10/09/2020

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STAGE STORES, INC., *et al.*,[1] | ) Case No. 20-32564 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 829** |

**ORDER (I) APPROVING
THE PRIVATE SALES OF ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) approving the sale of all of Debtors' right, title, and interest in and to certain Acquired Assets[2] free and clear of all liens, claims, encumbrances, leases, tenancies, and other interests for total consideration of $7 million in cash (the "Sale") pursuant to that certain sale agreement (the "Purchase Agreement") by and between Stage Stores, Inc. (the "Seller") and Burke's DC TX, LLC (together with its designated affiliates, collectively, the "Purchaser"), attached hereto as **Exhibit 1** and (b)  granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Stage Stores, Inc. (6900) and Specialty Retailers, Inc. (1900).  The Debtors' service address is: 2425 West Loop South, Houston, Texas 77027.

[2]     Capitalized terms used and not defined herein have the meanings ascribed to them in the Purchase Agreement.

proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing") and in the Crowley Declaration and the Graiser Declaration (both as defined in the Motion); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY:

FOUND AND DETERMINED THAT:[3]

A.     The Debtors have articulated good and sufficient reason for this Court to grant the relief requested in the Motion, specifically, without limitation, entry into the Purchase Agreement.

B.     The Debtors have articulated good and sufficient reason for this Court to ratify the Sale.

C.     To the extent any inconsistency arises between this Order and the Purchase Agreement, this Order shall control.

D.     Under the facts and circumstances of these cases, the purchase price (the "Purchase Price") for the Acquired Assets is fair and reasonable.

E.     Under the facts and circumstances of these cases, the sale procedures described in the Motion are appropriate.

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  *See* Fed. R. Bankr. P. 7052.

F.      The Purchaser is a purchaser in good faith with respect to the Purchase Agreement, as that term is used in section 363(m) on the Bankruptcy Code and, as such, are entitled to the protections offered thereby.

G.      The Purchaser is not the mere continuation of, or successor to, the Debtors in any respect, and there is no continuity of enterprise between the Debtors or the Purchaser.  Neither the Purchaser nor any of its Affiliates is a successor to or a mere continuation or substantial continuation of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Purchaser (or any of its Affiliates) and the Debtors. Neither the Purchaser nor its Affiliates is holding itself out to the public as a successor to or a continuation of the Debtors or their estates. The Purchaser and its Affiliates are not, and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale does not amount to a consolidation, succession, merger, or de facto merger of the Purchaser and the Debtors. Immediately prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders existed between the Debtors and the Purchaser. The transfer of the Acquired Assets to the Purchaser, and the assumption of the Assumed Liabilities, does not, and will not, subject the Purchaser or its Affiliates to any liability whatsoever, with respect to the Debtors or the operation of the Debtors' businesses prior to the closing of the Sale or by reason of such transfer, including under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any foreign jurisdiction, based, in whole or in part, directly or indirectly, on any, or any theory of, successor, vicarious, antitrust, environmental, fraudulent transfer or avoidance, revenue, pension, ERISA, tax, labor (including any WARN Act), employment or  benefits, de facto merger, business continuation,

substantial continuity, alter ego, derivative, transferee, veil piercing, escheat, continuity of enterprise, mere continuation, product line, or products liability or law, or other applicable law, rule, or regulation (including filing requirements under any such law, rule, or regulation), or theory of liability, whether legal, equitable, or otherwise (collectively, the "Successor or Other Liabilities"). Pursuant to the Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets nor assuming the Excluded Liabilities and the Purchaser shall have no liability for the Excluded Liabilities.

H.      The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and adequate, (ii) is the highest or otherwise best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. No other person, entity, or group of entities has offered to purchase the Acquired Assets for greater overall value to the Debtors' estates than the Purchaser.

I.      No consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtors to consummate the Sale, implement the Purchase Agreement, or consummate the transactions contemplated thereby.

J.      The Debtors have valid and legal title to the Acquired Assets. The transfer of the Acquired Assets to the Purchaser will be, as of the Closing Date (as defined in the Purchase Agreement), a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Purchaser with all right, title, and interest to the Acquired Assets free and clear of all

Encumbrances (as defined in the Purchase Agreement), subject only to the Permitted Encumbrances solely as to the Owned Real Estate.

K.      Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors' chapter 11 estates (taken as a whole), their creditors, and other parties in interest.

L.      All the requirements of sections 363 of the Bankruptcy Code have been met with respect to the sale of the Acquired Assets; and therefore, the Debtors may sell the Acquired Assets free and clear of any Encumbrances.

M.      The Debtors' privacy policies with respect to personally identifiable information provide that such information may be transferred pursuant to a proposed or actual sale (including as part of insolvency or bankruptcy proceedings, financing, merger or any other change of control or ownership of debtors or any of their assets or divisions).   Accordingly, the sale or transfer of any Acquired Assets constituting personally identifiable information is consistent with such policies, and therefore section 363(b)(1) of the Bankruptcy Code is satisfied.

N.      The Purchaser would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Acquired Assets to the Purchaser, were not free and clear of all Encumbrances of any kind or nature whatsoever, subject only to the Permitted Encumbrances solely as to the Owned Real Estate or if the Purchaser would, or in the future could, be liable for any such Encumbrances or Successor or Other Liabilities.

O.      The Purchase Agreement is an arm's-length, negotiated transaction between unrelated parties, in which the Purchaser has at all times acted in good faith. There has been no collusion or conduct that would cause or permit the Purchase Agreement to be avoided under Section 363(n) of the Bankruptcy Code.

P.      To maximize the value of the Acquired Assets, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement. Time is of the essence in consummating the Sale.

Q.      Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price under the Purchase Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      The Sale is hereby approved.

3.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived, settled by announcement or ruled upon by the Court during the Sale Hearing, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice. Those parties who did not object or withdrew their objections to the Motion are deemed to have consented to the sale pursuant to Section 363(f)(2) of the Bankruptcy Code.

4.      The Purchase Agreement and all other documents ancillary thereto, and all of the terms and conditions thereof, are hereby approved, and the Debtors and Purchaser are authorized and directed to take any and all actions necessary or appropriate to effectuate the terms of this Order and consummate the transactions contemplated by the Purchase Agreement, including any actions that otherwise would require further approval by shareholders, members, or the Debtors' board of directors or board of managers, as the case may be, with respect to the Debtors, without the need of obtaining such approvals.

5.      Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, the transfer of the Acquired Assets to the Purchaser on the Closing Date shall (a) constitute a legal, valid, binding, and effective transfer of the Acquired Assets, (b) vest the Purchaser with full and legal title to the Acquired Assets, and (c) upon the Debtors' receipt of the Purchase Price, be free and clear of all Encumbrances (other than the Assumed Liabilities) and subject only to the Permitted Encumbrances solely with respect to the Owned Real Estate, with such Encumbrances to attach to the proceeds of the Sale in the order of their priority, with the same validity, force, and effect which they now have as against the Acquired Assets. Upon the closing of the Sale, the Purchaser shall take title to and possession of the Acquired Assets subject only to the Assumed Liabilities and with respect to the Owned Real Estate, subject only to the Permitted Encumbrances.

6.      Pursuant to section 363(m) of the Bankruptcy Code, the Purchaser shall be, and hereby is, deemed to have purchased the Acquired Assets in good faith, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale, unless such authorization and such sale are duly stayed pending such appeal

7.      Subject to the terms, conditions, and provisions of this Order and the Purchase Agreement, all entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to the Purchaser or its assignee on the Closing Date.

8.      None of the Purchaser or any of its Affiliates is a "successor" to, continuation of, or alter ego of, any of the Debtors or their estates by reason of any theory of law or equity. The Purchasers and their Affiliates shall not have, assume, or be deemed to have assumed, or in any

way be responsible for, any Successor or Other Liabilities of any of the Debtors or their estates, or any of the Debtors' predecessors or Affiliates with respect to the Acquired Assets or otherwise.

9.     Except for the Assumed Liabilities, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the Acquired Assets, and all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Encumbrances or other interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtors, the operation of the Debtors' business prior to the Closing Date, or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, any of its affiliates, any of the foregoing's successors, assigns, or properties, or the Acquired Assets, such persons' or entities' Encumbrances or any other interests in and to the Acquired Assets, including, without limitation, the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, or properties, or the Acquired Assets; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, or properties, or the Acquired Assets; (c) creating, perfecting, or enforcing any Encumbrances against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, or properties, or the Acquired Assets; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates, or any of the foregoing's successors, assigns,

or properties or the Acquired Assets; (e) commencing or continuing any action, in any manner or place, that does not comply with or is inconsistent with the provisions of this Order, other orders of the Court, or the Purchase Agreement or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

10.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets. This Order is and shall be effective as a determination that, on the Closing Date, all Encumbrances and any other interest of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, other than the Assumed Liabilities, and with respect to the Owned Real Estate only, the Permitted Encumbrances, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein and in the Purchase Agreement have been effectuated.

11.     Each and every federal, state, and local governmental agency or department is hereby directed to accept this Order and any and all other documents and instruments necessary and appropriate to consummate the Purchase Agreement.

12.     This Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing officers, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or

state of title in or to the Acquired Assets.  In particular, any applicable clerk's or recorder's offices are authorized to discharge any Encumbrances of record encumbering the Acquired Assets as of the Closing Date; alternatively, the Purchaser is hereby authorized to (i) execute a release for any Encumbrance of which the Acquired Assets are to be transferred free and clear or (ii) seek in the Court, or any other court of appropriate jurisdiction, to compel the appropriate parties to execute, file, and/or deliver termination statements, instruments of satisfaction, releases, and/or other similar documents with respect to all Encumbrances that such person has against or in the Acquired Assets.  A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to cancel any of the Encumbrances of record. Notwithstanding the foregoing, the provisions of this Order authorizing the sale and assignment of the Acquired Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments or documents in order to effectuate, consummate, and implement the provisions of this Order.

13.    This Order and the terms and provisions of the Purchase Agreement and all documents ancillary thereto shall be binding on all of the Debtors' creditors (whether known or unknown) and equity-holders, the Debtors, each respective landlord, and their respective affiliates, successors, and assigns, and any affected third parties, including other fiduciaries appointed in the Debtors' chapter 11 cases or on a chapter 7 trustee upon a conversion of one or more of the chapter 11 cases to a case under chapter 7 of the Bankruptcy Code.  The Purchase Agreement and any documents ancillary thereto shall not be subject to rejection or avoidance under any circumstances. Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 case into which one or more of these

chapter 11 cases may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

14.     The Purchase Agreement and all documents ancillary thereto may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, in accordance with the terms thereof, without further order of the Court; provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

15.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

16.     The failure to specifically include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety. All of the provisions of this Order are non-severable and mutually dependent.

17.     Notwithstanding anything to the contrary in the Purchase Agreement or this Order, neither the Debtors nor the Purchaser may terminate the Purchase Agreement after the date that the Court enters this Order other than in accordance with Section 8.1 of the Purchase Agreement. In the event that the Purchase Agreement may be duly terminated by a party pursuant to Section 8.1 of the Purchase Agreement, the due termination of the Purchase Agreement, shall not be stayed or otherwise precluded by the provisions of the Bankruptcy Code, including section 362 of the Bankruptcy Code.

18.     Purchaser shall use and process all personally identifiable information constituting Customer Data in accordance with the Debtors' existing privacy policies, provided however, Purchaser may modify its privacy policies and processing of personally identifiable data from time

to time as long as Purchaser gives advance notice to affected customers of any changes to its privacy policy and an opportunity to opt out of any new uses of such data.

19.     Unless otherwise agreed to by Comenity Bank f/k/a World Financial Network National Bank ("Comenity") in a separate written agreement, the private label credit cards offered by Comenity to qualifying customers of the Debtors pursuant to that certain Amended and Restated Private Label Credit Card Plan Agreement by and between Comenity, Stage Stores, Inc., and Specialty Retailers, Inc. dated as of August 8, 2012 (as amended and modified from time to time, the "Plan Agreement") shall immediately cease being accepted for the purchase or return of any merchandise or inventory immediately upon the Closing Date of the sale.  Additionally, Purchaser shall permit Comenity to continue the use (on a non-exclusive, non-transferable and non-sublicensable basis) of the following Debtors' trademarks and service marks: Steele's, Stage, Goody's, Peebles, Palais Royal, Bealls (collectively, the "Marks")  under the same restrictions and quality guidelines benefitting the Sellers (and Purchaser as successor in interest to the Acquired Assets, and its successors and assignees) as set forth in the Plan Agreement (including as set forth in Section 4.1(b)) for the sole purpose of administering the collection of private label credit card accounts created under such Plan Agreement for a period of six (6) months after the entry of this Order (consistent with the terms of the Plan Agreement); provided, however, that after such six (6) month period and subject to all the other terms herein, Comenity shall be permitted to continue the use of un-stylized names of the Marks solely in order to process, service, and collect any remaining balances on the private label open-ended credit card accounts until such time as the accounts are fully processed, collected and closed.  For the avoidance of doubt, Comenity acknowledges that after the closing of the sale of the Acquired Assets to Purchaser as contemplated herein, Purchaser (and its successors and assigns) shall be the sole owner(s) of the Marks, that

Comenity has no rights of ownership or license therein (except for the limited license set forth in this paragraph), and that Comenity is not entitled to (and shall not) use the Marks for any purpose other than as set forth expressly in this paragraph. Purchaser (and its successors and assigns) shall have the right, in its sole and absolute discretion, to prohibit the use of any Marks in any documents or other materials or references proposed to be used by Comenity for the limited purpose permitted herein that Purchaser (and its successors and assigns) deem objectionable or improper.  All goodwill associated with use of the Marks by Comenity will inure to the benefit of Purchaser. The Marks shall be  licensed by Purchaser 'as-is' and without any warranties or guarantees, either express or implied.  Comenity, and not Purchaser, shall be solely liable and responsible for the use of such Marks in connection with such limited purpose.

20.     This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

21.     To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

22.     Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

23.     Notwithstanding Bankruptcy Rule 6004(h), 7062 or otherwise, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion

25.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**Signed:  October 09, 2020.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## **Exhibit 1**

**Purchase Agreement**

**EXECUTION VERSION**

---

**ASSET PURCHASE AGREEMENT**

**DATED AS OF OCTOBER 4, 2020**

**BY AND AMONG**

**BEALLS, INC.,**

**BURKE'S DC TX, LLC,**

**STAGE STORES, INC.**

**AND**

**SPECIALTY RETAILERS, INC.**

---

# TABLE OF CONTENTS

**Page**

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES ............................................................................................................ 5

    1.1       Purchase and Sale of the Acquired Assets ............................................................. 5

    1.2       Excluded Assets ...................................................................................................... 6

    1.3       Assumption of Certain Liabilities .......................................................................... 8

    1.4       Excluded Liabilities ............................................................................................... 8

ARTICLE II CONSIDERATION; PAYMENT; CLOSING ...................................................................... 9

    2.1       Consideration; Payment .......................................................................................... 9

    2.2       Deposit .................................................................................................................... 9

    2.3       Closing .................................................................................................................. 10

    2.4       Closing Deliveries by Sellers .............................................................................. 10

    2.5       Closing Deliveries by Purchaser ......................................................................... 11

    2.6       Withholding .......................................................................................................... 11

    2.7       Casualty and Condemnation. ............................................................................... 12

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ............................................. 12

    3.1       Organization and Qualification ............................................................................ 13

    3.2       Authorization of Agreement ................................................................................ 13

    3.3       Conflicts; Consents .............................................................................................. 13

    3.4       Title to Properties ................................................................................................. 14

    3.5       Insurance .............................................................................................................. 15

    3.6       Litigation .............................................................................................................. 15

    3.7       Permits; Compliance with Laws .......................................................................... 15

    3.8       Environmental Matters ......................................................................................... 15

    3.9       Intellectual Property ............................................................................................. 16

    3.10    Data Security ........................................................................................................ 16

    3.11    Tax Matters .......................................................................................................... 17

    3.12    Brokers ................................................................................................................. 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................................... 17

    4.1       Organization and Qualification ............................................................................ 17

    4.2       Authorization of Agreement ................................................................................ 17

4.3     Conflicts; Consents ........................................................................... 18

4.4     Financing .......................................................................................... 18

4.5     Brokers ............................................................................................. 18

4.6     No Litigation .................................................................................... 19

4.7     No Additional Representations or Warranties ................................. 19

4.8     No Outside Reliance ........................................................................ 19

ARTICLE V BANKRUPTCY COURT MATTERS ................................................................. 20

5.1     Bankruptcy Actions ......................................................................... 20

ARTICLE VI COVENANTS AND AGREEMENTS ............................................................... 21

6.1     Conduct of Business of Sellers ........................................................ 21

6.2     Access to Information ...................................................................... 22

6.3     Regulatory Approvals ...................................................................... 23

6.4     Reasonable Efforts; Cooperation ..................................................... 23

6.5     Notification of Certain Matters ........................................................ 24

6.6     Further Assurances .......................................................................... 24

6.7     Insurance Matters ............................................................................ 24

6.8     Receipt of Misdirected Assets ......................................................... 24

6.9     Title Matters. ................................................................................... 25

6.10    Post-Transfer Domain Name Services ............................................. 26

ARTICLE VII CONDITIONS TO CLOSING ....................................................................... 27

7.1     Conditions Precedent to the Obligations of Purchaser and Sellers ...... 27

7.2     Conditions Precedent to the Obligations of Purchaser .................... 27

7.3     Conditions Precedent to the Obligations of the Sellers ................... 28

7.4     Waiver of Conditions ...................................................................... 29

ARTICLE VIII TERMINATION ....................................................................................... 29

8.1     Termination of Agreement ............................................................... 29

8.2     Effect of Termination ...................................................................... 30

ARTICLE IX TAXES ..................................................................................................... 30

9.1     Transfer Taxes ................................................................................. 30

9.2     Cooperation ..................................................................................... 30

9.3     Preparation of Tax Returns and Payment of Taxes ........................ 30

ARTICLE X MISCELLANEOUS ....................................................................................... 32

10.1    Non-Survival of Representations and Warranties and Certain Covenants;
        Certain Waivers .................................................................................................. 32

10.2    Expenses .............................................................................................................. 32

10.3    Notices ................................................................................................................. 32

10.4    Binding Effect; Assignment ................................................................................ 34

10.5    Amendment and Waiver ...................................................................................... 34

10.6    Third Party Beneficiaries .................................................................................... 34

10.7    Non-Recourse ...................................................................................................... 34

10.8    Severability ......................................................................................................... 34

10.9    Construction ........................................................................................................ 34

10.10   Schedules ............................................................................................................. 34

10.11   Complete Agreement ........................................................................................... 35

10.12   Specific Performance .......................................................................................... 35

10.13   Jurisdiction and Exclusive Venue ....................................................................... 36

10.14   Governing Law; Waiver of Jury Trial ................................................................ 36

10.15   Counterparts and PDF ......................................................................................... 37

10.16   Publicity .............................................................................................................. 37

10.17   Bulk Sales Laws .................................................................................................. 38

10.18   Fiduciary Obligations ......................................................................................... 38

10.19   Utilities ................................................................................................................ 38

10.20   Performance Guarantee ....................................................................................... 38

ARTICLE XI ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS ....................................... 38

11.1    Certain Definitions .............................................................................................. 38

11.2    Index of Defined Terms ...................................................................................... 43

11.3    Rules of Interpretation ........................................................................................ 44

## INDEX OF EXHIBITS

EXHIBIT A    FORM OF ESCROW AGREEMENT
EXHIBIT B    FORM OF SPECIAL WARRANTY DEED
EXHIBIT C    OWNER'S AFFIDAVIT
EXHIBIT D    ASSIGNMENT AND ASSUMPTION AGREEMENT
EXHIBIT E    SALE ORDER

### ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October 4, 2020, by and among Burke's DC TX, LLC, a Florida limited liability company ("Purchaser"), Stage Stores, Inc., a Nevada corporation (the "Company"), and its Subsidiary, Specialty Retailers, Inc., a Texas corporation (together with the Company, each a "Seller" and collectively "Sellers"), and solely for purposes of Section 10.20, Bealls, Inc., a Florida corporation ("Parent").  Purchaser, Sellers and Parent are referred to herein individually as a "Party" and collectively as the "Parties."  Capitalized terms used in herein shall have the meanings set forth herein or in Article XI.

WHEREAS, the Company and the other Seller filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), which chapter 11 cases will be jointly administered for procedural purposes (collectively, the "Bankruptcy Case");

WHEREAS, Purchaser desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign, and transfer to Purchaser the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order; and

WHEREAS on August 14, 2020, the Bankruptcy Court entered the Confirmation Order confirming the Plan.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants, and agreements set forth herein, and intending to be legally bound hereby, Purchaser and Sellers hereby agree as follows.

### ARTICLE I

### PURCHASE AND SALE OF THE ACQUIRED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

1.1     Purchase and Sale of the Acquired Assets. Pursuant to sections 105 and 363 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Sellers shall sell, transfer, assign, convey, and deliver to Purchaser (or its designee), and Purchaser (or its designee) shall purchase, acquire, and accept from Sellers, all right, title and interest in and to the Acquired Assets, free and clear of all Encumbrances subject to Permitted Encumbrances on the Owned Real Property. "Acquired Assets" means only the following assets of Sellers (but excluding in all cases any Excluded Asset):

(a)     that certain real property located at 506 Beall Boulevard, Jacksonville, TX and more particularly described on Schedule 1.1(a) and known as the Jacksonville DC Property (the "Land");

(b)     all of Sellers' right, title and interest in and to all streets, alleys, easements and rights of way in, on, across, in front of, abutting or adjoining the Land and any other appurtenances belonging thereto (collectively, the "Appurtenances");

(c)     all improvements on the Land, including without limitation those certain buildings located on the Land and the various facilities on the Land, and all other sidewalks, canopies, access ways, signs, and other improvements thereon (collectively, the "Improvements", and together with the Appurtenances and the Land, the "Owned Real Property");

(d)     all of Sellers' right, title and interest in and to all intangible property rights related to the Real Property (defined below), including and any and all Actions, warranties and zoning approvals related to same (collectively, the "Intangible Personal Property")

(e)     all right, title and interest in and to all tangible assets (including Equipment and any Documentation related thereto or necessary for its operation, whether physical or stored on the computer systems, data networks or servers of any Seller) of Sellers located at the Owned Real Property, including, without limitation, the assets set forth on Schedule 1.1(e) (collectively, the "Personal Property");

(f)     to the extent transferable under applicable Law, all of the rights, interests and benefits accruing under all Permits with respect to the Owned Real Property, and all pending applications therefor; and

(g)     all Intellectual Property (and all goodwill associated therewith), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights or Actions that, now or hereafter, may be secured throughout the world.

1.2     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers be deemed to sell, transfer, assign, or convey, and Sellers shall retain all right, title and interest to, in and under any other assets of Sellers other than the Acquired Assets, including the following assets, properties, interests and rights of such Seller (all such assets, properties, interests and rights that are not Acquired Assets being referred to collectively herein, collectively, the "Excluded Assets"):

(a)     all Cash and Cash Equivalents, all accounts receivable, all bank accounts, and all deposits (including maintenance deposits, customer deposits, and security deposits for rent, electricity, telephone or otherwise) or prepaid or deferred charges and expenses, including all lease and rental payments, that have been prepaid by any Seller, and any retainers or similar amounts paid to Advisors or other professional service providers;

(b)     all Contracts of Sellers;

(c)     all Documents other than those described in Section 1.1(e), including (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of any Seller); (ii) that are Sellers' financial accounting Documents, all minute books, organizational documents, stock registers and

such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) and any other Tax information or records not directly related to the Owned Real Property), corporate seal, checkbooks, and canceled checks; or (iii) that any Seller is required by Law to retain;

(d)     all Documents prepared or received by any Seller or any of its Affiliates in connection with the sale of the Acquired Assets, this Agreement, or the transactions contemplated hereby, including (i) all records and reports prepared or received by Sellers, any of their respective Affiliates or Advisors in connection with the sale of the Acquired Assets and the transactions contemplated hereby, including all analyses relating to the business of Purchaser or its Affiliates so prepared or received, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets; and (iii) all privileged materials, documents and records of a Seller or any of its Affiliates;

(e)     all current and prior insurance policies of any of Sellers, including for the avoidance or doubt all director and officer insurance policies, and all rights and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(f)     all membership interests or other equity interests of any Seller or securities convertible into, exchangeable, or exercisable for any such membership interests or other equity interests;

(g)     (i) all preference or avoidance claims or actions arising under the Bankruptcy Code or applicable Law, (ii) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of any Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (iii) all claims that any of Sellers may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(h)     Sellers' claims or other rights under this Agreement, including the Purchase Price hereunder, or any agreement, certificate, instrument, or other document to which a Seller is a party that is executed and delivered between any Seller and Purchaser in connection with the transactions contemplated hereby;

(i)     all emails sent by or to any email addresses or accounts of Sellers on or prior to the six-month anniversary of the Closing Date hosted on the "stage.com" or "stagestores.com" domains;

(j)     all rights, data, records, documentation, or other information relating to private-label credit cards;

(k)     all Tax refunds attributable to Pre-Closing Tax Periods or attributable to the pre-Closing portion of a Proration Period, and all Tax attributes that are not transferred by the operation of applicable Tax Law; and

(l)     all real estate and all interests in real estate other than the Owned Real Property; all demands, allowances, refunds, rebates (including any vendor or supplier rebates),

rights (including under or with respect to express or implied guarantees, warranties, representations, covenants and indemnities), claims, counterclaims, defenses, credits, causes of action, rights of set off, rights of recovery or rights of recoupment relating to or arising against suppliers, vendors, merchants, manufacturers and counterparties to leases, licenses or any Contract, arising out of or relating to events occurring on or prior to the Closing Date.

      1.3    <u>Assumption of Certain Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Cash Payment in accordance with <u>Section 2.1</u>, Purchaser shall irrevocably assume from Sellers (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms as Purchaser deems appropriate), and Sellers shall irrevocably convey, transfer, and assign to Purchaser, only the following Liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "<u>Assumed Liabilities</u>"):

      (a)    the portion of Transfer Taxes allocated to Purchaser pursuant to <u>Section 9.1</u>; and

      (b)    the Tax amounts allocated to Purchaser pursuant to <u>Section 9.3(b)</u>.

      1.4    <u>Excluded Liabilities</u>. Except for the Assumed Liabilities, Purchaser shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Sellers or their Affiliates, or arising from or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, conditions, or circumstances taking place on or prior to the Closing  (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "<u>Excluded Liabilities</u>"). For avoidance of doubt, "Excluded Liabilities" shall include, without limitation, the following Liabilities:

      (a)    all Liabilities arising as a result of the ownership of the Acquired Assets and/or the use and operation of the Sellers' businesses or properties and assets (tangible and intangible), including nonperformance of any Contracts, on or prior to the Closing;

      (b)    all Liabilities of a Seller for Taxes attributable to Pre-Closing Tax Periods and the pre-Closing portion of a Proration Period (except as provided for in <u>Sections 9.1</u> and <u>9.3(b)</u>);

      (c)    all Liabilities of a Seller for borrowed money, all accounts and trade payable on or prior to Closing, and any and all Actions against a Seller and their Advisors;

      (d)    all Liabilities of a Seller under this Agreement or any Transaction Document;

      (e)    all Liabilities arising from or related to any Excluded Assets;

(f)     gift cards, rewards points or loyalty rewards issued by a Seller or its Affiliates;

(g)     all amounts due to employees, independent contractors or consultants of a Seller or its Affiliates; and

(h)     any Employee Obligations.

## ARTICLE II

## CONSIDERATION; PAYMENT; CLOSING

2.1     <u>Consideration; Payment</u>.

(a)     The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Purchaser for the purchase of the Acquired Assets shall be: (i) the assumption of Assumed Liabilities and (ii) a cash payment of Seven Million and No/100 Dollars ($7,000,000) (the "<u>Cash Payment</u>").

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to the Company the Cash Payment <u>less</u> the Deposit (the "<u>Closing Date Payment</u>"). The Closing Date Payment and any payment required to be made pursuant to any other provision hereof shall be made in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the applicable Party to (or for the benefit of) whom such payment is to be made at least two Business Days prior to the date such payment is to be made.

2.2     <u>Deposit</u>.

(a)     Purchaser shall, on the next Business Day after the date hereof, make an earnest money deposit with the Title Company (the "<u>Escrow Agent</u>") in the amount of ten percent (10%) of the Cash Payment (the "<u>Deposit</u>"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "<u>Deposit Escrow Account</u>"), established pursuant to the escrow agreement, dated as of the date hereof, by and among the Company, Purchaser and the Escrow Agent, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Escrow Agreement</u>"). The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of any of Sellers or Purchaser and shall be applied against payment of the Cash Payment on the Closing Date.

(b)     If this Agreement has been terminated by the Company pursuant to <u>Section 8.1(e)</u>, then the Company shall retain the Deposit together with all received investment income, if any, as liquidated damages, and the retention thereof shall constitute the sole and exclusive remedy of the Sellers in the event of such breach or termination.

(c)     If this Agreement has been terminated by any Party for any reason permitted under this Agreement, other than as contemplated by <u>Section 2.2(b)</u>, then the Deposit, together with all received investment income, if any, shall be returned to Purchaser within three (3) Business Days after such termination.

(d)     The Parties agree that the Company's right to retain the Deposit, as set forth in Section 2.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)     If the Closing occurs, the Deposit shall be transferred to the Company.

2.3     Closing. The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Payment, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") will take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical closing, at the offices of Haynes and Boone LLP, located at 1221 McKinney Street, Suite 4000, Houston, Texas 77010) at 8:00 a.m. Houston time on the second (2nd) Business Day following full satisfaction or due waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII (other than conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), or at such other place and time as the Parties may agree. The date on which the Closing actually occurs is referred to herein as the "Closing Date."

2.4     Closing Deliveries by Sellers. At or prior to the Closing, Sellers shall deliver to Purchaser:

(a)     a special warranty deed in the form of Exhibit B (the "Deed") executed and acknowledged by Seller and conveying to Purchaser (or its designee) title to the Owned Real Property free and clear of all Encumbrances, subject only to the Permitted Encumbrances;

(b)     an Owner's Affidavit in the form of Exhibit C with respect to the Owned Real Property;

(c)     a bill of sale and assignment and assumption agreement in the form of Exhibit D conveying the Personal Property, Intangible Personal Property, Permits and Intellectual Property (as set forth more particularly in Section 1.1 hereto) to Purchaser (or its designee) free and clear of all Encumbrances (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(d)     each IP Assignment Agreement in a form mutually acceptable to the Parties, duly executed by the Sellers party thereto;

(e)     a copy of the Sale Order, as entered by the Bankruptcy Court;

(f)     a duly executed IRS Form W-9 with respect to each Seller (or, in the case of any disregarded entity, the regarded parent entity of such Seller);

(g)     an executed certificate of non-foreign status from each Seller with respect to the Owned Real Property in compliance with Treasury Regulations Section 1.1445-2;

10

(h)      a key to access the Improvements shall be delivered to Purchaser or its counsel (or any other representative agreed to by the Parties) on the Closing Date and all other keys, security cards, access cards, passwords and codes necessary to access the Improvements, will remain in the Improvements;

(i)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Sellers certifying that the conditions set forth in Sections 7.2(b) and 7.2(c) have been satisfied;

(j)      with respect to the Social Media Accounts, each of Seller's login credentials for such accounts as may be reasonably necessary to transfer to Purchaser all administrative rights to the Social Media Accounts;

(k)      the Customer Data pursuant to a process to be determined and agreed by the Parties and applicable third party hosting providers prior to the Closing;

(l)      each other Transaction Document to which a Seller is a party, duly executed by such Seller; and

(m)      a joint written instruction, duly executed by Sellers, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit.

2.5      <u>Closing Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to (or at the direction of) the Sellers:

(a)      the Closing Date Payment;

(b)      the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)      an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Purchaser certifying that the conditions set forth in Sections 7.3(a), 7.3(b) and 7.3(c) have been satisfied;

(d)      each other Transaction Document to which Purchaser is a party, duly executed by Purchaser; and

(e)      a joint written instruction, duly executed by Purchaser, instructing the Escrow Agent to release to the Company by wire transfer of immediately available funds, the Deposit.

2.6      <u>Withholding</u>. Purchaser shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement all Taxes that Purchaser is required to deduct and withhold with respect to such payment under any provision of applicable Law, including to the extent resulting from Seller's failure to satisfy its obligations under Sections 2.4(f) and 2.4(g); provided, however, that Purchaser shall provide three (3) Business Days' notice prior to any such deductions or withholding to give the Sellers an opportunity to provide additional information and documentation available to show an exemption from such withholding.

2.7     Casualty and Condemnation.

(a)     The risk of loss of or damage to the Acquired Assets by reason of any insured or uninsured casualty during the period up to and including the Closing Date shall be borne solely by Sellers.  If, during the period beginning on the date hereof and ending on the Closing Date, any portion of the Acquired Assets (the "Loss Assets"), are damaged or destroyed, by fire or other casualty, and the amount required to repair, restore, reconstruct or replace such Loss Assets to the condition such Loss Assets were in prior to the fire or other casualty (the "Loss") exceeds $100,000 (as determined by Sellers' insurance appraiser), then, at Purchaser's election made by written notice from Purchaser to Sellers sent by Purchaser within three (3) Business Days after Purchaser's receipt of Seller's written notice of such casualty and determination of Sellers' insurance appraiser (which may be made in Purchaser's sole discretion), either (i) the Cash Purchase Price shall be reduced by the amount of such Loss and Purchaser shall proceed with Closing in accordance with this Agreement or (ii) the Purchaser shall have the unilateral right to terminate this Agreement in its sole discretion. If the amount required to repair, restore, reconstruct or replace such Loss Assets as aforesaid does not exceed $100,000, then Purchaser shall proceed with Closing in accordance with this Agreement without any reduction in the Cash Purchase Price. If Purchaser fails to provide the aforesaid written notice within the aforesaid three (3) Business Day period, then Purchaser shall be deemed to have elected to proceed in accordance with Subsection 2.7(a) above.  For the avoidance of doubt, Purchaser shall not have any right, title or interest in, or claim with respect to, any insurance proceeds due and payable to, or received by, Seller as a result of any such Loss.  If the Purchaser terminates this Agreement, then Purchaser shall have no further action or actions, cause or causes of action, complaints, suits, debts, judgments, claims and demands whatsoever against Seller, other than its right to the prompt return of the Deposit within three (3) Business Days of such termination.

(b)     If, during the period beginning on the date hereof and ending on the Closing Date, any portion of the Owned Real Property is taken by power of eminent domain or condemnation, then by written notice from Purchaser to Seller sent by Purchaser within three (3) Business Days after Purchaser's receipt of Seller's written notice of such taking, the Purchaser shall have the unilateral right to terminate this Agreement. In the event Purchaser elects to terminate this Agreement, the Deposit shall be returned to Purchaser within three (3) Business Days of Purchaser's election to so terminate.  If Purchaser fails to provide the aforesaid written notice within the aforesaid three (3) Business Day period, then Purchaser shall be deemed to have waived its rights under this Section 2.7(b) and Purchaser shall proceed with Closing hereunder without any reduction in the Cash Purchase Price.  If the Purchaser terminates this Agreement, then Purchaser shall have no further action or actions, cause or causes of action, complaints, suits, debts, judgments, claims and demands whatsoever against Seller, other than its right to prompt return of the Deposit within three (3) Business Days of such termination.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Schedules delivered by the Company concurrently herewith, each of the Sellers represent and warrant to Purchaser as follows as of the date hereof and as of the Closing Date.

3.1     <u>Organization and Qualification</u>. Each Seller (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own or lease and operate its properties and to carry on its businesses as now conducted, subject to the provisions of the Bankruptcy Code, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Sellers' ability to consummate the transactions contemplated hereby.

3.2     <u>Authorization of Agreement</u>. The execution, delivery, and performance of this Agreement and each other Transaction Document to which it is a party by such Seller, and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and the other Transaction Documents to which it is a party by such Seller, other than entry of the Sale Order to authorize the sale of the Acquired Assets in accordance with this Agreement.  This Agreement and the other Transaction Documents to which it is a party has been or will be (as applicable) duly and validly executed and delivered by such Seller, and, assuming this Agreement and the other Transaction Documents to which it is a party is a valid and binding obligation of Purchaser and subject to the Bankruptcy Court's entry of the Sale Order to authorize the sale of the Acquired Assets in accordance with this Agreement, this Agreement and the other Transaction Documents to which it is a party constitute valid and binding obligations of such Seller, enforceable against such Seller in accordance with its and their respective terms.

3.3     <u>Conflicts; Consents</u>.

(a)     Except as set forth on <u>Schedule 3.3(a)</u> and assuming that (w) the Sale Order is entered and (x) the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3(b)</u> are made, given or obtained (as applicable), the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents to which they are a party and the consummation by Sellers of the transactions contemplated hereby and thereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of any Seller; (ii) violate any Law applicable to any Seller or by which any property or asset of any Seller is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance (other than a Permitted Encumbrance on the Owned Real Property) on any Acquired Asset; except, in each case, for any such violations, breaches, defaults or other occurrences that are not material to the transactions contemplated by this Agreement.

(b)     Except as set forth on <u>Schedule 3.3(b)</u>, Sellers are not required to file, seek or obtain any notice, authorization, approval, Order, permit, or consent of or with any Governmental Body or other Person in connection with the execution, delivery and performance by Sellers of this Agreement and the Transaction Documents to which they are a party or the consummation by Sellers of the transactions contemplated hereby and thereby, except (i) for entry

13

of the Sale Order, (ii) where failure to obtain such consent, approval, authorization of action, or to make such filing or notification, is not material to the transactions contemplated by this Agreement, or (iii) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates.

      3.4    <u>Title to Properties</u>.

      (a)    Neither Seller has leased or otherwise granted to any Person rights to use or occupy the Owned Real Property other than subject to the Permitted Encumbrances, and there are no outstanding options, rights of first offer or rights of first refusal to purchase the Owned Real Property.  Neither Seller is a party to any agreement or option to purchase any real property or interest therein.  The Sellers have made available true correct, and complete copies of the deed, and the Sellers have made available a copy of the existing title commitment and a copy of the existing survey with respect to the Owned Real Property.

      (b)    No Person other than Sellers has the right to occupy any portion of the Owned Real Property. The Owned Real Property shall be delivered to Purchaser on the Closing Date free of the right of any other Person to occupy or use such properties other than subject to the Permitted Encumbrances.

      (c)    The Sellers own indefeasible fee simple title to all of the Owned Real Property, subject to Permitted Encumbrances, and good, valid and legal title to all the other Acquired Assets.  At the Closing, subject to the entry of the Sale Order to close the sale of the Acquired Assets in accordance with this Agreement, the Sellers shall transfer indefeasible fee simple title to the Owned Real Property, subject to Permitted Encumbrances, and good, valid and legal title to all of the other Acquired Assets to Purchaser (or its designee), free and clear of all Encumbrances, subject to Permitted Encumbrances on the Owned Real Property.

      (d)    All of the Personal Property has been, and will continue to be, physically located at the Owned Real Property from September 30, 2020 through the Closing Date.

      (e)    To the Company's Knowledge, there are no Contracts entered into by the Sellers that relate to or affect the ownership or use of the Acquired Assets following the Closing.

      (f)    Except as incurred in the Ordinary Course, there are no unpaid charges, costs, or expenses for improvements to the Owned Real Property which are reasonably likely to give rise to any mechanic's or materialmen's or other statutory liens.

      (g)    To the Company's Knowledge, all utilities (including water, sewer, gas, electricity, trash removal, and telephone service) that are reasonably necessary for the Company's use of the Owned Real Property are available to and connected with the Owned Real Property in sufficient quantities to adequately serve the same, except for any service interruptions or disruptions in the ordinary course.

      (h)    There are no actions pending or, to the Company's Knowledge, threatened in writing, in respect of the Owned Real Property that would materially and adversely alter the current zoning classification of any portion of such property or alter any applicable legal requirements that would adversely affect the use of such property by the Purchaser.

3.5     <u>Insurance</u>. <u>Schedule 3.5</u> lists, as of the date hereof, each material insurance policy maintained by the Sellers on their properties, assets, products, business or personnel with respect to the Acquired Assets. With respect to each such insurance policy the policy is legal, valid, binding, enforceable on the Sellers, as applicable, and in full force and effect, and all premiums have been or will be paid prior to the due date covering all periods up to and including the date hereof through the Outside Date, and no notice of cancellation, termination or denial of coverage for any material claim has been received with respect to any such insurance policy.

3.6     <u>Litigation</u>. Other than the Bankruptcy Case, there are, and during the prior two (2) years there have been, no Actions pending or, to the Company's Knowledge, threatened against or by the Sellers with respect to the Acquired Assets, at law or in equity, or before or by any Governmental Body, other than any Action that would not reasonably be expected to be material to the transactions contemplated by this Agreement or affect Purchaser's use or ownership of the Acquired Assets following the Closing.  Other than in connection with the Bankruptcy Case, neither Seller is, or during the prior two (2) years has been, subject to any outstanding Order, with respect to or otherwise affecting the Acquired Assets.

3.7     <u>Permits; Compliance with Laws</u>.

(a)     Each Seller holds and is in compliance, in all material respects, with all permits, certificates, licenses, approvals, registrations and authorizations that are material to the ownership and operation of the Acquired Assets under applicable Laws (the "<u>Permits</u>"). All of the Permits are valid, binding and in full force and effect.

(b)     The Sellers are, and have been during the prior two (2) years, in compliance, in all material respects, with all applicable Laws with respect to or affecting the Acquired Assets, and during the prior two (2) years neither Seller has received any written notice of any Action against it or *in rem* with respect to or affecting the Acquired Assets alleging any failure to comply in any material respect with any such Laws. No investigation by any Governmental Body with respect to or affecting the Acquired Assets is pending or, to the Company's Knowledge, threatened, and during the prior two (2) years neither of the Sellers has received any written notice of any such investigation.

3.8     <u>Environmental Matters</u>.  Except as set forth in the Executive Summary section of the Phase I Environmental Site Assessment of the Property dated August 18, 2020, prepared by Bureau Veritas (the "<u>Phase I Assessment</u>"):

(a)     With respect to the Acquired Assets, the Sellers are and for the prior three (3) years have been in compliance in all material respects with all applicable Environmental Laws, which compliance has for the past three (3) years included obtaining all permits, licenses and authorizations required under applicable Environmental Laws that are material to the ownership or operation of the Acquired Assets;

(b)     Neither Seller has during the prior two (2) years received written notice from any Governmental Body regarding any actual or alleged material violation of or material liability under Environmental Laws with respect to the Acquired Assets;

15

(c)     No Hazardous Substance has been released on, at or from the Owned Real Property by the Sellers in a manner that would reasonably be expected to result in a material liability under any Environmental Law; and

(d)     The Sellers have made available to Purchaser copies of all material non-privileged environmental audits, assessments and reports in its possession to the extent relating to the Owned Real Property.

3.9     <u>Intellectual Property</u>.

(a)     <u>Schedule 3.9(a)</u> sets forth a correct and complete list of all Intellectual Property that is registered, filed or issued under the authority of any Governmental Body (including Domain Names), and all applications for Intellectual Property filed with any Governmental Body, in each case that is owned by the Sellers (collectively, "<u>Company Intellectual Property</u>"). Except as set forth on <u>Schedule 3.9(a)</u>, the Sellers own the Company Intellectual Property, free and clear of all Encumbrances.

(b)     To the Knowledge of the Company, neither Seller's respective businesses infringe, misappropriate or otherwise violate any Intellectual Property of any other Person, except where such infringement, misappropriation or violation is not material to the Sellers taken as a whole.

(c)     To the Knowledge of the Company, no third party infringes, misappropriates or otherwise violates any Intellectual Property owned by the Sellers, except where such infringement, misappropriation or violation is not material to the Sellers taken as a whole. The Sellers have used efforts that are reasonable under the circumstances to maintain the secrecy of their material trade secrets, except where such failure to maintain such material trade secrets would not be material to the Sellers taken as a whole.

(d)     To the Knowledge of the Company, all of the issued patents and registered trademarks that constitute Company Intellectual Property are valid, subsisting and enforceable. Except for office actions issued in the ordinary course of prosecution by the United States Patent and Trademark Office or analogous foreign Governmental Body, during the prior two (2) years, no claim by any third party contesting the validity or enforceability of any of the material Company Intellectual Property has been made or has been threatened against any Seller, in each case in writing.

(e)     This <u>Section 3.9</u> contains the sole and exclusive representations and warranties of the Company with respect to Intellectual Property.

3.10     <u>Data Security</u>. The Sellers maintain commercially reasonable policies and procedures regarding data privacy, protection and security designed to protect any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "<u>Personal Information</u>") collected by it.  To the Knowledge of the Company, the Sellers and the conduct of their business are in material compliance with, and at all times since December 31, 2017, have been in material compliance with, all applicable Privacy Laws and their applicable published privacy policies.  The transactions contemplated by this Agreement (including the transfer of the Customer Data) will not result in a

breach of the Sellers' published privacy policies in effect as of the date hereof. This <u>Section 3.10</u> contains the sole and exclusive representations and warranties of the Company with respect to data privacy, protection, and security.

3.11    <u>Tax Matters</u>. (a) All material Tax Returns required to be filed under applicable Law by Sellers with respect to the Acquired Assets have been filed and such Tax Returns are complete in all material respects, (b) all material Taxes payable by Sellers with respect to the Acquired Assets (whether or not shown to be due on such Tax Returns) have been paid, except to the extent nonpayment of which is permitted or required by the Bankruptcy Code, (c) no material claims have been asserted in writing with respect to any such Taxes and (d) there are no Encumbrances for Taxes (other than any Encumbrance for Taxes that is a Permitted Encumbrance on the Owned Real Property) on any of the Acquired Assets. The representations and warranties in this <u>Section 3.11</u> are the sole and exclusive representations and warranties of Sellers relating to Taxes. No representation or warranty is made in this Agreement with respect to (i) the amount, sufficiency or usability of any net operating loss, capital loss, Tax basis or other Tax attribute of any Seller, or otherwise (ii) Taxes or the availability of any Tax position in any taxable period (or portion thereof) beginning after the Closing Date.

3.12    <u>Brokers</u>. Except as set forth on <u>Schedule 3.12</u>, all of whose fees and expenses will be borne solely by Seller, there is no investment banker, broker, finder or other such intermediary that has been retained by, or has been authorized to act on behalf of, any of the Sellers and is entitled to a fee or commission in connection with the transactions contemplated by this Agreement from any of the Sellers.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date.

4.1    <u>Organization and Qualification</u>. Purchaser (a) is an entity duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, as applicable, (b) has all requisite power and authority to own and operate its properties and to carry on its businesses as now conducted, and (c) is qualified to do business and is in good standing (or its equivalent) in every jurisdiction in which its ownership of property or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.2    <u>Authorization of Agreement</u>. The execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party by Purchaser, and the consummation by Purchaser of the transactions contemplated hereby and thereby, have been or will be (as applicable) duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement and the other

Transaction Document to which it is a party by Purchaser. This Agreement and the other Transaction Documents to which it is a party has been or will be upon execution duly and validly executed and delivered by Purchaser, and, assuming this Agreement and the Transaction Documents to which they are a party are valid and binding obligations of Sellers and subject to the entry of the Sale Order to close the sale of the Acquired Assets in accordance with this Agreement, this Agreement and the Transaction Documents constitute valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with its and their terms, except as limited by the application of bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium, or other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law.

4.3     Conflicts; Consents.

(a)     Except as set forth on Schedule 4.3(a) and assuming that the notices, authorizations, approvals, Orders, permits or consents set forth on Schedule 4.3(b) are made, given or obtained (as applicable), the execution, delivery and performance by Purchaser of this Agreement and the other Transaction Documents to which it is a party and the consummation by Purchaser of the transactions contemplated hereby, do not: (i) violate the certificate of formation, limited liability company agreement or equivalent organizational documents of Purchaser; (ii) violate any Law applicable to Purchaser or by which any material property or asset of Purchaser is bound; or (iii) result in any breach of, constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, create in any party thereto the right to terminate or cancel, or require any consent under, or result in the creation or imposition of any Encumbrance on any material property or asset of Purchaser under, any material Contract; except, in each case, for any such violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

(b)     Except as set forth on Schedule 4.3(a), Purchaser is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Body in connection with the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially delay the ability of Purchaser to consummate the transactions contemplated hereby.

4.4     Financing. Purchaser has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Purchaser in connection with the transactions contemplated by this Agreement.

4.5     Brokers. Except as set forth on Schedule 4.5, all of whose fees and expenses will be borne solely by Purchaser, there is no investment banker, broker, finder, or other intermediary which has been retained by, or has been authorized to act on behalf of, Purchaser and is entitled to

any fee or commission in connection with the transactions contemplated by this Agreement from the Purchaser.

4.6     No Litigation. There are no Actions pending or, to Purchaser's knowledge, threatened against or affecting Purchaser that will materially adversely affect Purchaser's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

4.7     No Additional Representations or Warranties. Except for the representations and warranties contained in this Article IV, each of Sellers acknowledges that neither Purchaser nor any other Person acting on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided directly or indirectly to any Seller by Purchaser, and they are the sole and exclusive representations, warranties and statements of any kind made to Sellers or any member of the Seller Parties. Sellers acknowledge and agree, on their own behalf and on behalf of the Seller Parties, that (other than solely to the extent expressly set forth in this Article IV) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, are specifically disclaimed by Purchaser, and that neither Sellers nor any member of the Seller Parties has relied on any such representations, warranties or statements.

4.8     No Outside Reliance. Notwithstanding anything contained in this Article IV or any other provision of this Agreement to the contrary, Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties made by Sellers to Purchaser in Article III (as qualified by the information set forth in the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group.  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information, in that certain datasite administered by Intralinks (the "Dataroom"), any Projections or in any meetings, calls or correspondence with management of the Sellers or any other Person on behalf of the Sellers or any of their respective Affiliates or Advisors and (b) the quality, quantity or condition of any of the Sellers' assets, in each case, are specifically disclaimed by Sellers, and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its satisfaction an independent investigation and verification of the Acquired Assets and the Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the Express Representations and the results of the Purchaser Group's own independent investigation and verification.

# ARTICLE V

# BANKRUPTCY COURT MATTERS

5.1     <u>Bankruptcy Actions</u>.

(a)     From the date hereof, the Sellers shall expeditiously file a motion with the Bankruptcy Court seeking approval of this Agreement as a private sale of the Acquired Assets to the Purchaser (the "<u>Sale Motion</u>") and such private sale shall not be subject to the need for additional marketing. The Parties shall use their respective commercially reasonable efforts to (i) obtain entry of the Sale Order, and (ii) consummate the transactions contemplated hereby as promptly as practicable and in any case prior to the Outside Date.  Sellers shall take all actions as reasonably requested by the Purchaser, including without limitation, making such employees and Advisors of the Sellers available to testify before the Bankruptcy Court for the purposes of, among other things, demonstrating that additional marketing or competitive bidding is unnecessary due to the Sellers' prior marketing efforts.

(b)     Purchaser and Sellers shall promptly take all actions as are reasonably necessary to obtain the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors available to testify before the Bankruptcy Court for the purposes of, among other things providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Purchaser's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

(c)     Notwithstanding any other provision of this Agreement to the contrary, the Sellers acknowledge that from and after the date hereof until entry of the Sale Order, they will not solicit inquiries, proposals, or offers for the Acquired Assets in connection with any Alternative Transaction, unless required to do so by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that up until the hearing on the Sale Motion (i) Sellers may respond to any inbound inquiry with respect to some of all of the Acquired Assets, and (ii) the Sellers may continue advertising with respect to the Acquired Assets.  To the extent any alternative bidder formally or informally asserts an objection to approval of the sale prior to the objection deadline on the Sale Motion, indicating that such purchaser is willing to purchase all (and not less than all) the Acquired Assets, the Seller may hold an auction prior to the hearing on the Sale Motion seeking the highest or otherwise best bid (to the extent such bid may constitute higher or better offers, or may result in higher or better offers, as determined by Sellers in their business judgment, a "<u>Competing Bid</u> ") for such Acquired Assets upon reasonable notice to the Purchaser. If an auction is to be conducted, (i) any third party bidder (the "<u>Competing Bidder</u> ") must deposit ten percent (10%) of the purchase price for the Competing Bid with the Sellers prior to commencement of such auction; (ii) the Competing Bidder must bid more than the Purchase Price <u>plus</u> an amount equal to 3% of the Purchase Price (the "<u>Break-Up Fee</u>") <u>plus</u> the minimum overbid amount of $100,000 (the "<u>Minimum Overbid</u>"), (iii) subsequent bids shall be in increments of at least the Minimum Overbid amount and (iv) the Sellers will file a notice with the Bankruptcy Court identifying the prevailing party at the conclusion of the auction

(such prevailing party, the "Successful Bidder") and will seek approval of such sale at the hearing on the Sale Motion (collectively, the "Auction Procedures").  The Sellers may revise the Auction Procedures in their reasonable discretion and subject to their business judgement and Purchaser reserves its right to object and raise any issues with the Bankruptcy Court regarding the Auction Procedures.  In the event an auction is conducted, and the Purchaser is not the Successful Bidder at the auction, Sellers will, at the hearing on the Sale Motion, seek approval to pay to Purchaser the Break-up Fee out of the proceeds of sale received by the Debtors from the Successful Bidder.

(d)     If an auction is conducted, and Purchaser is not the Successful Bidder but is the next highest bidder at the auction, Purchaser will serve as a back-up bidder (the "Backup Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the auction) open and irrevocable until the earlier of the Outside Date or when this Agreement is otherwise terminated as set forth herein. If the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and the Sellers may consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement as such terms may have been improved upon in the auction.

(e)     Sellers' and Purchaser's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to, to the extent entered, the terms of the Sale Order.  Nothing in this Agreement shall require the Seller or its Affiliates or the Purchaser or its Affiliates to give testimony to or submit any pleading to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

6.1     Conduct of Business of Sellers. Until the earlier of the termination of this Agreement and the Closing, except (v) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (w) as required by applicable Law, (x) as otherwise required by to carry out the terms of this Agreement or as set forth on Schedule 6.1 or (y) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), the Sellers shall (1) maintain and preserve the Acquired Assets in their present condition and remain current on all amounts necessary to maintain access to and to be in good standing with respect to the Social Media Accounts included in the Acquired Assets and applicable registrars of the Domain Names included in the Acquired Assets, and (2) without limiting the generality of the foregoing, not:

(a)     issue any notes, bonds or other debt securities, or otherwise incur any indebtedness for borrowed money or otherwise become liable for any such indebtedness of any other Person, in each case, other than Excluded Liabilities;

(b)      sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any portion of the Acquired Assets or relocate any of the Personal Property that is located at the Owned Real Property;

(c)      cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset;

(d)      subject any portion of the Acquired Assets to any Encumbrance, subject to Permitted Encumbrances on the Owned Real Property;

(e)      allow any insurance policies maintained by the Sellers with respect to the Acquired Assets to lapse or otherwise go in default; or

(f)      authorize any of, or commit or agree, in writing or otherwise, to take any of, the foregoing actions.

For the avoidance of doubt, the Sellers will not be required to remove and/or dispose of the two drums of unknown materials stored on the southeastern corner of the Land as identified in the Phase I Environmental Site Assessment dated August 18, 2020 nor will they be required to repair the exterior box baler. Nothing contained in this Agreement is intended to give Purchaser or its Affiliates, directly or indirectly, the right to control or direct the business of the Sellers prior to the Closing.

6.2      <u>Access to Information</u>.

(a)      From the date hereof until the Closing (or the earlier termination of this Agreement pursuant to <u>Article VIII</u>), the Sellers will provide Purchaser and its Advisors with reasonable access and upon reasonable advance notice and during regular business hours to the Owned Real Property and books and records of the Sellers, in order for Purchaser and its Advisors to access such information regarding the Acquired Assets and Sellers as Purchaser reasonably deems necessary in connection with effectuating the transactions contemplated by this Agreement; <u>provided</u> that (i) all requests for access will be directed to the General Counsel and Chief Restructuring Officer or such other Person(s) as the Company may designate in writing from time to time and (ii) nothing herein will require the Company to provide access to, or to disclose any information to, Purchaser if such access or disclosure (A) would waive any legal privilege, (B) would be in violation of applicable Laws, or (C) would result in any physical damage to the Acquired Assets, including any Phase II or similar invasive diligence; <u>provided</u> that, in the event that the Company withholds access or information in reliance on the foregoing clause (A) or (B), the Company shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Purchaser that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law.

(b)      The information provided pursuant to this <u>Section 6.2</u> will be used solely for the purpose of effecting the transactions contemplated hereby, and will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall hereby be automatically amended to terminate upon the Closing notwithstanding anything to the contrary therein. Neither the Company nor any of the Sellers makes any representation or warranty

as to the accuracy of any information, if any, provided following the execution of this Agreement pursuant to this <u>Section 6.2</u>, and Purchaser may not rely on the accuracy of any such information, in each case, other than the Express Representations.

        (c)      From and after the Closing for a period of three (3) years following the Closing Date (or, if later, the closing of the Bankruptcy Case), Purchaser will provide Sellers and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the ad valorem real property and personal property Tax Returns applicable to the Acquired Assets with respect to periods prior to the Closing Date and any other books and records of Sellers in the possession of Purchaser, if any.

        6.3      <u>Regulatory Approvals</u>.

        (a)      The Sellers will (i) make or cause to be made all filings and submissions required to be made by any of the Sellers under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with Purchaser in exchanging such information and providing such assistance as Purchaser may reasonably request in connection with the foregoing and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances, authorizations or consents in connection with such filings.

        (b)      Purchaser will, and will cause its Affiliates and Advisors to, (i) make or cause to be made all filings and submissions required to be made by any member of the Purchaser Group under any applicable Laws for the consummation of the transactions contemplated by this Agreement, (ii) cooperate with the Company in exchanging such information and providing such assistance as the Company may reasonably request in connection with all of the foregoing, and (iii) (A) supply promptly any additional information and documentary material that may be requested in connection with such filings and (B) use reasonable best efforts to take all actions necessary to obtain all required clearances, authorizations or consents in connection with such filings.

        6.4      <u>Reasonable Efforts; Cooperation</u>.

        (a)      Subject to the other terms of this Agreement and provisions hereof, each Party shall, and shall cause its Advisors to, use its reasonable best efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things reasonably necessary, proper, advisable or permitted under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder. The "reasonable best efforts" of the Parties will not require any Party or any of their respective Affiliates or Advisors to expend any money, to remedy any breach of any representation or warranty, to commence any Action, to waive or surrender any right, to modify any Contract or to waive or forego any right, remedy or condition expressly set forth hereunder.

(b)     The obligations of the Company pursuant to this Agreement, including this Section 6.4, shall be subject to each of Sellers' obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court and Sellers' duty to seek and obtain the highest or otherwise best price for the Acquired Assets as required by the Bankruptcy Code.

6.5     Notification of Certain Matters.

(a)     The Company will promptly notify Purchaser of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that would reasonable be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.5(a) will not limit the remedies expressly available to Purchaser in this Agreement.

(b)     Purchaser will promptly notify the Company of: (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement; (ii) any notice or other communication from any Governmental Body related to or in connection with the transactions contemplated by this Agreement; and (iii) any breach or inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that would reasonably be expected to cause the conditions set forth in Article VII not to be satisfied; provided that the delivery of any notice pursuant to this Section 6.5(b) will not limit the remedies expressly available to Sellers in this Agreement.

6.6     Further Assurances. From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

6.7     Insurance Matters. Purchaser acknowledges that, upon Closing, all insurance coverage provided in relation to Sellers and the Acquired Assets that is maintained by any Seller or its Affiliates (whether such policies are maintained with third party insurers or with such Seller or its Affiliates) shall cease to provide any coverage to Purchaser and the Acquired Assets and no further coverage shall be available to Purchaser or the Acquired Assets under any such policies.

6.8     Receipt of Misdirected Assets. From and after the Closing, if any Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Purchaser, and such asset will be deemed the property of Purchaser held in trust by such Seller for Purchaser until so transferred. From and after the Closing, if Purchaser or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Purchaser shall promptly transfer or cause such of its Affiliates to transfer such asset (and

shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the Company, and such right, property or asset will be deemed the property of the Company held in trust by Purchaser for the Company until so transferred.

6.9     Title and Phase One Matters.

(a)     The Company shall deliver to Purchaser an updated preliminary title report or commitment (the "Title Commitment ") from Fidelity National Title Insurance Company (the "Title Company "), a copy of which together with copies of all underlying documents relating to title exceptions referred to therein received from the Title Company was (or will be) delivered to Purchaser promptly upon Company's receipt thereof.  Any update or recertification of the survey of the Owned Real Property (the "Survey ") or new survey of the Owned Real Property shall be obtained by Purchaser at Purchaser's sole cost and expense, in connection with Purchaser's review and inspections of the Owned Real Property and title thereto.

(b)     At the Closing, Sellers shall discharge (collectively, "Must Cure Items "): (i) any mortgage, deed to secure debt, deed of trust, security interest or similar security instrument encumbering all or any part of the Owned Real Property, if any, that was created or entered into by Sellers or any party claiming by, through or under Sellers; (ii) any mechanic's, materialman's or similar lien affecting or encumbering the Owned Real Property as a result of the action(s) of any of the Sellers or the action(s) of any party claiming by, through or under Sellers, which, if disputed and not yet resolved, may be bonded over by Sellers, but expressly excluding any such lien resulting from any act or omission of Purchaser and with the understanding that if such lien is disputed and not yet resolved, that same may be bonded over by Sellers in lieu of satisfying same); (iii) the lien of ad valorem real or personal property Taxes, assessments and governmental charges affecting all or any portion of the Owned Real Property which are delinquent, and (iv) any other Encumbrances, in each of the foregoing cases to the extent not a Permitted Encumbrance. Purchaser and Sellers agree that such mortgages, liens, judgments or other encumbrances, if any, may be paid out of the cash consideration to be paid by Purchaser at Closing.

(c)     If the Title Commitment or Survey reveals any matter which is objectionable to Purchaser, then Purchaser shall notify Sellers in writing within five (5) business days after the Effective Date specifying such title defects ("Title Defects Notice "). If Purchaser fails to provide a Title Defect Notice within such time period, then Purchaser shall be deemed to have accepted all matters (other than Must Cure Items), pertaining to the update to the Title Commitment, such matters shall be deemed Permitted Encumbrances hereunder, and such Permitted Encumbrances shall not be deemed to render title not marketable or not insurable. If Purchaser timely delivers the Title Defect Notice, then Sellers shall within five (5) business days thereafter notify Purchaser of any Title Defects, which Sellers are unable or unwilling to cure, it being understood that Sellers have no obligation to cure any Title Defects other than as required by this Section 6.9.  If by Sellers' written notice Sellers elect not to attempt to cure any of the Title Defects, then Purchaser may, within five (5) business days of receipt of such notice or deemed election, deliver written notice to Sellers indicating Purchaser's election to (A) terminate this Agreement and receive a refund of the Deposit, or (B) proceed to close and accept title "as is" without reduction in the Purchase Price, in which event the Title Defects (other than Must Cure Items) shall be deemed to be waived for all purposes.  If Purchaser fails to notify Sellers, in writing,

of Purchaser's intention to proceed under subsection (A) or (B) above, then Purchaser shall be deemed to have elected to proceed under subsection (B) above.

(d)     If, at any time prior to the Closing Date, an update to the Title Commitment reveals any matter not disclosed in a prior version of the Title Commitment and which is objectionable to Purchaser, then Purchaser shall notify Sellers in writing within five (5) business days after Purchaser's receipt of such update specifying the new Title Defects ("Supplemental Title Defects Notice"). If Purchaser fails to provide a Supplemental Title Defect Notice within such time period, then Purchaser shall be deemed to have accepted all matters (other than Must Cure Items), pertaining to the update to the Title Commitment, such matters shall be deemed Permitted Encumbrances hereunder, and such Permitted Encumbrances shall not be deemed to render title not marketable or not insurable. If Purchaser timely delivers the Supplemental Title Defect Notice, then Sellers shall within five (5) business days thereafter notify Purchaser of any new Title Defects which Sellers are unable or unwilling to cure, it being understood that Sellers have no obligation to cure any such Title Defects other than as required by this Section 6.9(d). If by Sellers' written notice Sellers elect not to attempt to cure any of such Title Defects, then Purchaser may, within five (5) business days of receipt of such notice or deemed election, deliver written notice to Sellers indicating Purchaser's election to (A) terminate this Agreement and receive a refund of the Deposit or (B) proceed to close and accept title "as is" without reduction in the Purchase Price, in which event such new Title Defects (other than Must Cure Items) shall be deemed to be waived for all purposes. If Purchaser fails to notify Sellers in writing of Purchaser's intention to proceed under subsection (A) or (B) above, then Purchaser shall be deemed to have elected to proceed under subsection (B) above.

(e)     Purchaser acknowledges that is shall use reasonable best efforts to execute an engagement agreement with Bureau Veritas to obtain a Phase 1 Environmental Assessment in form reasonably acceptable to Purchaser as soon as possible following execution of this Agreement, and Purchaser shall promptly execute and deliver any documents reasonably requested from Purchaser by Bureau Veritas for purposes of issuing such report.

6.10     Post-Transfer Domain Name.  For a period of one ninety (90) days after the date on which either the "stage.com" or "stagestore.com" Domain Name is transferred to Purchaser, Purchaser will not (i) change the respective DNS record associated with each such Domain Name as to enable Sellers to continue to receive emails and utilize VPN and remote access services associated with such Domain Names, or (ii) take any action intended to disrupt Sellers' access to the services associated with such Domain Names, provided that Purchaser will not be restricted from changing the "A" or "CNAME" DNS records for such Domain Names to redirect web services for customer-facing purposes.  In the event Purchaser assigns, transfers, licenses, or otherwise grants rights in the either the "stage.com" or "stagestore.com" Domain Name to a third party within the applicable ninety (90) day period, Purchaser will ensure that any third party to whom it assigns, transfers, licenses, or otherwise grants rights in such Domain Name agrees in writing, for the benefit of Sellers, to a provision equivalent to this Section 6.10.

6.11     Transfer Copy of Customer Data. Following the Closing, Purchaser will make available to Sellers a copy of the Customer Data, solely for the use of Sellers to address any Actions asserted against the Sellers following the Closing or to wind down the Sellers' estates (the "Bona Fide Purposes"), provided, that Purchaser will not make a copy of the Customer Data available to

Sellers in a manner that will violate applicable Privacy Laws or applicable published privacy policies. Sellers will not use the Customer Data for any purpose other than the Bona Fide Purposes. Sellers shall not (a) disclose any Customer Data to third parties without prior written authorization from the Purchaser or (b) copy, modify, publish, or transfer any Customer Data without prior written authorization from the Purchaser; except in each case of (a) and (b) in the event that a Seller is requested or required to disclose any Customer Data pursuant to any applicable Law or pursuant to the applicable terms of a deposition, interrogatory, request for documents, subpoena, order, civil investigative demand or similar judicial process. Sellers shall use the same degree of care to protect Customer Data as Sellers used to preserve and safeguard the Customer Data prior to Closing. Sellers shall notify Purchaser in writing immediately upon becoming aware of the occurrence of any unauthorized use or disclosure of Customer Data, whether inadvertent or otherwise, and shall use reasonable efforts to prevent or limit any further dissemination of the Customer Data. If any Sellers or their Affiliates will hold any Customer Data upon completion of the Bona Fide Purposes, before such completion, Sellers will notify Purchaser of same and coordinate with it on the destruction of such Customer Data prior to such completion. After the execution of this Agreement, the Sellers and Purchaser shall cooperate with each other to coordinate with the applicable third party vendors or registries as necessary to transfer to Purchaser the Customer Data and Social Media Accounts as Purchaser may reasonably request.

## ARTICLE VII

## CONDITIONS TO CLOSING

7.1     <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)     no court or other Governmental Body has issued, enacted, entered, promulgated or enforced any Law or Order (that is final and non-appealable and that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement; and

(b)     the Bankruptcy Court shall have entered the Sale Order.

7.2     <u>Conditions Precedent to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Purchaser in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     Sellers shall have delivered to Purchaser a certified copy of the Sale Order;

(b)     the representations and warranties made by each of the Sellers in <u>Article III</u> shall be true and correct in all material respects in the aggregate as of the Closing Date (disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein), as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as

of a specified date need be true and correct only as of such date), except that the representations and warranties set forth in Sections 3.1, 3.2, 3.4(c) and 3.12 will be true and correct in all respects (without disregarding any materiality qualifiers set forth therein, if any);

(c)     Each of the Sellers shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by each of the Sellers by the Closing;

(d)     The Title Company shall have issued (or provided an unconditional agreement to deliver to Purchaser as soon as possible after Closing if such cannot be delivered at Closing) an Owner's Title Insurance Policy (the "Title Policy") dated as of the Closing Date, in the amount of the Purchase Price and insuring the indefeasible, fee simple title to the Owned Real Property to be held by Purchaser, subject to no exceptions other than those matters disclosed by the Title Commitment and not objected to by Purchaser in a Title Defect Notice. The Title Policy may contain such endorsements as reasonably requested by Purchaser at Purchaser's sole expense, provided that the issuance of such endorsements shall not be a condition to Purchaser's obligation to close the transaction contemplated hereunder. The premium for the Title Policy will be shared equally (50-50%) between Sellers' and Purchaser;

(e)     Purchaser shall have received from Bureau Veritas a Phase I Environmental Site Assessment on the Owned Real Property in form reasonably acceptable to Purchaser; and

(f)     Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 2.4.

7.3     Conditions Precedent to the Obligations of the Sellers. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Sellers in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)     the representations and warranties made by Purchaser in Article IV shall be true and correct in all material respects in the aggregate (without giving effect to any materiality or similar qualification contained therein), in each case as of the date hereof and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except that the representations and warranties set forth in Sections 4.1, 4.2 and 4.5 will be true and correct in all respects (without disregarding any material qualifiers set forth therein, if any);

(b)     Purchaser shall have performed or caused to be performed, in all material respects, all of the obligations and covenants required by this Agreement to be performed by Purchaser by the Closing; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 2.5.

7.4 <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. None of Purchaser or Sellers may rely on the failure of any condition set forth in this <u>Article VII</u>, as applicable, to be satisfied if such failure was caused by such Party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the transactions contemplated hereby.

## ARTICLE VIII

## TERMINATION

8.1 <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 8.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of the Company and Purchaser;

(b) by written notice of either Purchaser or the Company, upon the issuance by any Governmental Body of an Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no termination may be made by a Party under this <u>Section 8.1(b)</u> if the issuance of such Order was caused by the material breach of the terms of this Agreement by such Party;

(c) by written notice of either Purchaser or the Company, if the Closing shall not have occurred on or before October 30, 2020 (the "<u>Outside Date</u>"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 8.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by the material breach of the terms of this Agreement by such Party;

(d) by written notice of either Purchaser or the Company, if the Bankruptcy Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs or reorganization of the Sellers is appointed in the Bankruptcy Case;

(e) by written notice from the Company to Purchaser, upon a material breach of any covenant or agreement on the part of Purchaser, or if any representation or warranty of Purchaser will have become untrue, in each case, such that the conditions set forth in <u>Section 7.3(a)</u> or <u>7.3(b)</u> would not be satisfied, including a breach of Purchaser's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Purchaser then the Company may not terminate this Agreement under this <u>Section 8.1(e)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after the Company notifies Purchaser of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(e)</u> will not be available to the Company at any time that a Seller is in material breach of, any covenant, representation or warranty hereunder;

(f) by written notice from Purchaser to the Company, upon a material breach of any covenant or agreement on the part of any Seller, or if any representation or warranty of any

29

Seller will have become untrue, in each case, such that the conditions set forth in <u>Section 7.2(b)</u> or <u>7.2(c)</u>; <u>provided</u> that (i) if such breach is curable by such Seller then Purchaser may not terminate this Agreement under this <u>Section 8.1(f)</u> unless such breach has not been cured by the date which is the earlier of (A) two (2) Business Days prior to the Outside Date and (B) thirty (30) days after Purchaser notifies the Company of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 8.1(f)</u> will not be available to Purchaser at any time that Purchaser is in material breach of, any covenant, representation or warranty hereunder;

(g)     solely before entry of the Sale Order, by written notice from the Company to Purchaser, if any Seller or the board of directors (or similar governing body) of any Seller determines, that proceeding with the transactions contemplated by this Agreement would be inconsistent with its or such Person's or body's fiduciary duties and enters into an Alternative Transaction; <u>provided</u> the Sellers fully perform their obligations under <u>Section 5.1(c)</u>; or

(h)     if an auction is held, by written notice from Purchaser to the Company, if Purchaser is not the Successful Bidder or the Backup Bidder at the auction; <u>provided</u> (i) Purchaser fully performs its obligations under <u>Section 5.1(d)</u> and (ii) Sellers fully perform their obligations under <u>Section 5.1(c)</u>.

8.2     <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to the express terms of this Agreement, including <u>Section 8.1</u>, <u>Section 6.9(c)</u> or <u>Section 2.7</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its Affiliates, Advisors, partners, officers, directors, managers, members, partners or shareholders; <u>provided</u> that <u>Section 2.2</u>, <u>Section 5.1</u>, this <u>Section 8.2</u>, and <u>Article X</u> (expressly excepting <u>Section 10.12</u> captioned "Specific Performance") shall survive any such termination.

## ARTICLE IX

## TAXES

9.1     <u>Transfer Taxes</u>. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges, if any, payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby (the "<u>Transfer Taxes</u>") shall be borne and timely paid by Purchaser, and Purchaser shall timely file all Tax Returns related to any Transfer Taxes. Sellers and Purchaser shall use commercially reasonable efforts and cooperate in good faith to exempt all such transactions from any Transfer Taxes.

9.2     <u>Cooperation</u>. Purchaser and Sellers shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.3     <u>Preparation of Tax Returns and Payment of Taxes</u>.

(a)     Except as otherwise provided by <u>Section 9.1</u>, Sellers shall prepare and timely file (i) all Tax Returns for any Pre-Closing Tax Period and (ii) all income Tax Returns of Sellers. Except to the extent any Tax reflected on a return required to be prepared and filed by Sellers pursuant to this <u>Section 9.4</u> is otherwise reflected as an adjustment to Purchase Price or

constitutes an Assumed Liability, Sellers shall be responsible for paying any Taxes reflected on any Tax Return that Sellers are obligated to prepare and file under this <u>Section 9.3(a)</u>.

(b)      All ad valorem real and personal property Taxes assessed against Sellers for the Acquired Assets for the year prior to the year in which the Closing occurs and prior years, and any matured and unmatured installments of special assessments with respect to the Acquired Assets attributable to a Pre-Closing Tax Period and due as of the Closing Date shall be paid solely by Seller.  Any ad valorem real and personal property Taxes on the Acquired Assets as of the Closing for the Tax period in which the Closing occurs (the "<u>Proration Period</u>"), shall be apportioned and prorated between Sellers and Purchaser as of the Closing Date with Purchaser bearing the expense of Purchaser's proportionate share of such Taxes that shall be equal to the product obtained by multiplying (A) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Proration Period, times (B) the number of days in the Proration Period after, from and including the Closing Date.  If the Closing shall occur before a new ad valorem real estate or personal property Tax rate is fixed for the applicable property, or if the amount of any such Tax cannot be ascertained on the Closing Date, apportionment and proration of Taxes for such property at the Closing shall be upon the basis of the old Tax rate for the preceding fiscal year applied to the latest assessed valuation.  Promptly after the new Tax rate is fixed, the apportionment of Taxes shall be recomputed by the Parties and any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at the Closing shall be promptly corrected and the proper party reimbursed within fifteen (15) days following such recomputation. Purchaser agrees to accept as a credit against the Purchase Price the portion owed by Sellers attributable to the period prior to the Closing Date. Purchaser shall prepare and timely file any ad valorem Tax Returns for all Proration Periods and shall provide Sellers with a draft of such Tax Returns at least twenty (20) days prior to the filing of any such Tax Return.  All Tax Returns for a Proration Period shall be prepared as required by Law.  Purchaser shall incorporate any changes reasonably requested by Sellers that are provided within ten (10) days after the delivery of such draft to Sellers with respect to such Tax Returns.

(c)      Upon the request of Purchaser, Sellers shall apply for a certificate of tax clearance (or comparable document) with respect to the Acquired Assets from the requested Governmental Body and Sellers will promptly deliver such certificate to Purchaser upon receipt of the same.

(d)      Purchaser shall not file any Tax Return, file an amendment to any previously-filed ad valorem Tax Return, or otherwise take any Tax position that has the effect of increasing any Tax due for a Pre-Closing Tax Period or portion of a Proration Period ending on the Closing, unless Purchaser receives an opinion from a nationally recognized accounting firm or law firm that there is no adequate "reporting position" with respect to any previously-asserted position with respect to Taxes. Upon such determination, Purchaser shall provide no less than twenty (20) days' notice of such position to Sellers before filing any such Tax Return. In the event Sellers disagree with such Tax position, and the dispute cannot be resolved between the Parties, such dispute shall be submitted to an independent national accounting firm or law firm mutually acceptable to Purchaser and Sellers for resolution, with the costs of such resolution to be evenly split by Purchaser, on the one hand, and Sellers, on the other hand. The determination of such independent national accounting firm or law firm shall be binding on all Parties and any Tax Return shall be filed consistently with such resolution.

## ARTICLE X

## MISCELLANEOUS

10.1    <u>Non-Survival of Representations and Warranties and Certain Covenants; Certain Waivers</u>. Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing), contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for five (5) years following the Closing Date, and nothing in this <u>Section 10.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement unless otherwise limited in Section 8.2. Purchaser and Seller Parties acknowledge and agree, on their own behalf and on behalf of the Purchaser Group or the Seller Parties, as the case may be, that the agreements and limitations contained in this <u>Section 10.1</u> are an integral part of the transactions contemplated hereby and that, without the agreements set forth in this <u>Section 10.1</u>, none of the Parties would enter into this Agreement. Purchaser Group hereby waives all rights and remedies that any member of the Purchaser Group may have against Seller under Environmental Law (including those arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or analogous Environmental Laws) relating to this Agreement or the transactions contemplated hereby.

10.2    <u>Expenses</u>. Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 8.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that all Transfer Taxes will be allocated pursuant to <u>Section 9.1</u>.

10.3    <u>Notices</u>. Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail, (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

Notices to Purchaser:

Burke's DC, TX LLC
1806 38th Avenue E
Bradenton, FL 34208
Attention:      Brian Crowley, Senior Vice President
Email:          bcrowley@BEALLSINC.COM

with a copy to (which shall not constitute notice):

Haynes and Boone, LLP
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Attention:      Kenric Kattner
                Ricardo Garcia-Moreno
Email:          kenric.kattner@haynesboone.com;
                ricardo.garcia-moreno@haynesboone.com


Notices to Sellers:

Stage Stores, Inc.
PO BOX 56627
Houston, TX 77256-6627
Attention:      Charles W. Haubiel II
                Acting General Counsel
Email:          chuck.haubiel@stage.com


with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
1601 Elm Street
Dallas, Texas 75201
Attention:      Michael Considine, P.C.
Email:          MPConsidine@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention:      Joshua A. Sussberg, P.C.
                Joshua M. Altman
Email:          jsussberg@kirkland.com
                joshua.altman@kirkland.com

10.4    Binding Effect; Assignment. This Agreement shall be binding upon Purchaser and Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 case; provided that neither this Agreement nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Purchaser and the Company, and any attempted assignment or delegation without such prior written consent shall be null and void, except that Purchaser shall be permitted, upon prior notice to the Company, to assign all or part of Purchaser's rights or obligations hereunder to an Affiliate, but no such assignment shall relieve Purchaser of Purchaser's obligations under this Agreement.

10.5    Amendment and Waiver. Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Purchaser and the Sellers or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

10.6    Third Party Beneficiaries. Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

10.7    Non-Recourse. This Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement. Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party or any Subsidiary of the Parties will have any liability (whether in Contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any Action based upon, arising out of or related to this Agreement.

10.8    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

10.9    Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

10.10    Schedules. The Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; however, each

section of the Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Schedules. Capitalized terms used in the Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Schedules, or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course.  No information set forth in the Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Schedule is a summary only and is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item. The information contained in this Agreement, in the Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.11  <u>Complete Agreement</u>. This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement. In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parol evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

10.12  <u>Specific Performance</u>. The Sellers agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Sellers fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement. It is accordingly agreed that (a) the Purchaser will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 10.13</u> without proof of damages or otherwise, this being in addition to any other remedy (if any) to which Purchaser is entitled, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, Purchaser would not have entered into this Agreement. The Sellers acknowledge and agree that any if Purchaser pursues an injunction or

injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 10.12</u>, it will not be required to provide any bond or other security in connection with any such Order. The remedies available to Purchaser pursuant to this <u>Section 10.12</u> will be in addition to any other remedy to which it was entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit Purchaser from seeking to collect or collecting damages. If, prior to the Outside Date, Purchaser brings any action, in each case in accordance with this <u>Section 10.12</u>, to enforce specifically the performance of the terms and provisions hereof by Seller, the Outside Date will automatically be extended (y) for the period during which such action is pending, <u>plus</u> ten (10) Business Days or (z) by such other time period established by the court presiding over such action, as the case may be. In no event will this <u>Section 10.12</u> be used, alone or together with any other provision of this Agreement, to require any Seller to remedy any breach of any representation or warranty of any Seller made herein. Following the Closing, each Party will be entitled to an injunction or injunctions, specific performance or other equitable relief to enforce specifically the terms and provisions hereof requiring performance after the Closing in the courts described in <u>Section 10.13</u> without proof of damages or otherwise.  Neither Party will be required to provide any bond or other security in connection with any such action.

      10.13   <u>Jurisdiction and Exclusive Venue</u>. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the Delaware Chancery Court and any state court sitting in the State of Delaware to which an appeal from the Delaware Chancery Court may be validly taken (or, if the Delaware Chancery Court declines to accept jurisdiction over a particular matter, any state or federal court within the state of Delaware) ((a) and (b), the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 10.3</u>. Nothing in this Agreement will affect the right of any Party to this agreement to serve process in any other manner permitted by Law.

      10.14   <u>Governing Law; Waiver of Jury Trial</u>.

      (a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the transactions

contemplated hereby will be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of Delaware or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of Delaware to apply.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, THE DOCUMENTS AND AGREEMENTS CONTEMPLATED HEREBY AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION BASED ON, ARISING OUT OF OR RELATED TO THIS AGREEMENT, ANY DOCUMENT OR AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.15   Counterparts and PDF. This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a facsimile machine, .PDF or other electronic transmission, will be treated in all manners and respects as an original Contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Agreement or any agreement or instrument contemplated hereby, including footers from earlier versions of this Agreement or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such Contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such Contract will raise the use of a facsimile machine, .PDF or other electronic transmission to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of facsimile machine, .PDF or other electronic transmission as a defense to the formation of a Contract and each such party forever waives any such defense.

10.16   Publicity. Neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld or delayed, unless, in the reasonable judgment of Purchaser or the Company, disclosure

is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or the Company lists securities, provided that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

10.17   Bulk Sales Laws. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances on the Owned Real Property, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

10.18   Fiduciary Obligations. Prior to entry of the Sale Order, nothing in this Agreement, or any document related to the transactions contemplated hereby, will require any Seller or any of their respective directors, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, prior to entry of the Sale Order, (a) Sellers retain the right, consistent with the requirements of Section 5.1(c) herein, to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates and (b) in the event the Sellers exercise their fiduciary obligations and pursue an Alternative Transaction, they shall seek court approval of the Break-Up Fee set forth in Section 5.1(c).

10.19   Utilities.  All utility charges accruing prior to the Closing Date with respect to the Owned Real Property will be paid by Sellers, and all utility charges accrued on and after the Closing Date with respect to the Owned Real Property will be paid by Purchaser.

10.20   Performance Guarantee.  Parent hereby guarantees the performance of (a) the payment of the Deposit pursuant to section 2.2(a) and (b) following the Closing, all covenants and obligations required to be performed by Purchaser after the Closing in accordance with this Agreement and any other Transaction Document to which Purchaser is a party, including by causing Purchaser or an Affiliate of Parent to perform such covenant or obligation.

# ARTICLE XI

# ADDITIONAL DEFINITIONS AND INTERPRETIVE MATTERS

11.1   Certain Definitions.

(a)   "Action" means any action, Claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought

to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

(b)  "Advisors" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

(c)  "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

(d)  "Alternative Transaction" means any transaction or series of transaction to sell the Acquired Assets (or subset thereof) to any third party other than Purchaser.

(e)  "Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(f)  "Cash and Cash Equivalents" means all of the Company's cash (including petty cash and checks received on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held.

(g)  "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(h)  "Code" means the United States Internal Revenue Code of 1986.

(i)  "Confidentiality Agreement" means that certain letter agreement, dated as of May 14, 2020, by and between the Company and Bealls, Inc.

(j)  "Confirmation Order" means the Order Confirming the Joint Second Amended Chapter 11 Plan of Stage Stores, Inc. and Specialty Retailers, Inc. entered by the Bankruptcy Court at Docket No. 705.

(k)  "Consent" means any approval, consent, ratification, permission, waiver or other authorization from any Person or Governmental Body, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

(l)  "Contract" means any contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, purchase order, license or other agreement that is binding upon a Person or its property.

(m)     "Customer Data" means rights in customer databases, loyalty records, and marketing statistics, and any other information pertaining to, of, or about current customers of Seller or the Social Media Accounts of Sellers; excluding, in each case data and rights in data contained in such databases, records, and other information that has been provided to Sellers by Lift360 and InfoGroup.  For the avoidance of doubt, "Customer Data" shall not include data, records, documentation, or other information relating to private-label credit cards.

(n)     "Documents" means all of the Company's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, non-privileged safety and environmental reports, data, studies, and documents prepared by a third party, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(o)     "Domain Names" means any domain names, web addresses, and internet uniform resource locators registered to Sellers and understood by web servers and online networks to provide pertinent destination information to visitors and users, including any accounts with registrars, including all related passwords, controlled by Sellers to manage such domain names, as further described on Schedule 11.1(p) attached hereto.

(p)     "Employee Obligations" means, in each case accrued prior to the Closing, (i) any and all obligations under applicable Law or Contracts owed by a Seller to employees, including without limitation, wages, salaries, commissions, accrued vacation, severance, sick leave pay, and expense reimbursements, and (ii) any and all payroll and other taxes associated with (i), including without limitation, federal income taxes, state and local income taxes, FICA, medicare, and state disability insurance.

(q)     "Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, Claim, charge, mortgage, deed of trust, option, pledge, security interest or other interest, hypothecations, easements, rights of way, encroachments, Orders and conditional sale or other title retention agreements.

(r)     "Environmental Laws" all applicable Laws relating to the protection of the environment or natural resources, including the use, handling, transportation, treatment, storage, disposal, release or threat of release or discharge of Hazardous Materials.

(s)     "Equipment" means any and all equipment (including any software or technology embedded in such equipment), machinery, systems, computers, hardware, furniture, furnishings, fixtures, trade fixtures, office supplies, supply inventory, vehicles and all other fixed assets, including spare, replacement and component parts.

(t)     "Final Order" means an order of the Bankruptcy Court (i) that was entered after notice and a hearing to all parties entitled to notice of the Sale Motion and any other motion

40

relating to the Acquired Assets, this Agreement or the transactions contemplated hereby; (ii) that is not subject to a stay pending appeal; and (iii) as to which the time to appeal from, or to seek review, rehearing, reconsideration, amendment or petition for certiorari of, has expired without a pending appeal or application seeking review, rehearing, reconsideration, amendment or petition for certiorari.

(u)    "Governmental Authorization" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law.

(v)    "Governmental Body" means any government, quasi-governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(w)    "Hazardous Substance" means any substance, material or waste that is defined or regulated as "hazardous," "toxic," "radioactive," a "pollutant," a "contaminant" or words of similar regulatory effect under any applicable Law due to its dangerous or deleterious properties or characteristics, including asbestos, polychlorinated biphenyls, radioactive materials, petroleum and petroleum by-products and distillates and per- and polyfluoroalkyl substances.

(x)    "Intellectual Property" means all of the following: (i) patentable inventions, patents, patent applications and patent disclosures; (ii) trademarks, trade names, labels, brands, service marks, trade dress and corporate names, registrations and applications for any of the foregoing, together with all goodwill associated with each of the foregoing; (iii) rights in works of authorship, copyright registrations and copyright applications; (iv) Domain Names; (v) trade secrets; (vi) rights in computer software, website code, website content, and Social Media Accounts; (vii) rights in drawings, schematics and other technical plans with respect to the Owned Real Property; (viii) right of publicity; (ix) Customer Data; and (x) all other intellectual property arising under the Laws of any jurisdiction.

(y)    "Knowledge of the Company", "Company's Knowledge" and words of similar import mean the actual knowledge of the Company's General Counsel, Chief Information and Supply Chain Officer, and Chief Restructuring Officer, after reasonable inquiry.

(z)    "Law" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

(aa)    "Liability" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure,

41

charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(bb)    "Order" means any order, injunction, order, decree, ruling, writ, assessment or arbitration award of a Governmental Body, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Sale Order).

(cc)    "Ordinary Course" means the ordinary and usual course of operations of the business of the Sellers taken as a whole consistent with past practice and taking into account the commencement and pendency of the Bankruptcy Case.

(dd)    "Permitted Encumbrances" means, only with respect to the Owned Real Property, (i) Encumbrances for current Taxes not yet due and payable or that are being contested in good faith, or the nonpayment of such Taxes which is permitted or required by the Bankruptcy Code; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments and other similar matters of record in each case as disclosed in Schedule B of the Title Commitment, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not violated by the current use or occupancy of the Owned Real Property, (iv) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion, and (v) any Encumbrances that will be removed or released by operation of the Sale Order or the Plan.

(ee)    "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(ff)    "Plan" means the Joint Second Amended Chapter 11 Plan of Stage Stores, Inc. and Specialty Retailers, Inc. filed at Docket No. 688 in the chapter 11 cases captioned In re Stage Stores, Inc., et al., Case No. 20-32564 (including any plan supplement documents and any schedules and exhibits attached thereto).

(gg)    "Pre-Closing Tax Period" means any Tax period ending on or before the Closing.

(hh)    "Privacy Laws" means all applicable Laws concerning data protection, privacy, security or other similar applicable Laws.

(ii)    "Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, Advisors, successors or permitted assigns.

(jj)    "Sale Motion" means a motion filed by any of the Sellers in the Bankruptcy Court, in form reasonably acceptable to Purchaser, seeking to sell the Acquired Assets to the Purchaser free and clear of all liens, claims, Encumbrances, and liabilities of any kind or nature whatsoever, whether at law or in equity, including without limitation, free and clear of any rights or claims based on theories of transferee or successor liability under any applicable law, whether

arising before or after the filing of the petitions for relief under chapter 11 of the Bankruptcy Code by Sellers, save and excepting only those liabilities expressly assumed by Purchaser in writing under this Agreement and Permitted Encumbrances on the Owned Real Property.

(kk)    "Sale Order" means the Final Order in substantially the form set forth on Exhibit E entered by the Bankruptcy Court approving the Sale Motion, as reasonably acceptable to the Purchaser and Sellers.

(ll)    "Seller Parties" means Sellers and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

(mm)    "Social Media Accounts" means the account registrations of Sellers with social media platforms, including without limitation Facebook, Instagram, Pinterest, YouTube and Twitter, including without limitation the goodwill, content, posts, traffic, and statistics associated therewith, as well as the handle names, passwords, URLs, and direct links to each of such account registrations, to the accounts listed on Schedule 11.1(mm).

(nn)    "Subsidiary" or "Subsidiaries" means, with respect to any Person, any corporation of which a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

(oo)    "Tax" or "Taxes" means any federal, state, local, foreign or other income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty or addition thereto.

(pp)    "Tax Return" means any return, claim for refund, report, statement or information return relating to Taxes required to be filed with a Governmental Body, including any schedule or attachment thereto, and including any amendments thereof.

(qq)    "Transaction Documents" means the Assignment and Assumption Agreement, IP Assignment Agreements, the Deed, the Escrow Agreement and any other agreements, documents, instruments or certificates expressly contemplated herein or therein to be executed or delivered by a Party.

11.2    Index of Defined Terms.

Acquired Assets ........................................... 5
Agreement .................................................. 5
Allocation ................................................ 30
Allocation Methodology ........................... 30
Appurtenances ............................................ 6
Assignment and Assumption Agreement .. 10

43

Assumed Liabilities ..................................... 8
Backup Bidder ......................................... 21
Bankruptcy Case ....................................... 5
Bankruptcy Code ...................................... 5
Bankruptcy Court....................................... 5
Bankruptcy Rules....................................... 5
Break-Up Fee .......................................... 20
Cash Payment........................................... 9
Chosen Courts.......................................... 36
Closing .................................................... 10
Closing Date.............................................. 10
Closing Date Payment................................. 9
Company .................................................. 5
Company Intellectual Property ................. 16
Competing Bid ......................................... 20
Competing Bidder .................................... 20
Dataroom.................................................. 19
Deed ....................................................... 10
Deposit .................................................... 9
Deposit Escrow Account............................ 9
Escrow Agent........................................... 9
Escrow Agreement.................................... 9
Excluded Assets ....................................... 6
Excluded Liabilities .................................. 8
Express Representations ........................... 19
Improvements .......................................... 6
Intangible Personal Property...................... 6

Land ........................................................ 5
Loss ........................................................ 12
Loss Assets............................................... 12
Minimum Overbid .................................... 20
Must Cure Items........................................ 25
Outside Date............................................. 29
Owned Real Property................................. 6
Parties..................................................... 5
Party ....................................................... 5
Permits .................................................... 15
Personal Information................................. 16
Personal Property ..................................... 6
Proration Period ....................................... 31
Purchase Price .......................................... 9
Purchaser ................................................. 5
Sale Motion.............................................. 20
Seller ...................................................... 5
Sellers..................................................... 5
SRS Acquiom, Inc. ................................... 9
Successful Bidder...................................... 21
Supplemental Title Defects Notice ........... 26
Survey ..................................................... 25
Title Commitment...................................... 25
Title Company ......................................... 25
Title Defects Notice .................................. 25
Transfer Taxes ......................................... 30

11.3   <u>Rules of Interpretation</u>. Unless otherwise expressly provided in this Agreement, the following will apply to this Agreement, the Schedules and any other certificate, instrument, agreement or other document contemplated hereby or delivered hereunder.

(a)   The terms "hereof," "herein" and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, schedule and exhibit references contained in this Agreement are references to sections, clauses, schedules and exhibits in or to this Agreement, unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)   Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(c)   The words "to the extent" shall mean "the degree by which" and not "if."

(d)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(e)     Words denoting any gender will include all genders, including the neutral gender. Where a word is defined herein, references to the singular will include references to the plural and vice versa.

(f)     The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(g)     All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(h)     All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(i)     Any document or item will be deemed "delivered," "provided" or "made available" by the Company, within the meaning of this Agreement if such document or item (a) is included in the Dataroom, (b) actually delivered or provided to Purchaser or any of Purchaser's Advisors or (c) made available upon request, including at any of the Sellers' offices.

(j)     Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(k)     Any reference to any particular Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Code section or Law, the reference to such Code section or Law means such Code section or Law as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(l)     All references to a day or days shall be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(m)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

[*Signature pages follow.*]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**STAGE STORES, INC.**

By: *Elaine D. Crowley*
Name:   Elaine D. Crowley
Title:   Chief Restructuring Officer

**SPECIALTY RETAILERS, INC.**

By: *Elaine D. Crowley*
Name:   Elaine D. Crowley
Title:   Chief Restructuring Officer

[Signature Page to Asset Purchase Agreement]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

                              **BURKE'S DC TX, LLC**

                              By: _____
                              Name:  Brian Crowley
                              Title:    Authorized Signatory


                              **BEALLS, INC.**

                              By: _____
                              Name:  Brian Crowley
                              Title:   SVP & Chief Financial Officer

[Signature Page to Asset Purchase Agreement]

EXHIBIT A

ESCROW AGREEMENT



**FIDELITY NATIONAL TITLE INSURANCE COMPANY**

**ESCROW AGREEMENT**

This Escrow Agreement made this 4th day of October 2020, by and among FIDELITY NATIONAL TITLE INSURANCE COMPANY, hereinafter known as Escrow Agent, Burke's DC TX, LLC, a Florida limited liability company, hereinafter known as Purchaser, Stage Stores, Inc., a Nevada corporation, and Specialty Retailers, Inc., a Texas corporation, hereinafter known as Seller.

Purchaser has tendered to Escrow Agent a check/wire in the amount of $700,000,  ("the Escrow Fund") pursuant to an Asset Purchase Agreement by and between , Stage Stores, Inc., Seller and Purchaser dated October 4, 2020 (the "Purchase Agreement"), in connection with the sale of certain assets, including property located in Jacksonville, TX.  In consideration of the acceptance of this tender, Escrow Agent, Purchaser, and Seller agree as follows:

1. **Deposit of Funds:** All checks, money orders or drafts will be processed for collection in the normal course of business. Escrow Agent may commingle funds received by it in escrow with funds of others, and may, without limitation, deposit such funds in its custodial or escrow accounts with any reputable trust company, bank, savings bank, savings association, or other financial services entity, including any affiliate of Escrow Agent. It is understood that Escrow Agent shall be under no obligation, except to the extent expressly instructed in writing, to invest the Escrow Fund deposited with it on behalf of any depositor, nor shall it be accountable for any earnings or incidental benefit attributable to the Escrow Fund which may be received by Escrow Agent while it holds such funds. The Escrow Fund held by Escrow Agent shall be subject to the provisions of applicable state statutes governing unclaimed property.

   The Seller and Purchaser acknowledge that Escrow Agent's duties are solely limited to the holding and disbursement of the Escrow Fund as set forth herein.  Escrow Agent shall have no obligations, responsibilities or duties, fiduciary or otherwise, under this Escrow Agreement and shall incur no liability to either Seller or Purchaser pursuant to the terms hereof, unless and until the first deposit to the Escrow Fund is made by or on behalf of Purchaser.

   Furthermore, it is understood and agreed that the Escrow Agent is acting as a stakeholder only with respect to the Escrow Fund.  It is agreed that the duties of the Escrow Agent are only as herein specifically provided, and are purely ministerial in nature.

2. **Notice of Opportunity**: Seller and Purchaser have the opportunity to earn interest on the Escrow Fund by requesting in writing that Escrow Agent set up an interest-bearing account under this Agreement. Receipt of a fully executed IRS Form W-9 is required prior to transfer of Escrow Fund to interest bearing account.  Escrow Agent is not responsible for levies by taxing authorities based upon the taxpayer identification number used to establish the interest bearing account.  Interest earned is dependent upon the amount of the deposit, the time of deposit and the prevailing interest rate at the time.

3. **Release of Funds:**  The Escrow Agent shall hold the Escrow Fund when received by it in accordance with the terms of this Agreement and the Purchase Agreement.  The Escrow Fund shall be paid in accordance with written instructions jointly executed by Seller and Purchaser or at the direction of the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy

Court"). Signed approval by Seller and Purchaser of settlement statements or other accounting of funds shall constitute the authority to Escrow Agent to disburse funds as shown thereon.

In the event of any disagreement between Seller and Purchaser resulting in conflicting instructions to, or adverse claims or demands upon the Escrow Agent with respect to the release of the Escrow Fund, the Escrow Agent shall refuse to comply with any such instruction, claim or demand so long as such disagreement shall continue, and in so refusing the Escrow Agent shall not release the Escrow Fund or make any other disposition of the Escrow Account, except Escrow Agent may interplead the Escrow Fund into the Bankruptcy Court. The Escrow Agent shall not be or become liable in any way to Purchaser or Seller for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands, and it shall be entitled to continue so to refrain from acting until such conflicting or adverse demands (a) shall have been adjusted by agreement and Escrow Agent shall have been notified in writing thereof by Purchaser and Seller or (b) shall have finally been determined by the Bankruptcy Court.

4.  **Limitations of Liability:** Escrow Agent shall not be liable for any loss or damage resulting from the following:

    a)  The effect of the transaction underlying this Escrow Agreement, including without limitation any defect in the title to the real estate, any failure or delay in the surrender of possession of the property, the rights or obligations of any party in possession of the property, the financial status or insolvency of any other party, and/or any misrepresentations of fact made by any other party;
    b)  The legal sufficiency of the document(s) purporting to transfer or otherwise encumber title to the real estate;
    c)  The default, error, act or failure to act by any other party to the transaction underlying this Escrow Agreement;
    d)  Any loss, loss of value or impairment of the Escrow Fund while in the course of collection or while on deposit in a depository institution if such loss, loss of value or impairment results from failure, insolvency or suspension of a depository institution;
    e)  Any delay in the electronic wire transfer of funds;
    f)  Any defects or conditions of title to any property that is the subject of the transaction underlying this Escrow Agreement provided, however, that this limitation of liability shall not affect the liability of Fidelity National Title Insurance Company under any title insurance policy which it has issued or may issue. NOTE: No title insurance liability is created by this Escrow Agreement;
    g)  The expiration of any time limit or other consequences of delay, absent receipt by the Escrow Agent of a properly executed escrow instruction instructing Escrow Agent to comply with said time limit;
    h)  Escrow Agent's compliance with any legal process including, but not limited to, subpoena, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

Furthermore, in its capacity as Escrow Agent, Escrow Agent shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it, and shall have no responsibility other than to faithfully follow the instructions contained herein and as jointly provided by Seller and Purchaser.

Escrow Agent is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and believed by Escrow Agent to have been signed by the proper person(s). Escrow Agent may assume that any person purporting to give any notice(s) hereunder and representing that they have authority to do so have been duly authorized to do so.

The Seller and Purchaser each release the Escrow Agent from any act done or omitted to be done by the Escrow Agent in good faith in the performance of its duties hereunder.

The terms of this section shall not be construed to limit Escrow Agent's liability for its own gross negligence or willful misconduct.

5.  **Accounting:** Escrow Agent shall account to the parties for all funds received and disbursed hereunder at the time of final settlement and full disbursement of the Escrow Fund. Escrow Agent shall not be liable for the accuracy of information furnished to it by other persons in the normal course of business, or the failure to adjust items not designated in writing. Adjustment items shall be prorated on the basis of a calendar year and a thirty-day month. Escrow Agent shall account for adjustments, credits and charges of expense items according to the custom and usage of the community. Upon disbursement of the Escrow Fund, Escrow Agent shall be released and discharged of its obligations hereunder.

6.  **Fees, Charges and/or Other Expenses:** Escrow Agent will be paid a fee of $__0__ for its services hereunder.  Additionally, in the event that the Escrow Fund is not fully disbursed within 12 months from the date of this Agreement, Escrow Agent will be paid an additional fee of $_0___ per month. All fees will be charged against the Escrow Fund and will be deducted at the time of final disbursement. Additional amounts which may become due for any reason shall be promptly paid to Escrow Agent by the party owing such amounts.

7.  **Applicability:** The conditions of this Escrow Agreement shall apply to and be for the benefit of agents, if any, of the Escrow Agent so employed by it for services in connection with the Agreement.

8.  **Attorneys' Fees:** In the event that litigation is initiated relating to this Escrow Agreement, or the underlying transaction, the parties hereto agree that Escrow Agent shall be held harmless from any and all attorneys' fees, court costs and expenses, unless the litigation arises as a result of Escrow Agent's gross negligence or willful misconduct. Purchaser and Seller agree to indemnify Escrow Agent, as set forth in Paragraph 9 below, for all such attorneys' fees, court costs and expenses. To the extent that Escrow Agent holds an Escrow Fund under the terms of this Agreement, the parties agree that the Escrow Agent may charge the Escrow Fund with any such attorneys' fees, court costs and expenses as they are incurred by the Escrow Agent.

9.  **Indemnification:** The Seller and the Purchaser shall jointly and severally indemnify, defend (with counsel acceptable to the Escrow Agent) and save harmless the Escrow Agent from and against all loss, cost, claim, liability, damage and expense, including reasonable attorneys' fees and disbursements incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or suffered by the Escrow Agent in bad faith, in willful disregard of this Escrow Agreement, or involving gross negligence on the part of the Escrow Agent (the "Indemnified Matters").  As between the Seller and Purchaser, the cost of such Indemnified Matters shall be shared equally, except to the extent Seller and Purchaser provide written agreement to Escrow Agent that costs shall be divided otherwise.

10. **Escrow Accommodations:** The parties to this Agreement acknowledge that the maintenance of escrow accounts with some depository institutions may result in Escrow Agent or its affiliates being provided with bank services, accommodations or other benefits by the depository institution. Escrow Agent or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution. All such services, accommodations and other benefits shall accrue to Escrow Agent or its affiliates, and Escrow Agent or its affiliates shall have no obligation to account to the parties to this Agreement for the value of such services, accommodation or other benefits.

11. **Controlling Law**: This Escrow Agreement shall be interpreted under the laws of the State of Delaware.

12. **Entire Agreement**: This Escrow Agreement contains the entire understanding between the parties hereto.  No variations, modifications or changes hereof shall be binding upon any party hereto unless set forth in a document duly executed by all parties hereto.

*[Signature Page Follow]*

**Seller: Specialty Retailers, Inc.**

By: *Elaine D. Crowley*
Name:   Elaine D. Crowley
Title:    Chief Restructuring Officer
Address for Notices:

Stage Stores, Inc.
PO Box 56627
Houston, TX 77256-6627

**Purchaser: Burke's DC TX, LLC**

By:  _____
Name:
Title:
Address for Notices:

_____

_____

**Fidelity National Title Insurance Company**

By:  _____
Name:
Title:
Address for Notices:
2701 Emerywood Parkway, Suite 200
Richmond, VA 23294

**Seller: Specialty Retailers, Inc.**

By: _____
Name:
Title:
Address for Notices:

_____

_____

**Purchaser: Burke's DC TX, LLC**

By: _____
Name:  Brian F. Crowley
Title:  Vice President
Address for Notices:

  PO Box 25207 _____

  Bradenton, FL 34206 _____


**Fidelity National Title Insurance Company**

By: _____
Name:
Title:
Address for Notices:
2701 Emerywood Parkway, Suite 200
Richmond, VA 23294

[Signature Page to Escrow Agreement]

**Seller: Specialty Retailers, Inc.**

By: _____

Name:

Title:

Address for Notices:

Stage Stores, Inc.

PO Box 56627

Houston, TX 77256-6627

**Purchaser: Burke's DC TX, LLC**

By: _____

Name:

Title:

Address for Notices:

_____

_____

**Fidelity National Title Insurance Company**

By: _____

Name: R. Chris Newman

Title: Commercial Title Officer

Address for Notices:

2701 Emerywood Parkway, Suite 200

Richmond, VA 23294

[Signature Page to Escrow Agreement]

EXHIBIT B

## SPECIAL WARRANTY DEED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER**

### SPECIAL WARRANTY DEED

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF _____ | § | |

THAT _____, a _____ ("***Grantor***"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD and CONVEYED and by these presents does GRANT, BARGAIN, SELL and CONVEY unto _____ ("***Grantee***"), subject to the Permitted Encumbrances (as defined below), that certain tract or parcel of land in _____ County, Texas more particularly described on **Exhibit A** attached to this deed and incorporated in it for all purposes, together with all rights, titles, and interests appurtenant thereto (such land and interests are hereinafter collectively referred to as the "***Property***"). In addition, Grantor hereby grants, sells and conveys to Grantee, all of Grantor's right, title and interest in and to (a) strips or gores, if any, between the Property and abutting properties, whether owned or claimed by deed, limitations or otherwise, and whether or not they are located inside or outside the Property, and (b) any land lying in or under the bed of any highway, avenue, street, road, alley, easement or right-of-way, open or proposed, in, on, across, abutting or adjacent to the Property and any and all awards made, or to be made in lieu thereof, for damage by reason of change in grade of any such highway, avenue, street, road, alley, easement, or right-of-way.

This Special Warranty Deed and the conveyance set out above is executed by Grantor and accepted by Grantee subject to the matters described in **Exhibit B** attached hereto and incorporated herein by this reference, to the extent the same are validly existing and applicable to the Property ("***Permitted Encumbrances***").

Grantor hereby assigns and transfers to Grantee all claims and causes of action arising from or relating to any Property Injury that may have occurred or originated prior to the date of this instrument. "***Property Injury***" means any injury, damage or loss in value to the Property, including without limitation, those arising from or related to any spill, leak or release of any hazardous or toxic substance (solid or otherwise), hazardous waste, pollutant, oil or petroleum product, or other solid, liquid or gaseous substance or product which is currently or hereinafter listed, regulated or designated by any state or federal governmental agency as toxic, hazardous or harmful.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto Grantee, its successors and assigns forever, and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the title to the Property unto said Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Grantor, but not otherwise, subject only to the Permitted Encumbrances.

Ad valorem taxes for the year 20__ having been prorated, Grantee, by its acceptance of this Special Warranty Deed, assumes payment thereof.

EXECUTED this the _____ day of _____, 20___.

<u>GRANTOR</u>:

_____,

_____

By:_____
Name:_____
Title:_____

STATE OF _____          §
                             §
COUNTY OF _____          §

     This instrument was acknowledged before me on this _____ day of _____, 20___, by _____, _____ of _____, a _____, on behalf of said _____.

_____

[SEAL]                       Notary Public in and for the
                             STATE OF _____

**<u>ADDRESS OF GRANTEE &</u>**
**<u>SEND TAX STATEMENTS TO</u>:**
_____
_____
_____
_____


**<u>AFTER RECORDING RETURN TO</u>:**
_____
_____
_____
_____

EXHIBIT A
TO
SPECIAL WARRANTY DEED

Description of the Property

Tract I (506 Beall Blvd.(a/k/a Bealls Blvd.), Jacksonville, TX)

All that certain lot, tract or parcel of land, being 27.554 acres in Block 27, Thomas Quevado Survey, A-44, Cherokee County, Texas, and being more particularly described as follows:

(1) 28.121 acres described in Warranty Deed from the Jacksonville Industrial, Foundation, Inc., a Texas Corporation to 3 Beall Brothers 3, Inc. dated November 6, 1984, recorded in Volume 935, page 761 of the Land Records of Cherokee County, Texas.

Save and Except: 0.893 acres described in Warranty Deed from 3 Beall Brothers 3, Inc., a Texas Corporation to S-TEN, Inc., a Texas Corporation, dated November 26, 1985, recorded in Volume 982, page 82 of the Land Records of Cherokee County, Texas.

And Save and Except: 0.8624 acres described in Warranty Deed from 3 Beall Brothers 3, Inc., to the City of Jacksonville for street, dated August 4, 1986, recorded in Volume 1014, page 741 of the Land Records of Cherokee County, Texas.

(2) 1.186 acres described in Warranty Deed from S-TEN, Inc., a Texas Corporation to 3 Beall Brothers 3, Inc., a Texas Corporation dated November 26, 1985, recorded in Volume 982, page 85 of the Land Records of Cherokee County, Texas.

Begin at axle found at the northeast corner of 28.121 acres,

Thence South 00 degrees 45 minutes 02 seconds East, with fence along the east line of 28.121 acres, 549.45 feet to 3/8" steel rod set at creosoted fence corner post.

Thence South 00 degrees 29 minutes East, with fence, 333.18 feet to 6" creosoted post set in concrete.

Thence South 00 degrees 19 minutes 23 seconds East, with fence, 100.00 feet to 3/8" steel rod set in concrete at old creosoted fence corner post.

Thence South 00 degrees 51 minutes 3S seconds East, with fence, 258.43 feet to axle found at the southeast corner of 28.121 acres

Thence South 89 degrees 18 minutes 35 seconds West, with old fence along the South line of 28.121 acres, 825.70 feet to 3/8" steel rod found at the southeast corner of Cecil Pond's 3.024 acres.

Thence North 00 degrees 26 minutes 25 seconds West, with the east line of said 3.024 acres, 209.41 feet to 3/8" steel rod found at the northeast corner of said 3.024 acres.

Thence North 00 degrees 14 minutes 49 seconds East, with the east line of 0.8624 acres conveyed to me City of Jacksonville, 60.00 feet to mark in concrete at the northeast corner of the same.

Thence North 89 degrees 40 minutes 46 seconds West, with the north line of 0.8624 acres, 626.07 feet to 3/8" steel rod at back of curb in the east margin of Elberta Street.

Thence North 00 degrees 14 minutes 49 seconds East, with the east margin of Elberta Street, 20.00 feet to 3/8" steel rod found at southwest corner of 0.893 acres sold to S-TEN, Inc.

Thence South 89 degrees 40 minutes 25 seconds East, with the south line of said 0.893 acres, 420.60 feet to 3/8" steel rod found bent at the southeast corner of said 0.893 acres.

Thence North 00 degrees 26 minutes 28 seconds West, with the east line of 0.893 acres, 96.80 feet to 3/8" steel rod found bent at the northeast corner of 0.893 acres.

Thence North 00 degrees 26 minutes 28 seconds West, with the west line of 1.186 acres conveyed by S-TEN, Inc., to 3 Beall Brothers 3, 252.72 feet to 3/8" steel rod found bent at the northwest corner of 1.186 acres and the southeast corner of 2.00 acres owned by Ten Quality Corporation.

Thence North 00 degrees 26 minutes 28 seconds West, with the east line of said 2.00 acres, 208.70 feet to 3/8" steel rod found at the northeast corner of the same.

Thence South 89 degrees 11 minutes 26 seconds West, at 208.71 feet pass 3/8" steel rod found and at 417.42 feet to 3/8" steel rod found in the east margin of Elberta Street.

Thence North 00 degrees 26 minutes 28 seconds West, with the east margin of Elberta Street, 60.00 feet to 3/8" steel rod found at the southwest corner of 5.00 acres sold to W.F.C. Company, Inc., DBA Warminster Fiberglass Company.

Thence North 89 degrees 11 minutes 26 seconds East, with the south line of said 5.00 acres 622.00 feet to Hurricane fence corner at the southeast corner of said 5.00 acres.

Thence North 00 degrees 26 minutes 34 seconds West, with Hurricane fence, 350.00 feet to 3/8" steel rod found at the northeast corner of said 5.00 acres in old fence, at the most northerly northwest corner of said 28.121 acres.

Thence with old fence along the north line of said 28.121 acres as follows;

North 89 degrees 11 minutes 15 seconds East, 187.25 feet;

North 89 degrees 13 minutes 58 seconds East, 322.93 feet;

South 86 degrees 44 minutes 21 seconds East, 311.29 feet to the place of beginning, containing 27.5544 acres.

Tract II (Beall Blvd., a/k/a Bealls Blvd., Jacksonville, TX)

All that certain tract or parcel of land situated in Block No. 27, Thomas Quevado Three League Grant, Abstract No. 44, Cherokee County, Texas, being all of that certain called 14 acre tract,

53

described in a Warranty Deed from Cecil J. Rhodes, Jr. and wife Martha J. Rhodes to Wesley Beard dated April 20, 1999, recorded in Volume 1421, Page 98 of the Real Property Records of Cherokee County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 3/8" iron rod found for the southwest corner of said Wesley Beard called 14 acre tract, and being in the east line of Martin Luther King Boulevard (also known as Elberta Street);

THENCE, North 00° 11' 42" West, with said east line of Martin Luther King Boulevard, a distance of 450.58 feet to a steel axle found for a corner of the herein described tract;

THENCE, South 89°42'11" East, a distance of 594.62 feet to a 3/8" iron rod found for a corner of the herein described tract;

THENCE, North 89°54'18" East, a distance of 34.13 feet to a 3/8" iron rod found for a corner of the herein described tract;

THENCE, North 89°18'35" East, a distance of 826.44 feet (same being the bearing basis of this survey as related to the record bearing as described in Volume 1527, Page 5 of said Real Property Records) to a steel axle found for the northeast corner of said Wesley Beard tract, same being the northeast corner of the herein described tract;

THENCE, South 00°36'40" East, a distance of 449.86 feet to a 3/8" iron rod found for the southeast corner of the herein described tract;

THENCE, South 89°41'54" West, a distance of 1458.41 feet to the POINT OF BEGINNING and containing 14.954 acres of land.

EXHIBIT C

<u>OWNER'S AFFIDAVIT</u>

## SELLER'S-BORROWER'S AFFIDAVIT AS TO
## DEBTS, LIENS, AND POSSESSION

GF No.:              SAT-41-4000412002218, issued by Fidelity National Title Insurance Company (the "Title Commitment")

PROPERTY:       506 Beall (a/k/a Bealls) Blvd., Jacksonville, TX

UNDERWRITER:  Fidelity National Title Insurance Company

STATE OF          TEXAS

COUNTY OF      <u>Cherokee</u>

Before me, the undersigned authority on this day personally appeared the undersigned, personally known to me to be the person whose name is subscribed hereto and upon his/her oath deposes and says and represents to Underwriter that he/she has knowledge of the facts contained herein, that he/she is authorized to make this affidavit, and further states that to the undersigned's actual knowledge:

1.  The undersigned has not received any written notice of unpaid debts for plumbing fixtures, water heaters, floor furnaces, air conditioners, radio or television antennae, carpeting, rugs, lawn sprinkling systems, venetian blinds, window shades, draperies, electric appliances, fences, street paving, or any personal property or fixtures that are located on the Property described above, and that no such items have been purchased on time payment contracts, and there are no security interest on such Property secured by financing statements, security agreements or otherwise except the following:  _____

      <u>Secured Party</u>                                            <u>Approximate Amount</u>

2.  The undersigned has not received any written notice of unpaid loans or liens (including Federal or State Liens and Judgments Liens) of any kind on such Property except the following:  _____

      <u>Creditor</u>                                                 <u>Approximate Amount</u>

      All labor and material used in the construction of improvements on the above described Property have been paid for and there are now no unpaid labor or material claims against the improvements or the property upon which same are situated EXCEPT:  _____

3.  There are no parties in possession of the Property (other than current owner) and no leases have been executed except pursuant to any exceptions shown on Schedule B to the Title Commitment and as follows:

4.  The undersigned has not received any written notice of unpaid fees for appraisals of the Property that are claimed, earned or payable, (whether arising out of any prior transaction or the current transaction), except as follows: _____

_____

5.  The undersigned has not received any written notice of unpaid broker's commissions or similar fees that are claimed, earned or payable with regard to the Property (whether arising out of any lease, prior transaction or the current transaction), except as follows:

_____

The undersigned has not received any written notice of unpaid paving liens of any kind or character or claims for paving outstanding against the above described property.

I/We further state:

This affidavit is made to Underwriter as an inducement to it to complete this transaction, and I/We realize that Underwriter is relying upon the representations contained herein; and the undersigned does hereby swear under the penalties of perjury that the foregoing information is true and correct in all respects.  I/We further covenant and agree with Underwriter forever fully to protect, defend and save harmless Underwriter from and against all loss, costs, damages, and attorney's fees and expenses of every kind and nature which it may suffer, expend or incur under or by reason, or in consequence of, reliance upon the representations herein.

*Signatures Follow*

Specialty Retailers, Inc., a Texas corporation, as
successor by merger to Specialty Retailers (TX) LP, a
Texas limited partnership

_____
Date

BY:_____

State of _____

_____ of _____

Subscribed and sworn to (or affirmed) before me on this _____, by _____ _____ as _____ of  Specialty  Retailers,  Inc.,  a  Texas corporation, as successor by merger to Specialty Retailers (TX) LP, a Texas limited partnership, a Texas corporation, on behalf of said corporation.

(Personalized Seal)

_____
Notary Public's Signature

59

EXHIBIT D

### BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment") is made and entered into this _____ day of _____, 2020 by and between _____ _____ ("Assignor"), and _____ ("Assignee"). All capitalized terms not defined herein shall have the meaning set forth in the Agreement.

R E C I T A L S:

WHEREAS, Assignor and Assignee entered into that certain Asset Purchase Agreement, dated _____, 2020, (the "Agreement"), for the purchase and sale of certain property located at 506 Beall Boulevard, Jacksonville, Texas, all appurtenances thereto and improvements thereon, permits related thereto, certain tangible and intangible personal property, and certain intellectual property; and

WHEREAS, in connection with the consummation of the transaction contemplated under the Agreement, Assignor and Assignee desire to execute this Assignment.

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Recitals.  The foregoing recitals are hereby incorporated in the body of this Assignment as if fully rewritten and restated herein.

2.      Intangible Personal Property; Personal Property. Assignor hereby sells, transfers and conveys unto Assignee, all right, title and interest in and to all of the Intangible Personal Property and all Personal Property, free and clear of all Encumbrances.  Except as provided in (and subject to the limitations of) the Agreement, the Intangible Personal Property and Personal Property are sold, transferred and conveyed by Assignor to Assignee (i) on an "AS-IS," "WHERE-IS," "WITH ALL FAULTS" basis, and (ii) without any warranties, representations or guaranties, either express or implied, of any kind, nature or type whatsoever, including, but not limited to, any warranty as to the fitness for a particular purpose or merchantability of the Personal Property.

3.      Permits. Assignor hereby sells, transfers and conveys unto Assignee, all right, title and interest in and to all of the rights, interests and benefits accruing under all Permits with respect to the Owned Real Property, and all pending applications therefor, free and clear of all Encumbrances. Except as provided in (and subject to the limitations of) the Agreement, the Permits are sold, transferred and conveyed by Assignor to Assignee (i) on an "AS-IS," "WHERE-IS," "WITH ALL FAULTS" basis, and (ii) without any warranties, representations or guaranties, either express or implied, of any kind, nature or type whatsoever.

4.      Intellectual Property. Assignor hereby sells, transfers and conveys unto Assignee, all right, title and interest in and to all Intellectual Property (and all goodwill associated therewith), all rights to collect royalties and proceeds in connection therewith with respect to the period from and after the Closing, all rights to sue and recover for past, present and future infringements, dilutions, misappropriations of, or other conflicts with, such Intellectual Property and any and all corresponding rights or Actions that, now or hereafter, may be secured throughout the world, free and clear of all Encumbrances. Except as provided in (and subject to the limitations of) the Agreement, the Intellectual Property is sold, transferred and conveyed by Assignor to Assignee (i) on an "AS-IS," "WHERE-IS," "WITH ALL FAULTS" basis, and (ii) without

any warranties, representations or guaranties, either express or implied, of any kind, nature or type whatsoever.

5.    <u>Assumption of Obligations</u>.  After the date hereof, Assignee hereby assumes and shall be responsible for and shall perform solely the Assumed Liabilities, to the extent such obligations first arise after the date hereof.

6.    <u>Counterparts</u>.  This Assignment may be executed in one or more identical counterparts, all of which, when taken together shall constitute one and the same instrument.

7.    <u>Governing Law</u>.  This Assignment shall be governed by and construed in accordance with the laws of the State of Texas.

8.    <u>Partial Invalidity</u>.  The provisions hereof shall be deemed independent and severable, and the invalidity or enforceability of any one provision shall not affect the validity or enforceability of any other provision hereof.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment on the date first above written.

ASSIGNOR:

_____

By: _____
Name: _____
Its: _____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

ASSIGNEE:

_____

By: _____
Name: _____
Its: _____

*Execution Version*

## AMENDMENT NO. 1
## TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (this "Amendment"), dated as of October 8, 2020, is made and entered into by and among Burke's DC TX, LLC, a Florida limited liability company ("Purchaser"), Bealls, Inc., a Florida corporation ("Parent"), Stage Stores, Inc., a Nevada corporation (the "Company"), and its Subsidiary, Specialty Retailers, Inc., a Texas corporation (together with the Company, the "Sellers"). Capitalized terms used but not defined herein shall have the meanings assigned to them in the Agreement (as defined below).

WHEREAS, reference is made to that certain Asset Purchase Agreement, dated as of October 4, 2020, between Purchaser, the Sellers and, solely for purposes of Section 10.20 thereof, Parent (the "Agreement"); and

WHEREAS, Purchaser and the Sellers desire to amend the Schedules and Exhibits pursuant to, and in accordance with, Section 10.5 of the Agreement as set forth herein.

NOW, THEREFORE, the Parties hereby agree as follows:

1.      Amendment to the Schedules and Exhibits.  Schedule 1.1(a) of the Disclosure Letter is hereby amended by removing the reference and related description to Tract III (1020 Willowcreek Dr., Jacksonville, TX) thereon.  Additionally, Exhibit A of the Deed attached to the Agreement as Exhibit B is hereby amended by removing the reference and related description to Tract III (1020 Willowcreek Dr., Jacksonville, TX) thereon.  For avoidance of doubt, the entirety of the Sellers Disclosure Letter and all other Schedules required by the Agreement are attached hereto as Attachment A.

2.      Effect of the Amendment.  Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement (including Exhibits) and the Schedules are and will remain in full force and effect and are hereby ratified and confirmed by Purchaser and the Sellers.  On and after the date hereof, each reference in the Agreement to "the Schedules," "thereunder," "thereof," "therein" or words of like import, and each reference to the Schedules in any other agreements, documents or instruments executed and delivered pursuant to, or in connection with, the Transaction Documents, will mean and be a reference to the Schedules as amended by this Amendment.

3.      Miscellaneous.  Sections 10.6, 10.9, 10.13, 10.14 and 10.15 of the Agreement are hereby incorporated herein by reference *mutatis mutandis*.

[*Signature pages follow.*]

**IN WITNESS WHEREOF,** the Parties have caused this Amendment to be executed by their duly authorized officers as of the date first above written.

**BURKE'S DC TX, LLC**

By:    _____

Name:  Brian Crowley

Title:   Authorized Signatory

**BEALLS, INC**

By:    _____

Name:  Brian Crowley

Title:   SVP & Chief Financial Officer

[Signature Page to Amendment No. 1 to Asset Purchase Agreement]

**IN WITNESS WHEREOF,** the Parties have caused this Amendment to be executed by their duly authorized officers as of the date first above written.

**STAGE STORES, INC.**

By: _Elaine D Crowley_

Name: Elaine D. Crowley

Title:   Chief Restructuring Officer

**SPECIALTY RETAILERS, INC.**

By: _Elaine D Crowley_

Name: Elaine D. Crowley

Title:   Chief Restructuring Officer

Attachment A

[see attached]

**FINAL VERSION**

## SELLER DISCLOSURE SCHEDULES

This Disclosure Letter is made and given pursuant to that certain Asset Purchase Agreement, dated as of October 4, 2020 (the "Agreement"), by and among Burke's DC TX, LLC, a Florida limited liability company ("Purchaser"), Stage Stores, Inc., a Nevada corporation (the "Company"), and its Subsidiary, Specialty Retailers, Inc., a Texas corporation (together with the Company, each a "Seller" and collectively "Sellers"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

Reference is made herein to Section 10.10 of the Agreement, which is incorporated herein for all purposes.

*[remainder of page intentionally blank]*

1

## Schedule 1.1(a)

## Land

Tract I (506 Beall Blvd.(a/k/a Bealls Blvd.), Jacksonville, TX)

All that certain lot, tract or parcel of land, being 27.554 acres in Block 27, Thomas Quevado Survey, A-44, Cherokee County, Texas, and being more particularly described as follows:

(1) 28.121 acres described in Warranty Deed from the Jacksonville Industrial, Foundation, Inc., a Texas Corporation to 3 Beall Brothers 3, Inc. dated November 6, 1984, recorded in Volume 935, page 761 of the Land Records of Cherokee County, Texas.

Save and Except: 0.893 acres described in Warranty Deed from 3 Beall Brothers 3, Inc., a Texas Corporation to S-TEN, Inc., a Texas Corporation, dated November 26, 1985, recorded in Volume 982, page 82 of the Land Records of Cherokee County, Texas.

And Save and Except: 0.8624 acres described in Warranty Deed from 3 Beall Brothers 3, Inc., to the City of Jacksonville for street, dated August 4, 1986, recorded in Volume 1014, page 741 of the Land Records of Cherokee County, Texas.

(2) 1.186 acres described in Warranty Deed from S-TEN, Inc., a Texas Corporation to 3 Beall Brothers 3, Inc., a Texas Corporation dated November 26, 1985, recorded in Volume 982, page 85 of the Land Records of Cherokee County, Texas.

Begin at axle found at the northeast corner of 28.121 acres,

Thence South 00 degrees 45 minutes 02 seconds East, with fence along the east line of 28.121 acres, 549.45 feet to 3/8" steel rod set at creosoted fence corner post.

Thence South 00 degrees 29 minutes East, with fence, 333.18 feet to 6" creosoted post set in concrete.

Thence South 00 degrees 19 minutes 23 seconds East, with fence, 100.00 feet to 3/8" steel rod set in concrete at old creosoted fence corner post.

Thence South 00 degrees 51 minutes 3S seconds East, with fence, 258.43 feet to axle found at the southeast corner of 28.121 acres

Thence South 89 degrees 18 minutes 35 seconds West, with old fence along the South line of 28.121 acres, 825.70 feet to 3/8" steel rod found at the southeast corner of Cecil Pond's 3.024 acres.

Thence North 00 degrees 26 minutes 25 seconds West, with the east line of said 3.024 acres, 209.41 feet to 3/8" steel rod found at the northeast corner of said 3.024 acres.

Thence North 00 degrees 14 minutes 49 seconds East, with the east line of 0.8624 acres conveyed to me City of Jacksonville, 60.00 feet to mark in concrete at the northeast corner of the same.

2

Thence North 89 degrees 40 minutes 46 seconds West, with the north line of 0.8624 acres, 626.07 feet to 3/8" steel rod at back of curb in the east margin of Elberta Street.

Thence North 00 degrees 14 minutes 49 seconds East, with the east margin of Elberta Street, 20.00 feet to 3/8" steel rod found at southwest corner of 0.893 acres sold to S-TEN, Inc.

Thence South 89 degrees 40 minutes 25 seconds East, with the south line of said 0.893 acres, 420.60 feet to 3/8" steel rod found bent at the southeast corner of said 0.893 acres.

Thence North 00 degrees 26 minutes 28 seconds West, with the east line of 0.893 acres, 96.80 feet to 3/8" steel rod found bent at the northeast corner of 0.893 acres.

Thence North 00 degrees 26 minutes 28 seconds West, with the west line of 1.186 acres conveyed by S-TEN, Inc., to 3 Beall Brothers 3, 252.72 feet to 3/8" steel rod found bent at the northwest corner of 1.186 acres and the southeast corner of 2.00 acres owned by Ten Quality Corporation.

Thence North 00 degrees 26 minutes 28 seconds West, with the east line of said 2.00 acres, 208.70 feet to 3/8" steel rod found at the northeast corner of the same.

Thence South 89 degrees 11 minutes 26 seconds West, at 208.71 feet pass 3/8" steel rod found and at 417.42 feet to 3/8" steel rod found in the east margin of Elberta Street.

Thence North 00 degrees 26 minutes 28 seconds West, with the east margin of Elberta Street, 60.00 feet to 3/8" steel rod found at the southwest corner of 5.00 acres sold to W.F.C. Company, Inc., DBA Warminster Fiberglass Company.

Thence North 89 degrees 11 minutes 26 seconds East, with the south line of said 5.00 acres 622.00 feet to Hurricane fence corner at the southeast corner of said 5.00 acres.

Thence North 00 degrees 26 minutes 34 seconds West, with Hurricane fence, 350.00 feet to 3/8" steel rod found at the northeast corner of said 5.00 acres in old fence, at the most northerly northwest corner of said 28.121 acres.

Thence with old fence along the north line of said 28.121 acres as follows;

North 89 degrees 11 minutes 15 seconds East, 187.25 feet;

North 89 degrees 13 minutes 58 seconds East, 322.93 feet;

South 86 degrees 44 minutes 21 seconds East, 311.29 feet to the place of beginning, containing 27.5544 acres.

Tract II (Beall Blvd., a/k/a Bealls Blvd., Jacksonville, TX)

All that certain tract or parcel of land situated in Block No. 27, Thomas Quevado Three League Grant, Abstract No. 44, Cherokee County, Texas, being all of that certain called 14 acre tract, described in a Warranty Deed from Cecil J. Rhodes, Jr. and wife Martha J. Rhodes to Wesley

Beard dated April 20, 1999, recorded in Volume 1421, Page 98 of the Real Property Records of Cherokee County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 3/8" iron rod found for the southwest corner of said Wesley Beard called 14 acre tract, and being in the east line of Martin Luther King Boulevard (also known as Elberta Street);

THENCE, North 00° 11' 42" West, with said east line of Martin Luther King Boulevard, a distance of 450.58 feet to a steel axle found for a corner of the herein described tract;

THENCE, South 89°42'11" East, a distance of 594.62 feet to a 3/8" iron rod found for a corner of the herein described tract;

THENCE, North 89°54'18" East, a distance of 34.13 feet to a 3/8" iron rod found for a corner of the herein described tract;

THENCE, North 89°18'35" East, a distance of 826.44 feet (same being the bearing basis of this survey as related to the record bearing as described in Volume 1527, Page 5 of said Real Property Records) to a steel axle found for the northeast corner of said Wesley Beard tract, same being the northeast corner of the herein described tract;

THENCE, South 00°36'40" East, a distance of 449.86 feet to a 3/8" iron rod found for the southeast corner of the herein described tract;

THENCE, South 89°41'54" West, a distance of 1458.41 feet to the POINT OF BEGINNING and containing 14.954 acres of land.

4

### Schedule 1.1(e)

### Personal Property

| | |
|---|---|
| Double pallet riders | 15 |
| Single rider | |
| Reach trucks | 3 |
| Order picker | 5 |
| Sit-down forklift | 9 |
| Stand-up forklift | 2 |
| Yard trucks | 2 |
| Day-cab tractor | 1 |
| Bailers | 3 |
| Boom lifts | 1 |
| Scissor lifts | 2 |
| Box truck | 1 |
| Registered over-the-road trailers | 10 |

| | |
|---|---|
| Slat Sorter | 2 |
| Tilt Sorter | 4 |
| GOH Sorter | 1 |
| Pouch sorter | 1 |
| PandA | 2 |

| | |
|---|---|
| Equipment Chargers | 39 |
| Pallet Jacks | 80 |
| Hand Trucks | 15 |
| Storage Trailers | 15 |

| Truck Listing By Vin # | | | | | |
|---|---|---|---|---|---|
| **Make** | | **VIN #** | **Truck Type** | **Title Found** | **Title Location** |
| Capacity | | 4LMBF21155L016241 | Yard Jockey | Yes | JAX |
| Capacity | | 4LMBF51167L018599 | Yard Jockey | Yes | JAX |
| International | | 1HTSDAAM0TH378462 | Box Truck | Yes | WLS |
| Freightliner | | 1DTV11523VA253972 | Day Cab Tractor Truck | No | TBD |

5

| OTR Trailers | Title Found | Title Location |
|---|---|---|
| **VIN #** | | |
| 1DW1A281125550402 | Yes | JAX |
| 1DTV11525WA265283 | Yes | JAX |
| 1DTV11525WA265235 | Yes | JAX |
| 1DTV11521WA265412 | Yes | JAX |
| 1DTV11522WA253029 | No | TBD |
| 1TV11522XTA247485 | Yes | JAX |
| 1DTV11523WA265217 | Yes | JAX |
| 1JJV532W$WL492413 | Yes | JAX |
| 1DTV11523VA253972 | Yes | JAX |
| 1DW1A281X25550401 | Yes | JAX |

| Storage Trailers | Title Found | Title Location |
|---|---|---|
| **VIN #** | | |
| 3AEVS5327WM011461 | No | N/A |
| 1H2V0532XTF050001 | No | N/A |
| 1DTV11W26HA177909 | No | N/A |
| 1UYVS25318P432809 | No | N/A |
| 1JSV532T3VL423765 | No | N/A |
| 1JJV532T0VL423657 | No | N/A |
| 1GRAA942XLS045303 | No | N/A |
| 1H2V04825GE032496 | No | N/A |
| 1DTV11529WA264685 | No | N/A |
| 1NNDA5322YM327096 | No | N/A |
| DTV11Z22KA189977 | Yes | WLS |
| 1DW1A4826RS849317 | Yes | WLS |
| T14827FB902012 | No | N/A |
| 1DTV11W25EA163480 | Yes | WLS |
| 1DTV11Z20MA199667 | Yes | WLS |

| Equipment Listing by Serial # | | |
|---|---|---|
| **Brand** | **Serial #** | **Machine Type** |
| Raymond | 8411210314 | Double Fork Lifts |
| Raymond | 8100661725 | Double Fork Lifts |
| Raymond | 8400670075 | Double Fork Lifts |
| Raymond | 8400664717 | Double Fork Lifts |
| Raymond | 8411210373 | Double Fork Lifts |
| Raymond | 8101187463 | Double Fork Lifts |
| Raymond | 8411421109 | Double Fork Lifts |
| Raymond | 8401187422 | Double Fork Lifts |
| Raymond | 8400664721 | Double Fork Lifts |
| Raymond | 8400666284 | Double Fork Lifts |
| Raymond | 8411421117 | Double Fork Lifts |

6

| | | |
|---|---|---|
| Raymond | 8400669408 | Double Fork Lifts |
| Raymond | 8400664381 | Double Fork Lifts |
| Toyota | 8HBE3041208 | Double Fork Lifts |
| Toyota | 6HBE3021512 | Double Fork Lifts |
| | | |
| JLG Lift | 895810300041831 | Boom Lift |
| | | |
| Genie | Style # GS1930 | Scizzor Lift |
| Genie | Style # GS2032 | Scizzor Lift |
| | | |
| Raymond | SA0203113 | Reach Truck - Man Up |
| Raymond | SA0203114 | Reach Truck - Man Up |
| Raymond | SB0601215 | Reach Truck - Man Up |
| | | |
| Raymond | RTW0502149 | Sit Down Fork Lifts |
| Raymond | RTW0502303 | Sit Down Fork Lifts |
| Raymond | RTW030401678 | Sit Down Fork Lifts |
| Raymond | 4451311619 | Sit Down Fork Lifts |
| Raymond | 4400810469 | Sit Down Fork Lifts |
| Raymond | 4451010082 | Sit Down Fork Lifts |
| Raymond | 4400710171 | Sit Down Fork Lifts |
| Raymond | 4451412161 | Sit Down Fork Lifts |
| Raymond | 4451210923 | Sit Down Fork Lifts |
| | | |
| Raymond | 74006CA5822 | Stand Up Fork Lifts |
| Toyota | 30465 | Stand Up Fork Lifts |
| | | |
| Raymond | 54008A07245 | Order Pickers |
| Raymond | 54008A07246 | Order Pickers |
| Raymond | EASI00AE26123 | Order Pickers |
| Raymond | EASI05AE36177 | Order Pickers |
| Raymond | EASI05AE36176 | Order Pickers |

## Schedule 3.3(a)

## Seller Conflicts

None.

**Schedule 3.3(b)**

**Seller Consents**

None.

## Schedule 3.5

## Insurance Policies

| Carrier | Coverage | Policy Number |
|---|---|---|
| Curotech Specialty, Inc. | All-Risk Property - Primary | CSXFQP0000104-00 |
| RSUI Group, Inc | All-Risk Property - Excess | LHD914943 |
| Arch Insurance Company | Business Auto | 41CAB0515804 |
| Arch Insurance Company | General Liability | 41GPP0515704 |
| Travelers Property Casualty Company Of America | Umbrella Liability | ZUP-16N51251-20-NF |
| Ace Property And Casualty Insurance Company | Excess Umbrella | XCQG71517123 002 |
| American Guarantee And Liability Insurance Company | Excess Umbrella | AEC0593761-01 |
| North American Specialty | Workers' Compensation (TX Non-Subscriber) | EPG1000026-11 |

10

## Schedule 3.9(a)

## Company Intellectual Property

<u>Trademarks</u>:  See attached.

<u>Domains</u>:  Schedule 11.1(p) is incorporated herein by reference.

<u>Social Media Accounts</u>:  Schedule 11.1(mm) is incorporated herein by reference.

SPECIALTY RETAILERS, INC
STATUS CHART OF TRADEMARK REGISTRATION AND APPLICATIONS

REGISTERED TRADEMARKS

| SERIAL NO. REG. NO. | MARK | FILING DATE REG. DATE | CLASS/ GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| 73/560,559 1,563,887 | **BEALLS** | 09/27/1985 10/31/1989 | Class 42 - Retail store services for clothing, shoes, jewelry, accessories, cosmetics and other soft goods | 10/31/2029 - Section 8 & 9 Renewal Due (cancellation pending) | * |
| 74/177,847 1,684,402 | **CAPE CLASSIC** | 06/20/1991 04/28/1992 | Class 14 – Jewelry | 04/28/2022 - Section 8 & 9 Renewal Due | |
| 86/248,192 4,742,049 | **CLUB 50 PLUS** | 04/10/2014 05/26/2015 | Class 35 – Retail store services in the field of clothing, shoes, fashion accessories and clothing accessories; administration of a program for enabling participants to obtain discounts on products, membership club services in the nature of providing discounts to members in the field of clothing, shoes and fashion accessories; customer loyalty program for commercial, promotional and/or advertising purposes | 05/26/2021 – Section 8 & 15 Renewal Due 05/26/2025 – Section 8 & 9 Renewal Due | |
| 75/876,367 2,548,132 | **𝓰** | 12/21/1999 03/12/2002 | Class 35 – Retail department store services | 03/12/2022 – Section 8 & 9 Renewal Due | ** |
| 75/865,607 2,640,229 | **G SOMETHING UNEXPECTED** | 12/06/1999 10/22/2002 | Class 35 – Retail department store services | 10/22/2022 – Section 8 & 9 Renewal Due | ** |
| 78/520,863 3,045,751 | **GIVE THE UNEXPECTED** | 11/22/2004 01/17/2006 | Class 35 – Retail department store services | 01/17/2026 – Section 8 & 9 Renewal Due | ** |
| 76/050,225 2,529,306 | **GOODY'S** | 05/17/2000 01/15/2002 | Class 35 – Retail clothing store services | 01/15/2022 – Section 8 & 9 Renewal Due | |
| 73/767,438 1,606,015 | **GOODY'S FAMILY CLOTHING** | 12/05/1988 07/10/1990 | Class 42 – Retail clothing store services | 07/10/2030 – Section 8 & 9 Renewal Due | |

12

| SERIAL NO.<br>REG. NO. | MARK | FILING DATE<br>REG. DATE | CLASS/<br>GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| 75/807,968<br>2,379,498 | **GORDMAN'S** | 09/27/1999<br>08/22/2000 | Class 35 – Retail department store services | 08/22/2020 – Section 8 & 9 Renewal Due (filed – acceptance from USPTO not yet received) | ** |
| 87/556,653<br>5,442,645 | **gRewards** | 08/04/2017<br>04/10/2018 | Class 35 – Retail store services featuring clothing, shoes, fashion accessories and clothing accessories; administration of a program for enabling participants to obtain discounts on products; membership club services in the nature of providing discounts to members in the field of clothing, shoes and fashion accessories; customer loyalty program for commercial promotional and/or advertising purposes | 04/10/2024 – Section 8 & 15 Due | |
| 73/660,672<br>1,475,067 | **HANNAH** | 05/14/1987<br>02/02/1988 | Class 25 – Women's ready to wear apparel, namely slacks, skirts, blouses, sweaters, jackets, coats, sleepwear, headwear, hosiery, shoes<br>Class 42 – Retail store services in the field of women's ready to wear apparel | 02/02/2028 – Section 8 & 9 Renewal Due | * |
| 74/516,578<br>2,657,455 | **IVY CREW** | 04/21/1994<br>12/10/2002 | Class 25 – Private label clothing, namely, men's shorts, pants, knit shirts and woven shirts sold in stores owned by applicant/registrant and its successors and assigns | 12/10/2022 – Section 8 & 9 Renewal Due | |
| 85/908,948<br>4,649,865 | **JINGLE BELL LANE** | 04/19/2013<br>12/02/2014 | Class 8 – Nutcrackers | 12/02/2020 – Section 8 & 15 Due<br>12/02/2024 – Section 8 & 9 Renewal Due | |
| 85/908,968<br>4,660,341 | **JINGLE BELL LANE** | 04/19/2013<br>12/23/2014 | Class 20 – Decorative pillows and picture frames | 12/23/2020 – Section 8 & 15 Due<br>12/23/2024 – Section 8 & 9 Due | |
| 85/908,978<br>4,660,342 | **JINGLE BELL LANE** | 04/19/2013<br>12/23/2014 | Class 21 – Beverage glassware, dinnerware, vases, vessels, bowls, plates, pots, decorative plates, napkin rings, collectible Santa and | 12/23/2020 – Section 8 & 15 Due<br>12/23/2024 – Section 8 & 9 Due | |

| SERIAL NO. REG. NO. | MARK | FILING DATE REG. DATE | CLASS/ GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| | | | angel figures of glass, porcelain and crystal, candle holders, crystal, namely, dinnerware and beverage ware | | |
| 85/909,011 4,660,343 | **JINGLE BELL LANE** | 04/19/2013 12/23/2014 | Class 28 – Decorative home décor and accessories featuring Santa, snowmen and reindeer; Christmas tree ornaments; Christmas tree skirts, Christmas stockings, Christmas tree toppers, Christmas stocking holders, artificial Christmas trees, water globes and ornamental Christmas decorations, namely, gingerbread houses and nativity scenes | 12/23/2020 – Section 8 & 15 Due 12/23/2024 – Section 8 & 9 Due | |
| 85/898,103 4,649,853 |  | 04/08/2013 12/02/2014 | Class 25 – Children's apparel and accessories Class 36 – Retail store services featuring children's apparel and accessories | 12/02/2020 – Section 8 & 15 Due 12/02/2024 – Section 8 & 9 Renewal Due | |
| 85/898,055 4,649,852 |  | 04/08/2013 12/02/2014 | Class 25 – Children's apparel and accessories Class 36 – Retail store services featuring children's apparel and accessories | 12/02/2020 – Section 8 & 15 Due 12/02/2024 – Section 8 & 9 Renewal Due | |
| 85/886,404 4,649,826 | **MAX & MINI** | 03/26/2013 12/02/2012 | Class 25 – Children's apparel and accessories | 12/02/2020 – Section 8 & 15 Due 12/02/2024 – Section 8 & 9 Renewal Due | |
| 76/033,731 2,561,162 | **MOUNTAIN LAKE** | 04/18/2000 04/16/2002 | Class 25 – Clothing, namely, dresses, shirts, pants, vests, jumpers, and loungewear pants and shirts | 04/16/2022 – Section 8 & 9 Renewal Due | |
| 75/744,174 2,785,222 | **PALAIS ROYAL** | 07/06/1999 11/25/2003 | Class 35 – Retail store services featuring men's, women's, children's and infant's clothing and accessories, head coverings, hats, caps, scarves, shoes, jewelry, hosiery, foundation garments, lingerie, watches, sunglasses, swim | 11/25/2023 – Section 8 & 9 Renewal Due | |

14

| SERIAL NO. REG. NO. | MARK | FILING DATE REG. DATE | CLASS/ GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| | | | wear, cosmetics, perfume, health and beauty aids, leather goods, wallets, handbags, candles, decorative accessories of crystal and glass, picture frames, and gift items | | |
| 73/657,539 1,492,322 | PEEBLES | 04/27/1987 06/14/1988 | Class 42 – Department store services | 06/14/2028 – Section 8 & 9 Renewal Due | |
| 74/073,162 1,769,352 | PRIVATE EXPRESSIONS | 06/27/1990 05/04/1993 | Class 25 – Women's lingerie, namely sleepwear, slips, panties, robes, loungewear, and hosiery | 05/04/2023 – Section 8 & 9 Renewal Due | |
| 75/882,619 2,821,443 | REBECCA MALONE | 12/28/1999 03/09/2004 | Class 25 – Women's clothing apparel; namely, blouses, pants, shirts, sweaters, jackets and knit tops | 03/09/2024 – Section 8 & 9 Renewal Due<br><br>Will be allowed to expire per Annette Hollingsworth 4-9-2020 | |
| 86/107,186 4,739,968 | RUSTIC BLUE | 10/31/2013 05/19/2015 | Class 25 – Young men's and boys' clothing and accessories, namely, knit tops, woven tops, knit bottoms, woven bottoms, denim tops, denim bottoms, coats, jackets, socks, sweaters, underwear, swimwear, belts, hats, and shoes | 05/19/2021 – Section 8 & 15 Due 5/29/2025 – Section 8 & 9 Renewal Due | |
| 74/391,027 2,072,046 | SIGNATURE STUDIO | 05/17/1993 06/17/1997 | Class 14 – Jewelry | 6/17/2027 – Section 8 & 9 Renewal Due | |
| 78/607,544 3,280,578 | SIGNATURE STUDIO | 04/13/2005 08/14/07 | Class 25 – Clothing, namely, tops, bottoms, dresses, skirts, sweaters, coats, capes, head wear, gloves, hosiery, sleepwear and lingerie | 08/14/2027 – Section 8 & 9 Renewal Due | |
| 86/478,789 4,838,271 | SIGNATURE STUDIO | 12/12/2014 10/20/2015 | Class 18 – Handbags | 10/20/2021 – Section 8 & 15 Due 10/20/2025 – Section 8 & 9 Renewal Due | |
| 78/150,793 2,721,561 | SOMETHING UNEXPECTED | 08/05/2002 06/03/2003 | Class 35 – Retail department store services | 06/03/2023 – Section 8 & 9 Renewal Due | ** |
| 87/223,020 5,362,648 | SPOT ON VALUE | 11/01/2016 12/26/2017 | Class 35 – Retail store services and on-line retail store services, both featuring value-priced clothing, fashion accessories, shoes, handbags, jewelry, watches, | 12/26/2023 – Section 8 & 15 Due | |

15

| SERIAL NO. REG. NO. | MARK | FILING DATE REG. DATE | CLASS/ GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| | | | housewares, cosmetics and fragrances | | |
| 73/660,706 1,525,762 | **STAGE** | 05/14/1987 02/21/1989 | Class 42 - Retail store services in the field of clothing, shoes and accessories | 02/21/2029 - Section 8 & 9 Renewal Due | * |
| 86/645,978 5,069,575 |  | 05/29/2015 10/25/2016 | Class 35 – Retail department store services and on-line retail department store services | 10/25/2022 – Section 8 & 15 Due | |
| 86/646,005 5,142,482 |  | 05/29/2015 11/14/2017 | Class 35 – Retail department store services and on-line retail department store services | 02/14/2023 – Section 8 & 15 Due | |
| 86/402,441 5,335,731 | **STYLE CIRCLE** | 09/22/2014 11/14/2017 | Class 35 – Retail store services in the field of clothing, shoes, fashion accessories and clothing accessories; administration of a program for enabling participants to obtain discounts on products; membership club services in the nature of providing discounts to members in the field of clothing, shoes and fashion accessories; customer loyalty program for commercial promotional and/or advertising purposes | 11/14/2023 – Section 8 & 15 Due | |
| 86/402,395 4,860,808 | **STYLE CIRCLE REWARDS** | 09/22/2014 11/24/2015 | Class 35 – Retail store services in the field of clothing, shoes, fashion accessories and clothing accessories; administration of a program for enabling participants to obtain discounts on products; membership club services in the nature of providing discounts to members in the field of clothing, shoes and fashion accessories; customer loyalty program for | 11/24/2021 – Section 8 & 15 Due 11/24/2025 – Section 8 & 9 Renewal Due | |

16

| SERIAL NO.<br>REG. NO. | MARK | FILING DATE<br>REG. DATE | CLASS/<br>GOODS & SERVICES | STATUS | LIENS |
|---|---|---|---|---|---|
| | | | commercial promotional and/or advertising purposes | | |
| 75/976,054<br>2,080,349 | **SUN RIVER CLOTHING CO.** | 01/04/1996<br>07/15/1997 | Class 25 – Clothing for adults namely, tops, bottoms, jeans, sweatshirts, slacks and shorts | 07/15/2027 - Section 8 & 9 Renewal Due | * |
| 85/374,698<br>4,177,006 | **VALERIE STEVENS** | 07/19/2011<br>07/17/2012 | Class 25 – Women's clothing, namely, blouses, knit tops, jackets, pants, Capri pants, dresses, sweaters, skirts | 07/17/2022 – Section 8 & 9 Renewal Due | |
| 86/484,874<br>4,838,287 | **VALERIE STEVENS** | 12/18/2014<br>10/20/2015 | Class 18 – Handbags | 10/20/2021 – Section 8 & 15 Due<br>10/20/2025 – Section 8 & 9 Renewal Due | |
| 77/868,649<br>3,887,766 | **WISHFUL PARK** | 11/09/2009<br>12/07/2010 | Class 25 – Clothing, namely, shorts, tops, jackets, sweaters, jeans and pants | 12/07/2020 – Section 8 & 9 Renewal Due | |
| 85/155,755<br>4,062,356 | **WISHFUL PARK** | 10/19/2010<br>11/29/2011 | Class 14- Costume jewelry, namely, necklaces, bracelets, earrings and rings | 11/29/2021 – Section 8 & 9 Due | |
| 76/217,340<br>2,515,145 | **Y.E.S. YOUR EVERYDAY SAVINGS** | 02/27/2001<br>12/04/2001 | Class 35 – Retail clothing store services | 12/04/2021 – Section 8 & 9 Renewal Due | |

All marks listed above are subject to a security interest recorded at the USPTO in favor of Wells Fargo Bank, NA dated August 3, 2018 (for which no release has been recorded).

* indicates marks also subject to a security interest recorded at the USPTO in favor of Citicorp USA, Inc. dated June 2, 2000 (for which no release has been recorded).

** indicates marks subject to a security interest recorded at the USPTO in favor of Wells Fargo Retail Finance, LLC. dated February 20, 2009 (for which no release has been recorded).

## **Schedule 3.12**

### **Brokers**

- A&G Real Estate Partners

- PJ Solomon

**Schedule 4.3(a)**

**Purchaser Conflicts**

None.

**Schedule 4.3(b)**

**Purchaser Consents**

None.

## **Schedule 4.5**

### **Brokers**

- ▪ Hilco IP Services, LLC dba Hilco Streambank

## Schedule 6.1

## Conduct of Business of Sellers

- Sellers may revise website landing pages and other social media accounts to reflect the store closures.

- Seller will not be required to defend the outstanding challenges filed by Purchaser to the BEALLS trademark.

**Schedule 11.1(p)**

**Domain Names**

| Domain Name | Expiration Date | Registrar |
|---|---|---|
| goodysonline.xxx | 12/10/2020 | GoDaddy |
| palaisroyalonline.xxx | 12/10/2020 | GoDaddy |
| peeblesonline.xxx | 12/10/2020 | GoDaddy |
| stageonline.xxx | 12/10/2020 | GoDaddy |
| stagestores.xxx | 12/10/2020 | GoDaddy |
| ssiemail.net | 1/25/2021 | Network Solutions |
| beallsmail.com | 1/26/2021 | Network Solutions |
| palaisroyalmail.com | 1/26/2021 | Network Solutions |
| peeblesmail.com | 1/26/2021 | Network Solutions |
| stagestoresmail.com | 1/26/2021 | Network Solutions |
| beallstxmail.com | 1/29/2021 | Network Solutions |
| stagestoresincmail.com | 1/29/2021 | Network Solutions |
| newstoreintownforyou.com | 2/2/2021 | Network Solutions |
| STYLECIRCLE.COM | 2/12/2021 | GoDaddy |
| goodysonline.com | 2/16/2021 | Network Solutions |
| gordmans.online | 3/10/2021 | Network Solutions |
| PALAISROYAL.BIZ | 3/14/2021 | GoDaddy |
| BEALLSTX.NET | 3/15/2021 | GoDaddy |
| STAGESTORES.ORG | 3/15/2021 | GoDaddy |
| gordmans.info | 4/8/2021 | Network Solutions |
| wishfulpark.info | 4/8/2021 | Network Solutions |
| beallsonline.com | 4/12/2021 | Network Solutions |
| promo-gordmans.com | 5/1/2021 | GoDaddy |
| peeblesuat.com | 5/11/2021 | Network Solutions |
| stageqa.com | 5/11/2021 | Network Solutions |
| stage.com | 6/3/2021 | Network Solutions |
| RSSTAGESTORES.COM | 6/5/2021 | GoDaddy |
| BEALLSDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| BEALLSGIFTCARDS.COM | 6/7/2021 | GoDaddy |
| BEALLSONLINESTORE.COM | 6/7/2021 | GoDaddy |
| BEALLSONLINESTORES.COM | 6/7/2021 | GoDaddy |
| GOODYSDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| GOODYSGIFTCARDS.COM | 6/7/2021 | GoDaddy |
| GOODYSONLINESTORE.COM | 6/7/2021 | GoDaddy |
| GOODYSONLINESTORES.COM | 6/7/2021 | GoDaddy |
| PALAISROYALDEPTSTORES.COM | 6/7/2021 | GoDaddy |

23

| | | |
|---|---|---|
| PALAISROYALONLINESTORE.COM | 6/7/2021 | GoDaddy |
| PALAISROYALONLINESTORES.COM | 6/7/2021 | GoDaddy |
| PEEBLESDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| PEEBLESONLINESTORE.COM | 6/7/2021 | GoDaddy |
| PEEBLESONLINESTORES.COM | 6/7/2021 | GoDaddy |
| SHOPBEALLSDEPARTMENTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPBEALLSDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPBEALLSSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPGOODYSDEPARTMENTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPGOODYSDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPGOODYSSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPALAISROYALDEPARTMENTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPALAISROYALDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPALAISROYALSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPEEBLESDEPARTMENTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPEEBLESDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPPEEBLESSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPSTAGEDEPARTMENTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPSTAGEDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| SHOPSTAGESTORES.COM | 6/7/2021 | GoDaddy |
| STAGEDEPTSTORES.COM | 6/7/2021 | GoDaddy |
| STAGEGIFTCARDS.COM | 6/7/2021 | GoDaddy |
| STAGEONLINESTORE.COM | 6/7/2021 | GoDaddy |
| STAGEONLINESTORES.COM | 6/7/2021 | GoDaddy |
| STEELESDEALS.COM | 6/17/2021 | GoDaddy |
| STEELESDEALS.NET | 6/17/2021 | GoDaddy |
| STEELESDEALS.ORG | 6/17/2021 | GoDaddy |
| stagestoresinc.com | 6/22/2021 | Network Solutions |
| JRSTEELES.COM | 6/24/2021 | GoDaddy |
| KJSTEELES.COM | 6/24/2021 | GoDaddy |
| goodysmail.com | 7/13/2021 | Network Solutions |
| STAGEORDERSTATUS.COM | 7/16/2021 | GoDaddy |
| E-BEALLSONLINE.COM | 7/27/2021 | GoDaddy |
| E-GOODYSONLINE.COM | 7/27/2021 | GoDaddy |
| E-PALAISROYAL.COM | 7/27/2021 | GoDaddy |
| E-PEEBLES.COM | 7/27/2021 | GoDaddy |
| E-STAGESTORES.COM | 7/27/2021 | GoDaddy |
| STEELESSTORES.COM | 7/27/2021 | GoDaddy |
| STEELESONLINE.COM | 8/17/2021 | GoDaddy |
| SHOPBEALLSTX.COM | 8/22/2021 | GoDaddy |
| SHOPBEALLSTX.NET | 8/22/2021 | GoDaddy |
| SHOPPALAISROYAL.COM | 8/22/2021 | GoDaddy |
| SHOPPALAISROYAL.NET | 8/22/2021 | GoDaddy |

| | | |
|---|---|---|
| SHOPPEEBLES.NET | 8/22/2021 | GoDaddy |
| BEALLSTX.BIZ | 8/26/2021 | GoDaddy |
| GOODYSONLINE.BIZ | 8/26/2021 | GoDaddy |
| GOODYSONLINE.US | 8/26/2021 | GoDaddy |
| SHOPGOODYS.BIZ | 8/26/2021 | GoDaddy |
| SHOPGOODYS.US | 8/26/2021 | GoDaddy |
| SHOPPEEBLES.BIZ | 8/26/2021 | GoDaddy |
| SHOPPEEBLES.US | 8/26/2021 | GoDaddy |
| SHOPSTAGE.BIZ | 8/26/2021 | GoDaddy |
| SHOPSTAGE.US | 8/26/2021 | GoDaddy |
| STAGESTORES.BIZ | 8/26/2021 | GoDaddy |
| STAGESTORESINC.BIZ | 8/26/2021 | GoDaddy |
| STAGESTORESINC.US | 8/26/2021 | GoDaddy |
| STAGESTORESINCMAIL.BIZ | 8/26/2021 | GoDaddy |
| STAGESTORESINCMAIL.US | 8/26/2021 | GoDaddy |
| STAGESTORESMAIL.BIZ | 8/26/2021 | GoDaddy |
| STAGESTORESMAIL.US | 8/26/2021 | GoDaddy |
| BEALLSTX.ORG | 8/27/2021 | GoDaddy |
| GOODYSONLINE.NET | 8/27/2021 | GoDaddy |
| SHOPGOODYS.NET | 8/27/2021 | GoDaddy |
| SHOPGOODYS.ORG | 8/27/2021 | GoDaddy |
| SHOPPEEBLES.ORG | 8/27/2021 | GoDaddy |
| SHOPSTAGE.ORG | 8/27/2021 | GoDaddy |
| STAGESTORES.NET | 8/27/2021 | GoDaddy |
| STAGESTORESINC.NET | 8/27/2021 | GoDaddy |
| STAGESTORESINC.ORG | 8/27/2021 | GoDaddy |
| STAGESTORESINCMAIL.NET | 8/27/2021 | GoDaddy |
| STAGESTORESINCMAIL.ORG | 8/27/2021 | GoDaddy |
| STAGESTORESMAIL.NET | 8/27/2021 | GoDaddy |
| STAGESTORESMAIL.ORG | 8/27/2021 | GoDaddy |
| promo-stagestores.com | 8/29/2021 | GoDaddy |
| stagestoresads.com | 9/2/2021 | Network Solutions |
| STYLECIRCLECOMMUNITY.COM | 9/5/2021 | GoDaddy |
| gordmans.org | 9/10/2021 | Network Solutions |
| palaisroyal.com | 9/18/2021 | Network Solutions |
| last-dash.com | 10/19/2021 | GoDaddy |
| BEALLSTXGIFTCARDS.COM | 10/19/2021 | GoDaddy |
| GOODYSONLINEGIFTCARDS.COM | 10/19/2021 | GoDaddy |
| PALAISROYALGIFTCARDS.COM | 10/19/2021 | GoDaddy |
| PEEBLESGIFTCARDS.COM | 10/19/2021 | GoDaddy |
| STAGESTORESGIFTCARDS.COM | 10/19/2021 | GoDaddy |
| beallstx.com | 10/23/2021 | Network Solutions |
| bcmoores.com | 10/25/2021 | Network Solutions |

| | | |
|---|---|---|
| PREMIERREWARDSDETAILS.COM | 10/26/2021 | GoDaddy |
| PREMIERREWARDSDETAILS.NET | 10/26/2021 | GoDaddy |
| stagestores.com | 11/10/2021 | Network Solutions |
| gordmans.com | 11/18/2021 | Network Solutions |
| gordmans.biz | 11/30/2021 | Network Solutions |
| gordmans.xxx | 12/1/2021 | Network Solutions |
| wishfulpark.biz | 12/14/2021 | Network Solutions |
| wishfulpark.cc | 12/14/2021 | Network Solutions |
| wishfulpark.com | 12/14/2021 | Network Solutions |
| wishfulpark.net | 12/14/2021 | Network Solutions |
| wishfulpark.org | 12/14/2021 | Network Solutions |
| peebles.com | 12/15/2021 | Network Solutions |
| onstagedeal.com | 4/5/2022 | Network Solutions |
| palaisroyalonline.com | 5/10/2022 | Network Solutions |
| stagestoresonline.com | 5/10/2022 | Network Solutions |
| peeblesonline.com | 6/19/2022 | Network Solutions |
| BEALLSFEEDBACK.COM | 7/28/2022 | GoDaddy |
| GOODYSFEEDBACK.COM | 7/28/2022 | GoDaddy |
| PALAISROYALFEEDBACK.COM | 7/28/2022 | GoDaddy |
| PEEBLESFEEDBACK.COM | 7/28/2022 | GoDaddy |
| STAGEFEEDBACK.COM | 7/28/2022 | GoDaddy |
| STYLECIRCLEREWARDS.COM | 7/28/2022 | GoDaddy |
| offstagestore.com | 10/4/2022 | GoDaddy |
| offstagestores.com | 10/4/2022 | GoDaddy |
| VOICESSURVEY.COM | 7/29/2025 | GoDaddy |

**Schedule 11.1(mm)**

**Social Media Accounts**

**Facebook**
Beallstx
Goodys
Gordmans
PalaisRoyal
Peebles
Stagestores

**Instagram**
@Gordmans
@shopbealls
@shopgoodys
@shoppalaisroyal
@shoppeebles
@Stage

**Pinterest**
BeallsTX
GoodysStores
gordmans
PeeblesStores
ShopPalaisRoyal
Stagestores

**Twitter**
@godmans
@ShopBealls
@ShopGoodys
@ShopPalaisRoayl
@ShopPeebles
@ShopeStageStores

**Youtube**
BeallsTX
Goodysonline
godmansstores
PalaisRoyalStores
PeeblesStores
StageStores